# Exhibit 5

MSMCH Loan No. 12-38089

## CONSOLIDATED, AMENDED AND RESTATED
## PROMISSORY NOTE

$11,500,000.00

New York, New York
May 9, 2012

THIS CONSOLIDATED, AMENDED AND RESTATED PROMISSORY NOTE is made by and among the undersigned 767 8TH AVENUE LLC, a Delaware limited liability company, SHERMAN MANAGEMENT LLC, a Delaware limited liability company, together as maker, each having an address at 302 West 47th Street, New York, New York 10036 (together, "Borrower"), and MORGAN STANLEY MORTGAGE CAPITAL HOLDINGS LLC, a New York limited liability company, as payee, having an address at 1585 Broadway, New York, New York 10036 ("Lender").

## RECITALS

A.     Lender is the holder of (a) those certain notes more particularly described in Exhibit A attached hereto (collectively, the "Original Note"), which Original Note was assigned to Lender and (b) that certain Gap Note also more particularly described in Exhibit A attached hereto (the "Gap Note").

B.     Borrower confirms that (a) the outstanding aggregate principal balance under the Original Note and the Gap Note as of the date hereof is $11,500,000.00 (b) the full principal amount has been advanced under the Original Note and the Gap Note, and (c) there are no offsets, advances, setoffs, defenses or counterclaims against payment of said amount.

C.     Lender and Borrower have agreed to consolidate the terms of the Original Note and the Gap Note, and in connection therewith, to amend and restate in their entirety the Original Note and the Gap Note upon the terms and conditions set forth herein.

NOW, THEREFORE, Lender and Borrower hereby agree to consolidate the Original Note and the Gap Note and thereafter to amend and restate in their entirety the Original Note and the Gap Note, as so consolidated (the Original Note and the Gap Note, as consolidated, amended and restated hereby, and as the same may be amended, restated, modified or extended from time to time, is hereinafter referred to as this "Note") as follows:

FOR VALUE RECEIVED, Borrower, on a joint and several basis, hereby unconditionally promises to pay to the order of Lender, or at such other place as the holder hereof may from time to time designate in writing, the principal sum of ELEVEN MILLION FIVE HUNDRED THOUSAND AND 00/100 DOLLARS ($11,500,000.00), in lawful money of the United States of America with interest thereon to be computed from the date of this Note at the Applicable Interest Rate (defined below) in accordance with the terms of this Note.

NJ01/FOLEB/165814.7

# ARTICLE I
## PAYMENT TERMS

Borrower agrees to pay sums under this Note in installments as follows:

(a)     on the date hereof, a payment of interest only with respect to the period commencing on the date hereof and ending on, and including, the ninth (9th) day of the month in which this Note is executed;

(b)     a constant payment of $67,899.57 on the tenth (10th) day of June, 2012 and on the tenth (10th) day of each calendar month thereafter up to and including the tenth (10th) day of April, 2022 (each, a "Payment Date"); each of the payments to be applied as follows: (i) first, to the payment of interest computed at the Applicable Interest Rate; and (ii) the balance toward the reduction of the principal sum; and

(c)     the balance of the principal sum and all interest thereon on the tenth (10th) day of May, 2022 (the "Maturity Date").

# ARTICLE II
## INTEREST

The interest rate on this Note is five and ten one-hundredths percent (5.10%) per annum (the "Applicable Interest Rate").  Interest on the principal sum of this Note shall be calculated by multiplying (a) the actual number of days elapsed in the period for which the calculation is being made by (b) a daily rate based on a three hundred sixty (360) day year (that is, the Applicable Interest Rate or the Default Rate, as then applicable, divided by 360) by (c) the outstanding principal balance.

# ARTICLE III
## DEFAULT AND ACCELERATION

Borrower covenants and agrees that if (a) any monthly installment of principal and/or interest due hereunder or any amount required to be deposited into the Reserves (as defined that certain Reserve and Security Agreement dated the date hereof between Borrower and Lender) is not paid when due, (b) any other portion of the Debt (defined below) is not paid when due (other than the payment due on the Maturity Date) and such non-payment referred to under this clause (b) continues for five (5) days following notice to Borrower that the same is due and payable or (c) the entire Debt is not paid on or before the Maturity Date or (d) any other Event of Default shall occur, then at the option of Lender (i) the whole of the principal sum of this Note, (ii) interest, default interest, late charges and other sums, as provided in this Note, the Security Instrument or the other Loan Documents, (iii) all other monies agreed or provided to be paid by Borrower pursuant to the terms of this Note, the Security Instrument or the other Loan Documents, (iv) all sums advanced pursuant to the Security Instrument to protect and preserve the Property (defined below) and the lien and the security interest created thereby, and (v) all sums advanced and costs and expenses incurred by Lender in connection with the Debt or any part thereof, any renewal, extension, or change of or substitution for the Debt or any part thereof, or the acquisition or perfection of the security therefor, whether made or incurred at the request of Borrower or Lender (all the sums referred to in (i) through (v) above shall collectively be

referred to as the "Debt") shall without notice become immediately due and payable. Whenever any payment to be made under this Note or under any other Loan Document shall be stated to be due on a day which is not a Business Day, the due date thereof shall be the Business Day immediately preceding such day. For purposes hereof, the term "Business Day" shall mean any day other than a Saturday, Sunday or any other day on which banks in New York, New York are not open for business.

## ARTICLE IV
## DEFAULT INTEREST

Borrower agrees that upon the occurrence of an Event of Default, Lender shall be entitled to receive and Borrower shall pay interest on the entire unpaid principal sum at a per annum rate equal to the lesser of (a) five percent (5%) plus the Applicable Interest Rate or (b) the maximum interest rate which Borrower may by law pay (the "Default Rate"). The Default Rate shall be computed from the occurrence of the default giving rise to such Event of Default (without regard to any notice or grace period) until the earlier of the date upon which the Event of Default is cured or the date upon which the Debt is paid in full. Interest calculated at the Default Rate shall be deemed part of the Debt and shall be deemed secured by the Security Instrument. This clause, however, shall not be construed as an agreement or privilege to extend the date of the payment of the Debt, nor as a waiver of any other right or remedy accruing to Lender by reason of the occurrence of any Event of Default.

## ARTICLE V
## LATE CHARGE

If any monthly installment payable under this Note is not paid when due, Borrower shall pay to Lender upon demand an amount equal to the lesser of five percent (5%) of such unpaid sum or the maximum amount permitted by applicable law to defray the expenses incurred by Lender in handling and processing the delinquent payment and to compensate Lender for the loss of the use of the delinquent payment and the amount shall be secured by the Security Instrument and the other Loan Documents.

## ARTICLE VI
## PREPAYMENT; DEFEASANCE

(a)     The principal balance of this Note may not be prepaid in whole or in part except as expressly permitted pursuant hereto.

(b)     Subject to compliance with and satisfaction of the terms and conditions of this Article VI and provided that no Event of Default exists, Borrower may elect to obtain a release (the "Release") of the Property from the lien of the Security Instrument on any Payment Date after the Lockout Period Expiration Date (defined below) by delivering to Lender, as security for the payment of all interest and principal due and to become due pursuant to this Note through the Maturity Date, plus the principal balance of this Note scheduled to be outstanding on the Maturity Date, Defeasance Collateral (defined below) sufficient to generate Scheduled Defeasance Payments (defined below) (the Release and the delivery of the Defeasance Collateral, a "Defeasance").

(c)     As a condition precedent to a Defeasance, and prior to any Release, Borrower shall have complied with all of the following:

(i)     Borrower shall provide not less than sixty (60) days prior written notice to Lender specifying a Payment Date upon which it intends to effect a Defeasance hereunder (the "Defeasance Date").

(ii)     All accrued and unpaid interest on the principal balance of this Note to and including the Defeasance Date, the scheduled amortization payment due on such Defeasance Date, and all other sums then due under this Note, the Security Instrument and the other Loan Documents, shall be paid in full on or prior to the Defeasance Date.

(iii)     Borrower shall execute and deliver to Lender any and all certificates, opinions, documents or instruments that a prudent lender originating mortgage loans for securitization similar to the Loan would require in connection with the Defeasance and Release, including, without limitation, a pledge and security agreement reasonably satisfactory to Lender creating a first priority lien on the Defeasance Collateral (a "Defeasance Security Agreement"). This Note shall thereafter be secured by the Defeasance Collateral delivered in connection with the Defeasance. After Defeasance, this Note cannot be prepaid in whole or in part or be the subject of any further Defeasance.

(iv)     Borrower shall have delivered to Lender an opinion of Borrower's counsel that would be satisfactory to a prudent lender stating (A) that the Defeasance Collateral and the proceeds thereof have been duly and validly assigned and delivered to Lender and that Lender has a valid, perfected, first priority lien and security interest in the Defeasance Collateral delivered by Borrower and the proceeds thereof, (B) that if the holder of this Note shall at the time of the Release be a REMIC (defined below), (1) the Defeasance Collateral has been validly assigned to the REMIC Trust which holds this Note (the "REMIC Trust"), (2) the Defeasance has been effected in accordance with the requirements of Treasury Regulation 1.860(g)-2(a)(8) (as such regulation may be amended or substituted from time to time) and will not be treated as an exchange pursuant to Section 1001 of the IRS Code and (3) the tax qualification and status of the REMIC Trust as a REMIC will not be adversely affected or impaired as a result of the Defeasance and (C) that the delivery of the Defeasance Collateral and the grant of a security interest therein to Lender shall not constitute an avoidable preference under Section 547 of the U.S. Bankruptcy Code or applicable state law. The term "REMIC" shall mean a "real estate mortgage investment conduit" within the meaning of Section 860D of the IRS Code. The term "IRS Code" shall mean the United States Internal Revenue Code of 1986, as amended, and the related Treasury Department regulations, including temporary regulations.

(v)     Borrower shall have delivered to Lender written confirmation from the Rating Agencies that such Defeasance will not result in a withdrawal, downgrade or qualification of the then current ratings by the applicable Rating Agencies of the Securities or Participations. If required by the Rating Agencies, Borrower shall, at

Borrower's expense, also deliver or cause to be delivered a non-consolidation opinion with respect to the Defeasance Obligor (defined below), if any, in form and substance that would be satisfactory to a prudent lender.

(vi)    Borrower shall have delivered to Lender a certificate given by Borrower's independent certified public accountant certifying that the Defeasance Collateral shall generate the Scheduled Defeasance Payments.

(d)    In connection with any Defeasance hereunder, Borrower shall transfer and assign all obligations, rights and duties under and to this Note and the Defeasance Security Agreement together with the pledged Defeasance Collateral to a newly-created successor entity, which entity shall be a single purpose, bankruptcy remote entity and which entity shall be designated or established by Lender, at Lender's option (the "Defeasance Obligor"). Lender shall also have the right to purchase on behalf of Borrower, or cause to be purchased on behalf of Borrower, the pledged Defeasance Collateral. Such rights to designate or establish the Defeasance Obligor as provided above or to purchase, or cause the purchase of, on behalf of Borrower the pledged Defeasance Collateral as provided above may be exercised by Morgan Stanley Mortgage Capital Holdings LLC ("MSMCH") in its sole discretion and shall be retained by MSMCH (and any successor or assign of MSMCH under a specific assignment of such retained rights separate and apart from a transfer or securitization of the Loan in whole or in part), notwithstanding any transfer or securitization of the Loan in whole or in part. Such Defeasance Obligor shall assume the obligations under the Note and any Defeasance Security Agreement and shall be bound by and obligated under Sections 3.1, 7.2, 7.4(a), 11.2, 11.7 and 14.2 and Articles XIII and XV of the Security Instrument; provided, however, that all references therein to "Property" or "Personal Property" shall be deemed to refer only to the Defeasance Collateral delivered to Lender, and Borrower shall be relieved of its obligations under such documents and, except with respect to any provisions therein which by their terms expressly survive a repayment, defeasance or other satisfaction of the Loan and/or a transfer of the Property in connection with Lender's exercise of its remedies under the Security Instrument and the other Loan Documents. Borrower shall pay a minimum of $1,000 to any such Defeasance Obligor as consideration for assuming such obligations under this Note and the Security Instrument. Borrower shall pay all costs and expenses incurred by Lender, including the cost of establishing the Successor Borrower and Lender's attorney's reasonable fees and expenses, incurred in connection therewith.

(e)    The following terms shall have the meaning set forth below:

(i)    The term "Defeasance Collateral" as used herein shall mean "government securities" as defined in Section 2(a)(16) of the Investment Company Act of 1940 and within the meaning of Treasury Regulation Section 1.860G-2(a)(8); provided, that, (A) such "government securities" are not subject to prepayment, call or early redemption, (B) to the extent that any REMIC Requirements (as defined in the Security Instrument) require a revised and/or alternate definition of "government securities" in connection with any defeasance hereunder, the foregoing shall be deemed amended in a manner commensurate therewith and (C) the aforesaid laws and regulations shall be deemed to refer to the same as may be and/or may hereafter be amended, restated, replaced or otherwise modified. Such Defeasance Collateral shall be duly endorsed by

the holder thereof as directed by Lender or accompanied by a written instrument of transfer in form and substance wholly satisfactory to Lender (including, without limitation, such instruments as may be required by the depository institution holding such securities or by the issuer thereof, as the case may be, to effectuate book-entry transfers and pledges through the book-entry facilities of such institution) in order to perfect upon the delivery of the Defeasance Collateral a first priority security interest therein in favor of the Lender in conformity with all applicable state and federal laws governing the granting of such security interests.  Borrower shall authorize and direct that the payments received from such obligations shall be made directly to Lender or Lender's designee and applied to satisfy the obligations of Borrower or, if applicable, the Defeasance Obligor, under this Note.

(ii)     The term "Scheduled Defeasance Payments" as used herein shall mean the scheduled payments of interest and principal in accordance with the terms of the Defeasance Collateral (without consideration of any reinvestment of interest therefrom), providing for payments prior, but as close as possible, to all successive Payment Dates after the Defeasance Date through and including the Maturity Date, and in amounts equal to or greater than the scheduled payments of interest and principal due under this Note, including the principal balance of this Note scheduled to be outstanding on the Maturity Date.

(iii)     The term "Lockout Period Expiration Date" shall mean the date which is the earlier of (A) the second anniversary of the date that is the "startup day," within the meaning of Section 860G(a) (9) of the IRS Code, of the REMIC Trust established in connection with the last issuance of Securities involving this Note or any portion hereof or (B) December 10, 2015.

(f)     Upon Borrower's compliance with all of the conditions to Defeasance and a Release set forth in this Article VI, Lender shall release the Property from the lien of the Security Instrument and the other Loan Documents.  All costs and expenses of Lender, third parties and the Rating Agencies incurred in connection with the Defeasance and Release, including, without limitation, the cost of establishing the Defeasance Obligor and Lender's counsel's fees and expenses, shall be paid by Borrower simultaneously with the delivery of the Release documentation.  Any revenue, documentary stamp or intangible taxes or any other tax or charge due in connection with the Defeasance shall be paid by Borrower simultaneously with the occurrence of any Defeasance.

(g)     If a Default Prepayment (defined below) occurs, Borrower shall pay to Lender the entire Debt, including, without limitation, an amount (the "Default Consideration") equal to the greater of (i) the amount (if any) which when added to the then outstanding principal amount of this Note will be sufficient to purchase Defeasance Collateral providing the required Scheduled Defeasance Payments assuming Defeasance would be permitted hereunder, or (ii) three percent (3%) of the Default Prepayment.  For purposes of this Note, the term "Default Prepayment" shall mean a prepayment of all or any portion of the principal amount of this Note made concurrently with or after the occurrence of any Event of Default or an acceleration of the Maturity Date under any circumstances, including, without limitation, a prepayment occurring in connection with reinstatement of the Security Instrument provided by statute under foreclosure

proceedings or exercise of a power of sale, any statutory right of redemption exercised by Borrower or any other party having a statutory right to redeem or prevent foreclosure, any sale in foreclosure or under exercise of a power of sale or otherwise.

        (h)     Notwithstanding anything to the contrary herein, Borrower may prepay the principal balance of this Note in whole, without premium or penalty, on any Payment Date during the three (3) months prior to the Maturity Date.  In addition, Borrower shall prepay without premium or penalty the principal balance of this Note in an amount equal to any insurance proceeds or condemnation awards which Lender elects to have applied to the Debt pursuant to Sections 3.6 and 3.7 of the Security Instrument or the amount required by Lender due to changes in tax and debt credit pursuant to Section 7.3 (a) or (b) of the Security Instrument (provided, however, that in the event any such prepayment pursuant to this sentence shall be made on a date other than a Payment Date, the amount so prepaid shall include all interest which would have accrued on such amount through the next Payment Date).  In each instance of prepayment permitted under this subparagraph (h), Borrower shall be required to pay all other sums due hereunder, and no principal amount repaid may be reborrowed.

## ARTICLE VII
## SECURITY

        This Note is secured by that certain Consolidated, Amended and Restated Fee and Leasehold Mortgage and Security Agreement dated the date hereof in the principal sum of $11,500,000.00 given by Borrower to (or for the benefit of) Lender covering the fee and leasehold estates of Borrower in certain premises located in New York County, State of New York, and other property, as more particularly described therein (collectively, the "Property") and intended to be duly recorded in said County (the "Security Instrument"), and by the other Loan Documents.

## ARTICLE VIII
## SAVINGS CLAUSE

        Notwithstanding anything to the contrary, (a) all agreements and communications between Borrower and Lender are hereby and shall automatically be limited so that, after taking into account all amounts deemed interest, the interest contracted for, charged or received by Lender shall never exceed the maximum lawful rate or amount, (b) in calculating whether any interest exceeds the lawful maximum, all such interest shall be amortized, prorated, allocated and spread over the full amount and term of all principal indebtedness of Borrower to Lender, and (c) if through any contingency or event, Lender receives or is deemed to receive interest in excess of the lawful maximum, any such excess shall be deemed to have been applied toward payment of the principal of any and all then outstanding indebtedness of Borrower to Lender, or if there is no such indebtedness, shall immediately be returned to Borrower.

## ARTICLE IX
## WAIVERS

        Borrower and all others who may become liable for the payment of all or any part of the Debt do hereby severally waive presentment and demand for payment, notice of dishonor,

notice of intention to accelerate, notice of acceleration, protest and notice of protest and non-payment and all other notices of any kind. No release of any security for the Debt or extension of time for payment of this Note or any installment hereof, and no alteration, amendment or waiver of any provision of this Note, the Security Instrument or the other Loan Documents made by agreement between Lender or any other Person or party shall release, modify, amend, waive, extend, change, discharge, terminate or affect the liability of Borrower, and any other Person who may become liable for the payment of all or any part of the Debt, under this Note, the Security Instrument or the other Loan Documents. No notice to or demand on Borrower shall be deemed to be a waiver of the obligation of Borrower or of the right of Lender to take further action without further notice or demand as provided for in this Note, the Security Instrument or the other Loan Documents. If Borrower is a partnership or limited liability company, the agreements herein contained shall remain in force and be applicable, notwithstanding any changes in the individuals comprising the partnership or limited liability company, and the term "Borrower," as used herein, shall include any alternate or successor partnership or limited liability company, but any predecessor partnership or limited liability company and their partners or members shall not thereby be released from any liability. If Borrower is a corporation, the agreements contained herein shall remain in full force and be applicable notwithstanding any changes in the shareholders comprising, or the officers and directors relating to, the corporation, and the term "Borrower," as used herein, shall include any alternative or successor corporation, but any predecessor corporation shall not be relieved of liability hereunder. (Nothing in the foregoing sentence shall be construed as a consent to, or a waiver of, any prohibition or restriction on transfers of interests in Borrower which may be set forth in the Security Instrument or any other Loan Document.)

## ARTICLE X
## WAIVER OF TRIAL BY JURY

**BORROWER HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER IN CONTRACT, TORT OR OTHERWISE, RELATING DIRECTLY OR INDIRECTLY TO THE LOAN EVIDENCED BY THIS NOTE, THE APPLICATION FOR THE LOAN EVIDENCED BY THIS NOTE, THIS NOTE, THE SECURITY INSTRUMENT OR THE OTHER LOAN DOCUMENTS OR ANY ACTS OR OMISSIONS OF LENDER, ITS OFFICERS, EMPLOYEES, DIRECTORS OR AGENTS IN CONNECTION THEREWITH.**

## ARTICLE XI
## EXCULPATION

(a)    Notwithstanding anything to the contrary contained in this Note, the Security Instrument or any other Loan Document (but subject to the provisions of subsections (b), (c) and (d) of this Article XI), Lender shall not enforce the liability and obligation of Borrower to perform and observe the obligations contained in this Note or the Security Instrument by any action or proceeding wherein a money judgment or any deficiency judgment or other judgment establishing any personal liability shall be sought against Borrower or any principal, director, officer, employee, beneficiary, shareholder, partner, member, trustee, agent or affiliate of Borrower or any Person owning, directly or indirectly, any legal or beneficial interest

8

in Borrower, or any successors or assigns of any of the foregoing (collectively, the "Exculpated Parties"), except that Lender may bring a foreclosure action, action for specific performance or other appropriate action or proceeding to enable Lender to enforce and realize upon this Note, the Security Instrument, the other Loan Documents, and the interest in the Property, the Rents and any other collateral given to Lender to secure this Note; provided, however, subject to the provisions of subsections (b), (c) and (d) of this Article XI, that any judgment in any such action or proceeding shall be enforceable against Borrower only to the extent of Borrower's interest in the Property, in the Rents and in any other collateral given to Lender to secure this Note. Lender, by accepting this Note and the Security Instrument, agrees that it shall not, except as otherwise provided in this Article XI, sue for, seek or demand any deficiency judgment against Borrower or any of the Exculpated Parties, in any such action or proceeding, under or by reason of or under or in connection with this Note, the Security Instrument or the other Loan Documents.  The provisions of this Article XI shall not, however, (i) constitute a waiver, release or impairment of any obligation evidenced or secured by this Note, the Security Instrument or the other Loan Documents delivered to Lender; (ii) impair the right of Lender to name Borrower as a party defendant in any action or suit for judicial foreclosure and sale under the Security Instrument; (iii) affect the validity or enforceability of any indemnity, guaranty, master lease or similar instrument made in connection with this Note, the Security Instrument, or the other Loan Documents; (iv) impair the right of Lender to obtain the appointment of a receiver; (v) impair the enforcement of the Assignment of Leases and Rents executed in connection herewith; (vi) impair the right of Lender to enforce the provisions of the environmental indemnity agreement executed in connection with the Loan, Section 12.2 of the Security Instrument or of Section 3.12(e) of the Security Instrument; or (vii) impair the right of Lender to obtain a deficiency judgment or other judgment on the Note against Borrower if necessary to fully realize the security granted by the Security Instrument or to commence any other appropriate action or proceeding in order for Lender to exercise its remedies against the Property.

(b)     Notwithstanding the provisions of this Article XI to the contrary, Borrower shall be personally liable to Lender for the Losses (as defined in the Security Instrument) Lender incurs due to: (i) fraud or intentional misrepresentation by Borrower, any of the Exculpated Parties or Guarantor (which for the purposes of this Note shall also include Indemnitor), in connection with the Loan; (ii) the gross negligence or willful misconduct of Borrower, any of the Exculpated Parties, or Guarantor; (iii) physical waste to the Property caused by the intentional acts or intentional omissions of Borrower, any Exculpated Party, or Guarantor, or the removal or disposal of any portion of the Property after an Event of Default; (iv) Borrower's misapplication, misappropriation or conversion of Rents received by Borrower, any Exculpated Party or Guarantor after the occurrence of an Event of Default; (v) the misapplication, misappropriation or conversion of tenant security deposits or Rents collected in advance whether by Borrower, any or the Exculpated Parties or Guarantor; (vi) the misapplication, misappropriation or conversion of insurance proceeds or condemnation awards; (vii) failure to pay taxes for the Property and/or insurance premiums as required under the terms of the Security Instrument; (viii) Personal Property (as defined in the Security Instrument) taken from the Property by or on behalf of Borrower, any of the Exculpated Parties or any guarantor or indemnitor and not replaced with Personal Property of the same utility and of the same or greater value; (ix) any act of arson by Borrower, any of the Exculpated Parties or Guarantor; (x) any fees or commissions paid by Borrower or on behalf of Borrower after the occurrence of an Event of Default to any Exculpated Party or Guarantor in violation of the terms of this Note, the Security

Instrument or the other Loan Documents; (xi) failure to pay charges for labor or materials or other charges that create liens on any portion of the Property (provided that there exists sufficient cash flow from the Property to do so); (xii) any security deposits, advance deposits or any other deposits collected with respect to the Property not being delivered to Lender upon a foreclosure of the Property or action in lieu thereof, except to the extent any such security deposits were applied in accordance with the terms and conditions of any of the Leases (as defined in the Security Instrument) prior to the occurrence of the Event of Default that gave rise to such foreclosure or action in lieu thereof; (xiii) any failure by Borrower to permit on-site inspections of the Property as required by the Security Instrument and/or the other Loan Documents after the occurrence and during the continuance of an Event of Default; (xiv) any failure of Borrower to appoint a new property manager upon the request of Lender as required by the terms of the Security Instrument and/or the other Loan Documents after the occurrence and during the continuance of an Event of Default;  (xv) the breach of, or failure to comply with, the representations, warranties and covenants contained in Sections 5.8(b), 5.19, 13.1-13.3, 18.2 or Article XII of the Security Instrument and/or the environmental indemnity agreement executed in connection herewith; (xvi) any litigation or other legal proceeding related to the Debt filed by Borrower or Guarantor that delays, opposes, impedes, obstructs, hinders, enjoins or otherwise interferes with or frustrates the efforts of Lender to exercise any rights and remedies available to Lender as provided herein, the Security Instrument and/or the other Loan Documents (collectively, "**Opposition Action**"); provided, however, Borrower shall have no liability pursuant to this clause (xvi) if a court of competent jurisdiction, in a final non-appealable decision, finds in favor of the defenses or opposition raised by Borrower or Guarantor in such Opposition Action and issues a permanent injunction against Lender's non-judicial foreclosure which does not allow Lender to foreclose on the liens created by the Mortgage; provided further, however, nothing herein shall affect Borrower or Guarantor's right in good faith to contest the (A) existence of any underlying Event of Default, or (B) the existence of Borrower or Guarantor personal liability and in such event, Borrower shall have no liability pursuant to this clause (xvi); (xvii) the seizure or forfeiture of the Property, or any portion thereof, or Borrower's interest therein, resulting from criminal wrongdoing by Borrower, any of the Exculpated Parties or Guarantor; (xviii) any failure of Borrower to make the Condemnation Payment (as defined in the Security Instrument), if required, pursuant to Section 3.7(j) of the Security Instrument; (xix) any amendment, modification or termination of the Franchise Agreement without the prior written consent of Lender; and/or (xx) Borrower fails to provide financial information to Lender as required by Section 3.12 of the Security Instrument.

        (c)    Notwithstanding the foregoing, the agreement of Lender not to pursue recourse liability as set forth in subsection (a) above SHALL BECOME NULL AND VOID and shall be of no further force and effect and the Debt shall be fully recourse to Borrower in the event that: (i) the first full monthly payment of principal and interest under this Note is not paid when due; (ii) Borrower fails to comply with any provision of Sections 4.2 and/or 4.3 of the Security Instrument; (iii) an Event of Default occurs under Article VIII of the Security Instrument; (iv) Borrower fails to comply with that certain Cash Management Agreement of even date herewith made by and among Borrower, Lender and Sherman Management LLC; (v) Borrower or any SPC Party files a voluntary petition under the Bankruptcy Code or any other federal or state bankruptcy or insolvency law; (vi) an affiliate, officer, director, or representative which controls, directly or indirectly, Borrower or any SPC Party, files, or joins in the filing of, an involuntary petition against Borrower or any SPC Party under the Bankruptcy Code or any

other federal or state bankruptcy or insolvency law, or solicits or causes to be solicited petitioning creditors for any involuntary petition against Borrower or any SPC Party from any Person; (vii) Borrower or any SPC Party files an answer consenting to or otherwise acquiescing in or joining in any involuntary petition filed against it, by any other Person under the Bankruptcy Code or any other federal or state bankruptcy or insolvency law, or solicits or causes to be solicited petitioning creditors for any involuntary petition from any Person; (viii) any affiliate, officer, director, or representative which controls Borrower or any SPC Party consents to or acquiesces in or joins in an application for the appointment of a custodian, receiver, trustee, or examiner for Borrower or any SPC Party or any portion of the Property; (ix) Borrower or any SPC Party makes an assignment for the benefit of creditors, or admits, in writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due; (x) there is substantive consolidation of Borrower or any Restricted Party with any other Person in connection with any federal or state bankruptcy proceeding involving a guarantor or indemnitor or any of its/their affiliates, (xi) Borrower or any Restricted Party contests or opposes any motion made by Lender to obtain relief from the automatic stay or seeks to reinstate the automatic stay in the event of any federal or state bankruptcy or insolvency proceeding involving Guarantor or any of its/their affiliates; (xii) Borrower or any Restricted Party accepts from any guarantor or indemnitor or Guarantor solicits or provides any debtor-in-possession financing to Borrower in the event Borrower or any Restricted Party is the subject of a bankruptcy or insolvency proceeding; or (xiii) the Ground Lease is terminated, cancelled or otherwise ceases to exist or the Ground Lease is amended or modified, in any such event without the prior written consent of Lender. For purposes hereof, "Restricted Party" shall mean any SPC Party, any Exculpated Party, Guarantor, any property manager affiliated with any of the foregoing and any shareholder, partner, member or non-member manager, or any direct or indirect legal or beneficial owner of Borrower, any SPC Party, Guarantor, any such affiliated property manager or any non-member manager. For purposes hereof, "SPC Party" shall mean Borrower's general partner(s), if Borrower is a partnership, or its managing member(s), if Borrower is a limited liability company.

(d)      Nothing herein shall be deemed to be a waiver of any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provision of the Bankruptcy Code to file a claim for the full amount of the indebtedness secured by the Security Instrument or to require that all collateral shall continue to secure all of the indebtedness owing to Lender in accordance with this Note, the Security Instrument and the other Loan Documents.

## ARTICLE XII
## AUTHORITY

Borrower (and the undersigned representative of Borrower, if any) represents that Borrower has full power, authority and legal right to execute and deliver this Note, the Security Instrument and the other Loan Documents and that this Note, the Security Instrument and the other Loan Documents constitute valid and binding obligations of Borrower.

## ARTICLE XIII
## GOVERNING LAW

This Note shall be governed, construed, applied and enforced in accordance with the laws of the state in which the Property is located.

## ARTICLE XIV
## TRANSFER

Upon the transfer of this Note, Borrower hereby waiving notice of any such transfer, Lender may deliver all the collateral mortgaged, granted, pledged or assigned pursuant to the Loan Documents, or any part thereof, to the transferee who shall thereupon become vested with all the rights herein or under applicable law given to Lender with respect thereto, and Lender shall thereafter forever be relieved and fully discharged from any liability or responsibility in the matter; but Lender shall retain all rights hereby given to it with respect to any liabilities and the collateral not so transferred.

## ARTICLE XV
## NOTICES

All notices required or permitted hereunder shall be given as provided in the Security Instrument.

## ARTICLE XVI
## INCORPORATION BY REFERENCE

All of the terms, covenants and conditions contained in the Security Instrument and the other Loan Documents are hereby made part of this Note to the same extent and with the same force as if they were fully set forth herein. Capitalized terms not otherwise defined herein shall have the meaning set forth in the Security Instrument.

## ARTICLE XVII
## COMPONENT NOTES

Lender, without in any way limiting Lender's other rights hereunder, in its sole and absolute discretion, shall have the right at any time to require Borrower to execute and deliver "component" notes (including senior and junior notes), which notes may be paid in such order of priority as may be designated by Lender, provided that (i) the aggregate principal amount of such "component" notes shall equal the outstanding principal balance of the loan evidenced by this Note immediately prior to the creation of such "component" notes, (ii) the weighted average interest rate of all such "component" notes shall on the date created equal the interest rate which was applicable to the loan evidenced by this Note immediately prior to the creation of such "component" notes, (iii) the debt service payments on all such "component" notes shall on the date created equal the debt service payment which was due under the loan evidenced by this Note immediately prior to the creation of such component notes and (iv) the other terms and provisions of each of the "component" notes shall be identical in substance and substantially similar in form to this Note. Borrower, at its cost and expense (including, without limitation, the reasonable fees of Lender's counsel), shall cooperate with all reasonable requests of Lender in order to establish the "component" notes and shall execute and deliver such documents as shall reasonably be required by Lender and any Rating Agency in connection therewith, all in form and substance reasonably satisfactory to Lender and any Rating Agency, including, without limitation, the severance of security documents if requested. In the event Borrower fails to execute and deliver such documents to Lender within five (5) business days

following such request by Lender, Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect such transactions, Borrower ratifying all that such attorney shall do by virtue thereof.

It shall be an Event of Default under this Note, the Security Instrument and the other Loan Documents if Borrower fails to comply with any of the terms, covenants or conditions of this Article XVII after the expiration of ten (10) business days after notice thereof.

## ARTICLE XVIII
## MISCELLANEOUS

(a)     Wherever pursuant to this Note it is provided that Borrower pay any costs and expenses, such costs and expenses shall include, but not be limited to, any fees paid to any special servicers of the Note and all legal fees and disbursements of Lender, whether with respect to retained firms, the reimbursement for the expenses of in-house staff, or otherwise.  Borrower shall pay to Lender on demand any and all expenses, including legal expenses and reasonable attorneys' fees and including, without limitation, loan servicing or special servicing fees, loan advances, and "work-out" and/or liquidation fees, incurred or paid by Lender in enforcing this Note, whether or not any legal proceeding is commenced hereunder, together with interest thereon at the Default Rate from the date paid or incurred by Lender until such expenses are paid by Borrower.

(b)     This Note may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

(c)     If Borrower consists of more than one Person, the obligations and liabilities of each Person shall be joint and several.

(d)     Whenever used, the singular number shall include the plural, the plural number shall include the singular, and the words "Lender" and "Borrower" shall include their respective successors, assigns, heirs, executors and administrators.

(e)     This Note may be executed in counterparts, each of which shall be deemed an original, and all of which together shall constitute one instrument.


[NO FURTHER TEXT ON THIS PAGE]

IN WITNESS WHEREOF, Borrower and Lender have duly executed this Note as of the day and year first above written.

**BORROWER**:

767 8TH AVENUE LLC,
a Delaware limited liability company

By:    767 Holding Corp.,
        a New York corporation,
        its sole member and manager

        By: _____
        Name:  Joginder Y. Sharma
        Title:  President

SHERMAN MANAGEMENT LLC,
a Delaware limited liability company

By:    Sherman Equities Inc.,
        a New York corporation,
        its sole member and manager

        By: _____
        Name:  Joginder Y. Sharma
        Title:  President

**LENDER**:

MORGAN STANLEY MORTGAGE CAPITAL
HOLDINGS LLC, a New York limited liability
company

By: _____
Name:
Title:

[Signature page to Consolidated, Amended and Restated Promissory Note]

NJ01/FOLEB/165814

IN WITNESS WHEREOF, Borrower and Lender have duly executed this Note as of the day and year first above written.

**BORROWER**:

767 8TH AVENUE LLC,
a Delaware limited liability company

By:    767 Holding Corp.,
        a New York corporation,
        its sole member and manager


        By: _____
        Name:  Joginder Y. Sharma
        Title:  President


SHERMAN MANAGEMENT LLC,
a Delaware limited liability company

By:    Sherman Equities Inc.,
        a New York corporation,
        its sole member and manager


        By: _____
        Name:  Joginder Y. Sharma
        Title:  President

**LENDER**:

MORGAN STANLEY MORTGAGE CAPITAL
HOLDINGS LLC, a New York limited liability
company

By: _____
Name:
Title:         Cynthia Eckes
           Authorized Signatory


[Signature page to Consolidated, Amended and Restated Promissory Note]

## Exhibit A

### Original Note and Gap Note

1. Promissory Note dated April 4, 2008 in the amount of $11,500,000.00 from 767 8th Avenue LLC ("767") and Sherman Management LLC ("Sherman"), jointly, as borrower and North Hill Funding of New York, LLC ("North Hill") as lender.

2. Replacement Promissory Note (Note A) (Replaces Note 1 above in part) dated July 20, 2009 in the amount of $8,950,000.00 from 767 and Sherman, jointly, as borrower and North Hill as lender together with Allonge dated July 20, 2009 assigning said note to Madison National Bank ("Madison").

3. Restated Replacement Mortgage Note dated July 20, 2009 the amount of $8,950,000.00 from 767 and Sherman, jointly, as borrower and Madison as lender together with Allonge dated May 3, 2012 assigning said note to Morgan Stanley Mortgage Capital Holdings LLC ("Morgan Stanley").

4. Replacement Promissory Note (Note B) (Replaces Note 1 above in part) dated July 20, 2009 in the amount of $2,500,000.00 from 767 and Sherman, jointly, as borrower and North Hill as lender together with Allonge dated July 20, 2009 assigning said note to Omni Vertex, Incorporated ("Omni").

5. Restated Replacement Mortgage Note dated July 20, 2009 the amount of $2,500,000.00 from 767 and Sherman, jointly, as borrower and Omni as lender together with Allonge dated May 8, 2012 assigning said note to Morgan Stanley.

6. Gap Note dated May 9, 2012 in the amount of $599,510.14 from 767 and Sherman, jointly, as borrower and Morgan Stanley, as lender.