# Exhibit 6

| NYC DEPARTMENT OF FINANCE OFFICE OF THE CITY REGISTER |  |
|---|---|
| This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument. The information on this page will control for indexing purposes in the event of any conflict with the rest of the document. | **2012051601218004001EBB1F** |

| RECORDING AND ENDORSEMENT COVER PAGE | | PAGE 1 OF 78 |
|---|---|---|
| **Document ID:** 2012051601218004 | Document Date: 05-09-2012 | Preparation Date: 05-16-2012 |

Document Type: AGREEMENT
Document Page Count: 76

| PRESENTER: | RETURN TO: |
|---|---|
| TO BE PICKED UP BY COMMONWEALTH COMMONWEALTH LAND TITLE INSURANCE CO. 140 EAST 45TH STREET, 22ND FLOOR NEW YORK, NY 10017 212-949-0100 gregoryshaw@cltic.com/NY120258M | PICK UP BY COMMONWEALTH KELLEY DRYE & WARREN LLP 200 KIMBALL DRIVE PARSIPPANY, NJ 07054 Attn: Stephen G. Hauck, Esq, |

## PROPERTY DATA

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 1037 | 36 | Entire Lot | 767 8 AVENUE |

**Property Type:** COMMERCIAL REAL ESTATE

## CROSS REFERENCE DATA

Document ID: 2012051601218001
x  Additional Cross References on Continuation Page

## PARTIES

| PARTY 1: | PARTY 2: |
|---|---|
| 767 8TH AVENUE LLC 302 WEST 47TH STREET NEW YORK, NY 10036 | MORGAN STANLEY MORTGAGE CAPITAL HOLDINGS LLC 1585 BROADWAY, 10TH FLOOR NEW YORK, NY 10036 |

x  Additional Parties Listed on Continuation Page

## FEES AND TAXES

| Mortgage | | | Filing Fee: | | |
|---|---|---|---|---|---|
| Mortgage Amount: | $ | 11,500,000.00 | | $ | 0.00 |
| Taxable Mortgage Amount: | $ | 0.00 | NYC Real Property Transfer Tax: | | |
| Exemption: | | 255 | | $ | 0.00 |
| TAXES: County (Basic): | $ | 0.00 | NYS Real Estate Transfer Tax: | | |
| City (Additional): | $ | 0.00 | | $ | 0.00 |
| Spec (Additional): | $ | 0.00 | | | |
| TASF: | $ | 0.00 | | | |
| MTA: | $ | 0.00 | | | |
| NYCTA: | $ | 0.00 | | | |
| Additional MRT: | $ | 0.00 | | | |
| TOTAL: | $ | 0.00 | | | |
| Recording Fee: | $ | 417.00 | | | |
| Affidavit Fee: | $ | 8.00 | | | |

**RECORDED OR FILED IN THE OFFICE OF THE CITY REGISTER OF THE CITY OF NEW YORK**

Recorded/Filed     06-04-2012 10:45
City Register File No.(CRFN):
**2012000216115**

*Annette M. Hill*

*City Register Official Signature*

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**



2012051601218004001CB99F

| RECORDING AND ENDORSEMENT COVER PAGE (CONTINUATION) | | PAGE 2 OF 78 |
|---|---|---|
| Document ID: 2012051601218004 | Document Date: 05-09-2012 | Preparation Date: 05-16-2012 |
| Document Type: AGREEMENT | | |

**CROSS REFERENCE DATA**
Document ID: 2012051601218002
Document ID: 2012051601218003
CRFN: 2009000242246
CRFN: 2009000242245
CRFN: 2009000242249
CRFN: 2009000242245

**PARTIES**
**PARTY 1:**
SHERMAN MANAGEMENT, LLC
302 WEST 47TH STREET
NEW YORK, NY 10036

NY120258

767 8TH AVENUE LLC and SHERMAN MANAGEMENT LLC, as mortgagor
(together, Borrower)

to

MORGAN STANLEY MORTGAGE CAPITAL HOLDINGS LLC, as mortgagee
(Lender)

---

CONSOLIDATED, AMENDED AND RESTATED
FEE AND LEASEHOLD MORTGAGE
AND SECURITY AGREEMENT

---

Dated:     May 9, 2012
Location:  EconoLodge Times Square
           767 Eighth Avenue / 302 West 47th Street
           New York, New York
County:    New York


PREPARED BY AND UPON
RECORDATION RETURN TO:

Kelley Drye & Warren LLP
200 Kimball Drive
Parsippany, New Jersey 07054
Attention: Stephen G. Hauck, Esq.

NJ01/FOLEB/165815.7

## TABLE OF CONTENTS

**Page**

ARTICLE I          GRANTS OF SECURITY.................................................................................2

    Section 1.1          Property Mortgaged......................................................................2
    Section 1.2          Assignment of Leases and Rents...........................................4
    Section 1.3          Security Agreement.......................................................................4
    Section 1.4          Pledge of Monies Held ...............................................................5
    Section 1.5          Conditions to Grant ....................................................................5

ARTICLE II          DEBT AND OBLIGATIONS SECURED .......................................5

    Section 2.1          Debt ..................................................................................................5
    Section 2.2          Other Obligations ........................................................................5
    Section 2.3          Debt and Other Obligations...................................................6
    Section 2.4          Payments.........................................................................................6

ARTICLE III          BORROWER COVENANTS ............................................................6

    Section 3.1          Payment of Debt...........................................................................6
    Section 3.2          Incorporation by Reference ...................................................6
    Section 3.3          Insurance.........................................................................................6
    Section 3.4          Payment of Taxes, etc...............................................................10
    Section 3.5          Escrow Fund ...............................................................................10
    Section 3.6          Condemnation.............................................................................11
    Section 3.7          Restoration After Casualty/Condemnation.......................11
    Section 3.8          Leases and Rents .......................................................................16
    Section 3.9          Maintenance and Use of Property ......................................17
    Section 3.10          Waste ............................................................................................17
    Section 3.11          Compliance With Laws ...........................................................18
    Section 3.12          Books and Records ...................................................................18
    Section 3.13          Payment For Labor and Materials ......................................21
    Section 3.14          Performance of Other Agreements .....................................21
    Section 3.15          Change of Name, Identity or Structure...............................21
    Section 3.16          Existence.......................................................................................22
    Section 3.17          Management ................................................................................22
    Section 3.18          ERISA.............................................................................................22
    Section 3.19          Debt Cancellation .....................................................................23
    Section 3.20          Distributions ...............................................................................23
    Section 3.21          Material Agreements ................................................................23
    Section 3.22          Franchise Agreement...............................................................23
    Section 3.23          Ground Lease...............................................................................23

ARTICLE IV          SPECIAL COVENANTS..................................................................26

    Section 4.1          Property Use ...............................................................................26
    Section 4.2          Single Purpose Entity .............................................................26
    Section 4.3          Backward Representations ....................................................29

# TABLE OF CONTENTS
(continued)

Page

ARTICLE V        REPRESENTATIONS AND WARRANTIES ..............................................30

    Section 5.1        Warranty of Title ..................................................................30
    Section 5.2        Legal Status and Authority ..................................................30
    Section 5.3        Validity of Documents .........................................................30
    Section 5.4        Litigation .............................................................................31
    Section 5.5        Status of Property ................................................................31
    Section 5.6        No Foreign Person ...............................................................32
    Section 5.7        Separate Tax Lot ..................................................................32
    Section 5.8        Leases ..................................................................................32
    Section 5.9        Financial Condition .............................................................33
    Section 5.10       Business Purposes ...............................................................33
    Section 5.11       Taxes ....................................................................................33
    Section 5.12       Mailing Address ..................................................................33
    Section 5.13       No Change in Facts or Circumstances ..................................33
    Section 5.14       Disclosure ............................................................................34
    Section 5.15       Third Party Representations .................................................34
    Section 5.16       Illegal Activity ....................................................................34
    Section 5.17       Regulations T, U and X .......................................................34
    Section 5.18       No Plan Assets .....................................................................34
    Section 5.19       No Change in Facts or Circumstances; Disclosure ..............34
    Section 5.20       Management Agreement .......................................................34
    Section 5.21       Perfection of Accounts ........................................................35
    Section 5.22       Intentionally Omitted ..........................................................35
    Section 5.23       Material Agreements ............................................................35
    Section 5.24       Illegal Activity/Forfeiture ...................................................35
    Section 5.25       Guarantor Representations ...................................................36
    Section 5.26       Embargoed Person ...............................................................36
    Section 5.27       Patriot Act ............................................................................36
    Section 5.28       Survival of Representations .................................................37
    Section 5.29       No Breach of Fiduciary Duty ...............................................37
    Section 5.30       Ground Lease ........................................................................37
    Section 5.31       Franchise Agreement ...........................................................37
    Section 5.32       Financial Statements ............................................................38
    Section 5.33       Phase One .............................................................................38

ARTICLE VI       OBLIGATIONS AND RELIANCE .....................................................38

    Section 6.1        Relationship of Borrower and Lender ..................................38
    Section 6.2        No Reliance on Lender .........................................................38
    Section 6.3        No Lender Obligations .........................................................38
    Section 6.4        Reliance ...............................................................................38

ARTICLE VII      FURTHER ASSURANCES ...............................................................39

# TABLE OF CONTENTS
## (continued)

Page

Section 7.1      Recording of Security Instrument, etc ................................................39
Section 7.2      Further Acts, etc .................................................................................39
Section 7.3      Changes in Tax, Debt Credit and Documentary Stamp Laws............40
Section 7.4      Estoppel Certificates...........................................................................40
Section 7.5      Flood Insurance ..................................................................................41
Section 7.6      Replacement Documents .....................................................................41

ARTICLE VIII     DUE ON SALE/ENCUMBRANCE .............................................41

Section 8.1      No Sale/Encumbrance .........................................................................41
Section 8.2      Sale/Encumbrance Defined .................................................................41
Section 8.3      Lender's Rights....................................................................................42
Section 8.4      Permitted One Time Transfer ..............................................................42
Section 8.5      Permitted Transfers of Ownership Interests .......................................45

ARTICLE IX       PREPAYMENT...........................................................................46

Section 9.1      Prepayment .........................................................................................46

ARTICLE X        DEFAULT ...................................................................................46

Section 10.1     Events of Default.................................................................................46

ARTICLE XI       RIGHTS AND REMEDIES .........................................................48

Section 11.1     Remedies .............................................................................................48
Section 11.2     Application of Proceeds.......................................................................50
Section 11.3     Right to Cure Defaults.........................................................................50
Section 11.4     Actions and Proceedings .....................................................................51
Section 11.5     Recovery of Sums Required To Be Paid .............................................51
Section 11.6     Examination of Books and Records ....................................................51
Section 11.7     Other Rights, etc ..................................................................................51
Section 11.8     Right to Release Any Portion of the Property .....................................52
Section 11.9     Violation of Laws ...............................................................................52
Section 11.10    Right of Entry ......................................................................................52
Section 11.11    Subrogation..........................................................................................52

ARTICLE XII      ENVIRONMENTAL MATTERS.................................................52

Section 12.1     Environmental Representations and Warranties...................................52
Section 12.2     Environmental Covenants....................................................................53
Section 12.3     Lender's Rights....................................................................................54
Section 12.4     Operations and Maintenance Programs ..............................................55

ARTICLE XIII     INDEMNIFICATIONS ................................................................55

Section 13.1     General Indemnification ......................................................................55

**TABLE OF CONTENTS**
(continued)

**Page**

Section 13.2    Mortgage and/or Intangible Tax ........................................................56
Section 13.3    Duty to Defend; Attorneys' Fees and Other Fees and Expenses........56
Section 13.4    Environmental Indemnity .................................................................56

ARTICLE XIV    WAIVERS ...................................................................................57

Section 14.1    Waiver of Counterclaim ...................................................................57
Section 14.2    Marshalling and Other Matters.........................................................57
Section 14.3    Waiver of Notice ..............................................................................57
Section 14.4    Waiver of Statute of Limitations ......................................................57
Section 14.5    Sole Discretion of Lender.................................................................57
Section 14.6    WAIVER OF TRIAL BY JURY.......................................................57

ARTICLE XV    EXCULPATION ...........................................................................58

Section 15.1    Exculpation .......................................................................................58

ARTICLE XVI    NOTICES ...................................................................................58

Section 16.1    Notices ..............................................................................................58

ARTICLE XVII    APPLICABLE LAW ..................................................................58

Section 17.1    Choice of Law ..................................................................................58
Section 17.2    Provisions Subject to Applicable Law...............................................58

ARTICLE XVIII    SECONDARY MARKET..........................................................59

Section 18.1    Transfer of Loan ...............................................................................59
Section 18.2    Cooperation ......................................................................................59

ARTICLE XIX    COSTS.......................................................................................60

Section 19.1    Performance at Borrower's Expense .................................................60
Section 19.2    Legal Fees for Enforcement .............................................................60

ARTICLE XX    DEFINITIONS .............................................................................61

Section 20.1    General Definitions............................................................................61
Section 20.2    Headings, etc ....................................................................................61

ARTICLE XXI    MISCELLANEOUS PROVISIONS .............................................61

Section 21.1    No Oral Change ................................................................................61
Section 21.2    Liability .............................................................................................61
Section 21.3    Inapplicable Provisions.....................................................................61
Section 21.4    Duplicate Originals; Counterparts.....................................................61
Section 21.5    Number and Gender...........................................................................61
Section 21.6    Brokers and Financial Advisors ........................................................62

# TABLE OF CONTENTS
(continued)

**Page**

ARTICLE XXII   SPECIAL NEW YORK PROVISIONS ..........................................................62

    Section 22.1       Principles of Construction ...................................................62
    Section 22.2       Trust Fund..........................................................................62
    Section 22.3       Commercial Property...........................................................62
    Section 22.4       Insurance............................................................................62
    Section 22.5       Section 291-f Agreement.....................................................62
    Section 22.6       Statutory Construction.........................................................63
    Section 22.7       Maximum Principal Amount Secured ..................................63
    Section 22.8       Power of Sale......................................................................63
    Section 22.9       Cooperation with Future Assignment...................................63

THIS CONSOLIDATED AMENDED AND RESTATED FEE AND LEASEHOLD MORTGAGE AND SECURITY AGREEMENT (this "Security Instrument") is made as of the 9th day of May, 2012, by 767 8TH AVENUE LLC, a Delaware limited liability company ("Fee Owner"), and SHERMAN MANAGEMENT LLC, a Delaware limited liability company ("Leasehold Owner"), each having its principal place of business at 302 West 47th Street, New York, New York 10036, together as mortgagor (Fee Owner and Leasehold Owner, together, "Borrower") to MORGAN STANLEY MORTGAGE CAPITAL HOLDINGS LLC, a New York limited liability company, having an address at 1585 Broadway, 10th Floor, New York, New York 10036, as mortgagee ("Lender").

RECITALS:

Lender is the holder of (a) those certain mortgages more particularly described in Exhibit B attached hereto and made a part hereof (collectively, the "Original Mortgage") and the notes secured thereby, which Original Mortgage was assigned to Lender by an Assignment of Mortgage, dated of even date herewith, and (b) that certain Gap Mortgage also more particularly described in Exhibit B attached hereto (the "Gap Mortgage").

Borrower confirms that (a) the full principal amount has been advanced under the notes secured by the Original Mortgage and the Gap Mortgage, (b) the aggregate principal amount outstanding under the notes secured by the Original Mortgage and the Gap Mortgage as of the date hereof is $11,500,000.00 and (c) there are no offsets, advances, setoffs, defenses or counterclaims against payment of said amount.

Lender and Borrower have agreed to consolidate the terms and liens of the Original Mortgage and the Gap Mortgage and in connection therewith, to amend and restate in their entirety the Original Mortgage and the Gap Mortgage upon the terms and conditions set forth herein. The Original Mortgage and the Gap Mortgage as consolidated, amended and restated hereby, and as the same may be amended, modified or extended from time to time, are herein referred to as this "Security Instrument"

Borrower by its consolidated, amended and restated promissory note of even date herewith given to Lender is indebted to Lender in the principal sum of ELEVEN MILLION FIVE HUNDRED THOUSAND AND 00/100 DOLLARS ($11,500,000.00) (the "Loan Amount") in lawful money of the United States of America (the note together with all extensions, renewals, modifications, substitutions and amendments thereof shall collectively be referred to as the "Note"), with interest from the date thereof at the rates set forth in the Note, principal and interest to be payable in accordance with the terms and conditions provided in the Note.

Borrower desires to secure the payment of the Debt (defined in Section 2.1) and the performance of all of its obligations under the Note and the Other Obligations (defined in Section 2.2).

NOW, THEREFORE, Lender and Borrower hereby consolidate the terms and liens of the Original Mortgage and the Gap Mortgage, and as so consolidated hereby amend and restate the Original Mortgage and the Gap Mortgage, in their entirety, as follows:

## ARTICLE I
## GRANTS OF SECURITY

Section 1.1   <u>Property Mortgaged</u>.  Borrower does hereby irrevocably mortgage, grant, bargain, sell, pledge, assign, warrant, transfer and convey to Lender, and grant a security interest to Lender in, the following property, rights, interests and estates now owned, or hereafter acquired by Borrower (collectively, the "<u>Property</u>"):

(a)   <u>Land</u>.  The real property described in <u>Exhibit A</u> attached hereto and made a part hereof (the "<u>Land</u>");

(b)   <u>Additional Land</u>.  All additional lands, estates and development rights hereafter acquired by Borrower for use in connection with the Land and the development of the Land and all additional lands and estates therein which may, from time to time, by supplemental mortgage or otherwise be expressly made subject to the lien of this Security Instrument;

(c)   <u>Improvements</u>.   The  buildings,  structures,  fixtures,  additions, enlargements, extensions, modifications, repairs, replacements and improvements now or hereafter erected or located on the Land (the "<u>Improvements</u>");

(d)   <u>Easements</u>.  All easements, rights-of-way or use, rights, strips and gores of land, streets, ways, alleys, passages, sewer rights, water, water courses, water rights and powers, air rights and development rights, and all estates, rights, titles, interests, privileges, liberties, servitudes, tenements, hereditaments and appurtenances of any nature whatsoever, in any way now or hereafter belonging, relating or pertaining to the Land and the Improvements and the reversion and reversions, remainder and remainders, and all land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining the Land, to the center line thereof and all the estates, rights, titles, interests, dower and rights of dower, curtesy and rights of curtesy, property, possession, claim and demand whatsoever, both at law and in equity, of Borrower of, in and to the Land and the Improvements and every part and parcel thereof, with the appurtenances thereto;

(e)   <u>Fixtures and Personal Property</u>.  All machinery, equipment, fixtures (including, but not limited to, all heating, air conditioning, plumbing, lighting, communications, elevator fixtures, beds, bureaus, chiffoniers, chests, chairs, desks, lamps, mirrors, bookcases, tables, rugs, carpeting, drapes, draperies, curtains, shades, venetian blinds, screens, paintings, hangings, pictures, divans, couches, luggage carts, luggage racks, stools, sofas, chinaware, linens, pillows, blankets, glassware, foodcarts, cookware, dry cleaning facilities, dining room wagons, keys or other entry systems, bars, bar fixtures, liquor and other drink dispensers, icemakers, radios, television sets, intercom and paging equipment, potted plants, stoves, ranges, refrigerators, laundry machines, dishwashers, garbage disposals, washers and dryers and other customary hotel equipment) and other property of every kind and nature whatsoever owned by Borrower, or in which Borrower has or shall have an interest, now or hereafter located upon the Land and the Improvements, or appurtenant thereto, and usable in connection with the present or future operation and occupancy of the Land and the Improvements and all building equipment, materials and supplies of any nature whatsoever owned by Borrower, or in which Borrower has or shall have an interest, now or hereafter located upon the Land and the Improvements, or

2

appurtenant thereto, or usable in connection with the present or future operation and occupancy of the Land and the Improvements (collectively, the "Personal Property"), and the right, title and interest of Borrower in and to any of the Personal Property which may be subject to any security interests, as defined in the Uniform Commercial Code, as adopted and enacted by the state, states, commonwealth or commonwealths where any of the Property is located (the "Uniform Commercial Code"), and all proceeds and products of the above;

(f)     Leases and Rents.  All leases, subleases and other agreements affecting the use, enjoyment or occupancy of the Land and/or the Improvements heretofore or hereafter entered into and all extensions, amendments and modifications thereto, including, without limitation, that certain Amended and Restated Commercial Ground Lease between Fee Owner and Leasehold Owner dated as of the date hereof (the "Ground Lease") (collectively, the "Leases"), whether before or after the filing by or against Borrower of any petition for relief under 11 U.S.C. §101 et seq., as the same may be amended from time to time (the "Bankruptcy Code") and all right, title and interest of Borrower, its successors and assigns therein and thereunder, including, without limitation, any guaranties of the lessees' obligations thereunder, cash, letters of credit or securities deposited thereunder to secure the performance by the lessees of their obligations thereunder and all rents, additional rents, early termination fees and payments and other termination fees and payments (any such early termination fees, payments and other termination fees and payments, the "Lease Termination Fees"), revenues, issues and profits (including all oil and gas or other mineral royalties and bonuses) from the Land and the Improvements, including, without limitation, all revenues and credit card receipts collected from guest rooms, restaurants, bars, meeting rooms, banquet rooms and recreational facilities, all receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of property or rendering of services by Borrower or any operator or manager of the hotel or the commercial space located in the Improvements or acquired from others (including, without limitation, from the rental of any office space, retail space, guest rooms or other space, halls, stores, and offices, and deposits securing reservations of such space), license, lease, sublease and concession fees and rentals, health club membership fees, food and beverage wholesale and retail sales, service charges and vending machine sales, whether paid or accruing before or after the filing by or against Borrower of any petition for relief under the Bankruptcy Code (collectively, the "Rents") and all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Debt;

(g)     Insurance Proceeds.  All proceeds of and any unearned premiums on any insurance policies covering the Property, including, without limitation, the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Property;

(h)     Condemnation Awards.   All awards or payments, including interest thereon, which may heretofore and hereafter be made with respect to the Property, whether from the exercise of the right of eminent domain (including but not limited to any transfer made in lieu of or in anticipation of the exercise of the right), or for a change of grade, or for any other injury to or decrease in the value of the Property;

(i)     Tax Certiorari.  All refunds, rebates or credits in connection with a reduction in real estate taxes and assessments charged against the Property as a result of tax certiorari or any applications or proceedings for reduction;

(j)     Conversion.  All proceeds of the conversion, voluntary or involuntary, of any of the foregoing including, without limitation, proceeds of insurance and condemnation awards, into cash or liquidation claims;

(k)     Rights.  The right, in the name and on behalf of Borrower, to appear in and defend any action or proceeding brought with respect to the Property and to commence any action or proceeding to protect the interest of Lender in the Property;

(l)     Agreements.  All agreements, contracts, certificates, instruments, franchises, permits, licenses, plans, specifications and other documents, now or hereafter entered into, and all rights therein and thereto, respecting or pertaining to the use, occupation, construction, management or operation of the Land and any part thereof and any Improvements or respecting any business or activity conducted on the Land and any part thereof and all right, title and interest of Borrower therein and thereunder, including, without limitation, the right, upon the occurrence and during the continuance of an Event of Default (as defined in Section 10.1), to receive and collect any sums payable to Borrower thereunder and including further, without limitation, all right, title and interest of Borrower in and to that certain Choice Hotels International, Inc. Franchise Agreement dated March 11, 2005 made by and among Choice Hotels International, Inc., Sherman Equities Corporation and John Sharma, as amended by that certain Assignment and Assumption of Franchise Agreement by and among Sherman Equities Corporation, John Sharma, Sherman Management LLC, Sherman Equities, Inc. and Choice Hotels International, Inc., dated as of March 24, 2008 (together with any amendments, replacements or substitutions therefor, the "Franchise Agreement");

(m)     Intangibles.  All trade names, trademarks, servicemarks, logos, copyrights, goodwill, books and records and all other general intangibles relating to or used in connection with the operation of the Property; and

(n)     Other Rights.  Any and all other rights of Borrower in and to the items set forth in Subsections (a) through (m) above.

Section 1.2     Assignment of Leases and Rents.  Borrower hereby absolutely and unconditionally assigns to Lender Borrower's right, title and interest in and to all current and future Leases and Rents; it being intended by Borrower that this assignment constitutes a present, absolute assignment and not an assignment for additional security only.  Nevertheless, subject to the terms of this Section 1.2 and Section 3.8, Lender grants to Borrower a revocable license to collect and receive the Rents.  Borrower shall hold a portion of the Rents sufficient to discharge all current sums due on the Debt for use in the payment of such sums.

Section 1.3     Security Agreement.  This Security Instrument is both a real property mortgage and a "security agreement" within the meaning of the Uniform Commercial Code.  The Property includes both real and personal property and all other rights and interests, whether tangible or intangible in nature, of Borrower in the Property.  By executing and

delivering this Security Instrument, Borrower hereby grants to Lender, as security for the Obligations (defined in Section 2.3), a security interest in the Personal Property to the full extent that the Personal Property may be subject to the Uniform Commercial Code.

Section 1.4    Pledge of Monies Held.  Borrower hereby pledges to Lender any and all monies now or hereafter held by Lender, including, without limitation, any sums deposited in the Escrow Fund (defined in Section 3.5), Net Proceeds (defined in Section 3.7) and condemnation awards or payments described in Section 3.6, as additional security for the Obligations until expended or applied as provided in this Security Instrument.

Section 1.5    Conditions to Grant.   TO HAVE AND TO HOLD the above granted and described Property unto and to the use and benefit of Lender and the successors and assigns of Lender, forever; PROVIDED, HOWEVER, these presents are upon the express condition that, if Borrower shall well and truly pay to Lender the Debt at the time and in the manner provided in the Note, this Security Instrument and the other Loan Documents, shall well and truly perform the Other Obligations as set forth in this Security Instrument and shall well and truly abide by and comply with each and every covenant and condition set forth herein and in the Note, these presents and the estate hereby granted shall cease, terminate and be void.

## ARTICLE II
## DEBT AND OBLIGATIONS SECURED

Section 2.1    Debt.  This Security Instrument and the grants, assignments and transfers made in Article I are given for the purpose of securing the payment of the following, in such order of priority as Lender may determine in its sole discretion (the "Debt"):

(a)      the indebtedness evidenced by the Note in lawful money of the United States of America;

(b)      interest, default interest, late charges and other sums, as provided in the Note, this Security Instrument or the other Loan Documents (defined in Section 3.2);

(c)      the Default Consideration (as defined in the Note), if any;

(d)      all other moneys agreed or provided to be paid by Borrower in the Note, this Security Instrument or the other Loan Documents;

(e)      all sums advanced pursuant to this Security Instrument to protect and preserve the Property and the lien and the security interest created hereby; and

(f)      all sums advanced and costs and expenses incurred by Lender in connection with the Debt or any part thereof, any renewal, extension, or change of or substitution for the Debt or any part thereof, or the acquisition or perfection of the security therefor, whether made or incurred at the request of Borrower or Lender.

Section 2.2    Other Obligations.   This Security Instrument and the grants, assignments and transfers made in Article I are also given for the purpose of securing the performance of the following (the "Other Obligations"):

(a)     all other obligations of Borrower contained herein;

(b)     each obligation of Borrower contained in the Note and in the other Loan Documents; and

(c)     each obligation of Borrower contained in any renewal, extension, amendment, modification, consolidation, change of, or substitution or replacement for, all or any part of the Note, this Security Instrument or the other Loan Documents.

Section 2.3     <u>Debt and Other Obligations</u>.   Borrower's obligations for the payment of the Debt and the performance of the Other Obligations shall be referred to collectively below as the "<u>Obligations</u>."

Section 2.4     <u>Payments</u>.   Unless payments are made in the required amount in immediately available funds at the place where the Note is payable, remittances in payment of all or any part of the Debt shall not, regardless of any receipt or credit issued therefor, constitute payment until the required amount is actually received by Lender in funds immediately available at the place where the Note is payable (or any other place as Lender, in Lender's sole discretion, may have established by delivery of written notice thereof to Borrower) and shall be made and accepted subject to the condition that any check or draft may be handled for collection in accordance with the practice of the collecting bank or banks.   Acceptance by Lender of any payment in an amount less than the amount then due shall be deemed an acceptance on account only, and the failure to pay the entire amount then due shall be and continue to be an Event of Default.

## ARTICLE III
## BORROWER COVENANTS

Borrower covenants and agrees that:

Section 3.1     <u>Payment of Debt</u>.   Borrower will pay the Debt at the time and in the manner provided in the Note and in this Security Instrument.

Section 3.2     <u>Incorporation by Reference</u>.   All the covenants, conditions and agreements contained in (a) the Note and (b) all and any of the documents other than the Note or this Security Instrument now or hereafter executed by Borrower and/or others in connection with the Loan, together with any supplements, amendments, modifications or alterations thereto (together with the Note and this Security Instrument, collectively, the "<u>Loan Documents</u>"), are hereby made a part of this Security Instrument to the same extent and with the same force as if fully set forth herein.

Section 3.3     <u>Insurance</u>.

(a)     Borrower shall obtain and maintain, or cause to be maintained, insurance for Borrower and the Property providing at least the following coverages:

(i)     Insurance with respect to the Improvements and building equipment insuring against any peril now or hereafter included within the classification

"All Risks of Physical Loss" in amounts at all times sufficient to prevent Lender from becoming a co-insurer within the terms of the applicable policies and under applicable law, but in any event such insurance shall be maintained in an amount which, after application of deductible, shall be equal to the full insurable value of the Improvements and building equipment, the term "full insurable value" to mean the actual replacement cost of the Improvements and building equipment (without taking into account any depreciation, and exclusive of excavations, footings and foundations, landscaping and paving) determined annually by an insurer, a recognized independent insurance broker or an independent appraiser selected and paid by Borrower and in no event less than the coverage required pursuant to the terms of any Lease;

(ii)     Comprehensive general liability insurance, including bodily injury, death and property damage liability, insurance against any and all claims, including all legal liability to the extent insurable and imposed upon Lender and all court costs and attorneys' fees and expenses, arising out of or connected with the possession, use, leasing, operation, maintenance or condition of the Property in such amounts as are generally available at commercially reasonable premiums and are generally required by institutional lenders for properties comparable to the Property but in any event for a combined single limit of at least $5,000,000;

(iii)     Statutory workers' compensation insurance with respect to any work on or about the Property;

(iv)     Business income insurance (A) with loss payable to Lender; (B) covering all risks required to be covered by the insurance provided for in subsection (i) above for a period commencing at the time of loss for such length of time as it takes to repair or replace with the exercise of due diligence and dispatch; (C) containing an extended period of indemnity endorsement which provides that after the physical loss to the Improvements and Personal Property has been repaired, the continued loss of income will be insured until such income either returns to the same level it was at prior to the loss, or the expiration of twelve (12) months from the date that the Property is repaired or replaced and operations are resumed, whichever first occurs, and notwithstanding that the policy may expire prior to the end of such period; and (D) in an amount equal to one hundred percent (100%) of the projected gross income from the Property for a period from the date of loss to a date (assuming total destruction) which is eighteen (18) months from the date that the Property is repaired or replaced and operations are resumed. The amount of such business income insurance shall be determined prior to the date hereof and at least once each year thereafter based on Borrower's reasonable estimate of the gross income from the Property for the succeeding eighteen (18) month period, based upon the assumption that no casualty has or will occur.  All proceeds payable to Lender pursuant to this subsection shall be held by Lender and shall be applied to the obligations secured by the Loan Documents from time to time due and payable hereunder and under the Note and the other Loan Documents and otherwise as determined by Lender in its sole discretion; provided, however, that nothing herein contained shall be deemed to relieve Borrower of its obligations to pay the obligations secured by the Loan Documents on the respective dates of payment provided for herein and in the Note and the other Loan

Documents except to the extent such amounts are actually paid out of the proceeds of such business income insurance;

(v)     Broad form boiler and machinery insurance (without exclusion for explosion) covering all boilers or other pressure vessels, machinery, and equipment located in, on or about the Property and insurance against loss of occupancy or use arising from any breakdown in such amounts as are generally required by institutional lenders for properties comparable to the Property;

(vi)    If required by Subsection 5.5(j) hereof, flood insurance in an amount at least equal to the lesser of (A) the principal balance of the Note, or (B) the maximum limit of coverage available for the Property under the National Flood Insurance Act of 1968, The Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994, as each may be amended;

(vii)   At all times during which structural construction, repairs or alterations are being made with respect to the Improvements (A) owner's contingent or protective liability insurance covering claims not covered by or under the terms or provisions of the above mentioned commercial general liability insurance policy; and (B) the insurance provided for in Subsection 3.3(a)(i) written in a so-called builder's risk completed value form (1) on a non-reporting basis, (2) against all risks insured against pursuant to Subsection 3.3(a)(i), (3) including permission to occupy the Property, and (4) with an agreed amount endorsement waiving co-insurance provisions; and

(viii)  Such other insurance with respect to the Property against loss or damage of the kinds from time to time customarily insured against and in such amounts as are required by institutional lenders for properties comparable to the Property.

The comprehensive all risk insurance and business income insurance policies required under subsections (i) and (iv) above shall be required to cover perils of terrorism and acts of terrorism for the amounts set forth in subsections (i) and (iv) above and with deductibles no greater than those provided in subsections (i) and (iv) above). If "acts of terrorism" or other similar acts or events or "fire following" are hereafter excluded from Borrower's comprehensive all risk insurance policy or policies required under subsections (i) and (iv) above, Borrower shall obtain an endorsement to such policy or policies, or a separate policy from an insurance provider which maintains at least an investment grade rating from Standard and Poor's Ratings Services (that is, "BBB-") and, if they are rating the Securities and if they rate the insurer from Fitch, Inc. (that is, "BBB-") and from Moody's Investors Services, Inc. (that is, "Baa3"), insuring against all such excluded acts or events and "fire following", to the extent such policy or endorsement is available, in an amount determined by Lender in its sole discretion (but in no event more than an amount equal to the sum of 100% of the "Full Replacement Cost" and twelve (12) months business interruption insurance); provided, such endorsement or policy shall be in form and substance reasonably satisfactory to Lender. Notwithstanding the foregoing, for so long as the Terrorism Risk Insurance Act of 2002, as extended and modified by the Terrorism Risk Insurance Program Reauthorization Act of 2007 ("TRIPRA") is in effect (including any extensions thereof or if another federal governmental program is in effect relating to "acts of terrorism" which provides substantially similar protections as TRIPRA), Lender shall accept

terrorism insurance which covers against "covered acts" as defined by TRIPRA (or such other program) as full compliance with this Section 3.3(a) as it relates to the risks that are required to be covered hereunder but only in the event that TRIPRA (or such other program) continues to cover both domestic and foreign acts of terrorism.

(b)      All insurance provided for in Subsection 3.3(a) hereof shall be obtained under valid and enforceable policies (the "Policies" or in the singular, the "Policy"), and shall be issued by one or more domestic primary insurer(s) having (i) a general policy rating of A or better and a financial class of VI or better by A.M. Best Company, Inc. (or if a rating of A.M. Best Company Inc. is no longer available, a similar rating from a similar or successor service) and (ii) a claims paying ability rating by a credit rating agency approved by Lender (a "Rating Agency") of not less than "AA" by S&P or such comparable rating by such other Rating Agency.   All insurers providing insurance required by this Security Instrument shall be authorized to issue insurance in the state or commonwealth in which the Property is located.  The Policy referred to in Subsection 3.3(a)(ii) above shall name Lender as an additional named insured and the Policies referred to in Subsection 3.3(a)(i), (iv), (v), (vi) and (vii), and as applicable (viii), above shall provide that all proceeds be payable to Lender as set forth in Section 3.7 hereof.  The Policies referred to in Subsections 3.3(a)(i), (v), (vi) and (vii) shall also contain:  (i) a standard "non-contributory mortgagee" endorsement or its equivalent relating, *inter alia*, to recovery by Lender notwithstanding the negligent or willful acts or omission of Lender; (ii) to the extent available at commercially reasonable rates, a waiver of subrogation endorsement as to Lender; and (iii) an endorsement providing for a deductible per loss of an amount not more than that which is customarily maintained by prudent owners of similar properties in the general vicinity of the Property, but in no event in excess of $10,000.  The Policy referred to in Subsection 3.3(a)(i) above shall provide coverage for contingent liability from Operation of Building Laws, Demolition Costs and Increased Cost of Construction Endorsements together with "Ordinance or Law Coverage" with "Time Element", "Loss to the Undamaged Portion of the Building", "Demolition Cost" and "Increased Cost of Construction" endorsements if any of the Improvements or any part thereof or the use of the Property shall at any time constitute legal non-conforming structures or uses under applicable law, in the amount of coverage requested by Lender.  All Policies shall contain (i) a provision that such Policies shall not be cancelled or terminated, nor shall they expire, without at least thirty (30) days' prior written notice to Lender in each instance; and (ii) include effective waivers by the insurer of all claims for Insurance Premiums (defined below) against any loss payees, additional insureds and named insureds (other than Borrower).  Certificates of insurance with respect to all renewal and replacement Policies shall be delivered to Lender not less than twenty (20) days prior to the expiration date of any of the Policies required to be maintained hereunder, which certificates shall bear notations evidencing payment of applicable premiums (the "Insurance Premiums").  Originals or certificates of such replacement Policies shall be delivered to Lender promptly after Borrower's receipt thereof but in any case within thirty (30) days after the effective date thereof.  If Borrower fails to maintain and deliver to Lender the original Policies or certificates of insurance required by this Security Instrument, upon ten (10) days' prior notice to Borrower, Lender may procure such insurance at Borrower's sole cost and expense.

(c)      Borrower shall comply with all insurance requirements and shall not bring or keep or permit to be brought or kept any article upon any of the Property or cause or permit any condition to exist thereon which would be prohibited by an insurance requirement, or would

invalidate the insurance coverage required hereunder to be maintained by Borrower on or with respect to any part of the Property pursuant to this Section 3.3.

        Section 3.4    Payment of Taxes, etc.

        (a)    Except to the extent the same is being escrowed for by Lender pursuant to Section 3.5 herein, Borrower shall promptly pay all taxes, assessments, water rates, sewer rents, governmental impositions, and other charges, including without limitation vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Land, now or hereafter levied or assessed or imposed against the Property or any part thereof (the "Taxes"), all ground rents, maintenance charges and similar charges, now or hereafter levied or assessed or imposed against the Property or any part thereof (the "Other Charges"), and all charges for utility services provided to the Property as same become due and payable. Borrower will deliver to Lender, promptly upon Lender's request, evidence satisfactory to Lender that the Taxes, Other Charges and utility service charges have been so paid or are not then delinquent. Borrower shall not suffer and shall promptly cause to be paid and discharged any lien or charge whatsoever which may be or become a lien or charge against the Property. Except to the extent sums sufficient to pay all Taxes and Other Charges have been deposited with Lender in accordance with the terms of this Security Instrument, Borrower shall furnish to Lender paid receipts for the payment of the Taxes and Other Charges prior to the date the same shall become delinquent.

        (b)    After prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any of the Taxes, provided that (i) no Event of Default has occurred and is continuing under the Note, this Security Instrument or any of the other Loan Documents, (ii) Borrower is permitted to do so under the provisions of any other mortgage, deed of trust or deed to secure debt affecting the Property, (iii) such proceeding shall suspend the collection of the Taxes from Borrower and from the Property or Borrower shall have paid all of the Taxes under protest, (iv) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower is subject and shall not constitute a default thereunder, (v) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, cancelled or lost, and (vi) Borrower shall have deposited with Lender adequate reserves for the payment of the Taxes, together with all interest and penalties thereon, unless Borrower has paid all of the Taxes under protest, or Borrower shall have furnished the security as may be required in the proceeding, or as may be reasonably requested by Lender to insure the payment of any contested Taxes, together with all interest and penalties thereon, taking into consideration the amount in the Escrow Fund available for payment of Taxes.

        Section 3.5    Escrow Fund. In addition to the initial deposits with respect to Taxes and Insurance Premiums made by Borrower to Lender on the date hereof to be held by Lender in escrow, Borrower shall pay to Lender on the tenth (10th) day of each calendar month (a) one-twelfth of an amount which would be sufficient to pay the Taxes payable, or estimated by Lender to be payable, during the next ensuing twelve (12) months and (b) one-twelfth of an amount which would be sufficient to pay the Insurance Premiums due for the renewal of the coverage afforded by the Policies upon the expiration thereof (the amounts in (a) and (b) above shall be called the "Escrow Fund"). Borrower agrees to notify Lender immediately of any

changes to the amounts, schedules and instructions for payment of any Taxes and Insurance Premiums of which it has or obtains knowledge and authorizes Lender or its agent to obtain the bills for Taxes directly from the appropriate taxing authority.  The Escrow Fund and the payments of interest or principal or both, payable pursuant to the Note shall be added together and shall be paid as an aggregate sum by Borrower to Lender.  Provided there are sufficient amounts in the Escrow Fund and no Event of Default exists, Lender shall be obligated to pay the Taxes and Insurance Premiums as they become due on their respective due dates on behalf of Borrower by applying the Escrow Fund to the payments of such Taxes and Insurance Premiums required to be made by Borrower pursuant to Sections 3.3 and 3.4 hereof.  If the amount of the Escrow Fund shall exceed the amounts due for Taxes and Insurance Premiums pursuant to Sections 3.3 and 3.4 hereof, Lender shall, in its discretion, return any excess to Borrower or credit such excess against future payments to be made to the Escrow Fund.  In allocating such excess, Lender may deal with the individual, corporation, partnership, limited liability company, joint venture, estate, trust, unincorporated association, other entity, government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing ("collectively, "Person") shown on the records of Lender to be the owner of the Property.  If the Escrow Fund is not sufficient to pay the items set forth in (a) and (b) above, Borrower shall promptly pay to Lender, upon demand, an amount which Lender shall reasonably estimate as sufficient to make up the deficiency.  The Escrow Fund shall not constitute a trust fund and may be commingled with other monies held by Lender.  Unless otherwise required by Applicable Laws (defined in Section 3.11), no earnings or interest on the Escrow Fund shall be payable to Borrower.

Section 3.6    Condemnation.  Borrower shall promptly give Lender notice of the actual or threatened commencement of any condemnation or eminent domain proceeding and shall deliver to Lender copies of any and all papers served in connection with such proceedings. Notwithstanding any taking by any public or quasi-public authority through eminent domain or otherwise (including but not limited to any transfer made in lieu of or in anticipation of the exercise of such taking), Borrower shall continue to pay the Debt at the time and in the manner provided for its payment in the Note and in this Security Instrument and the Debt shall not be reduced until any award or payment therefor shall have been actually received and applied by Lender, after the deduction of expenses of collection, to the reduction or discharge of the Debt. Borrower shall cause the award or payment made in any condemnation or eminent domain proceeding, which is payable to Borrower, to be paid directly to Lender.  Lender shall not be limited to the interest paid on the award by the condemning authority but shall be entitled to receive out of the award interest at the rate or rates provided herein or in the Note.  Lender may apply any award or payment to the reduction or discharge of the Debt whether or not then due and payable.  If the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of the award or payment, Lender shall have the right, whether or not a deficiency judgment on the Note (to the extent permitted in the Note or herein) shall have been sought, recovered or denied, to receive the award or payment, or a portion thereof sufficient to pay the Debt.

Section 3.7    Restoration After Casualty/Condemnation.    In the event of a casualty or a taking by eminent domain, the following provisions shall apply in connection with the Restoration (defined below) of the Property:

(a)     If the Property shall be damaged or destroyed, in whole or in part, by fire or other casualty, or if the Property or any portion thereof is taken by the power of eminent domain Borrower shall give prompt notice of such damage or taking to Lender and shall promptly commence and diligently prosecute the completion of the repair and restoration of the Property as nearly as possible to the condition the Property was in immediately prior to such fire or other casualty or taking, with such alterations as may be approved by Lender (the "Restoration").

(b)     The term "Net Proceeds" for purposes of this Section 3.7 shall mean: (i) the net amount of all insurance proceeds under the Policies carried pursuant to Subsections 3.3(a)(i), (iv), (v), (vi), (vii) and (viii) of this Security Instrument as a result of such damage or destruction, after deduction of Lender's reasonable costs and expenses (including, but not limited to reasonable counsel fees), if any, in collecting the same, or (ii) the net amount of all awards and payments received by Lender with respect to a taking referenced in Section 3.6 of this Security Instrument, after deduction of Lender's reasonable costs and expenses (including, but not limited to reasonable counsel fees), if any, in collecting the same (such amounts under this clause (ii) being specifically referred to as the "Condemnation Net Proceeds"), whichever the case may be.  If (i) the Net Proceeds do not exceed $200,000 (the "Net Proceeds Availability Threshold"); (ii) the costs of completing the Restoration as reasonably estimated by Borrower shall be less than or equal to the Net Proceeds; (iii) no Event of Default shall have occurred and be continuing under the Note, this Security Instrument or any of the other Loan Documents; (iv) the Property and the use thereof after the Restoration will be in compliance with, and permitted under, all applicable zoning laws, ordinances, rules and regulations (including, without limitation, all applicable Environmental Laws (defined in Section 12.1); (v) (A) in the event that the Net Proceeds are insurance proceeds, less than thirty percent (30%) of the total floor area of the Improvements has been damaged or destroyed, or rendered unusable as a result of such fire or other casualty; or (B) in the event that the Net Proceeds are condemnation awards, less than thirty (30%) of the Land constituting the Property is taken, such Land that is taken is located along the perimeter or periphery of the Property, no portion of the Improvements is located in such Lands, and such taking does not materially impair access to the Property; (vi) Lender shall be satisfied that any operating deficits, including all scheduled payments of principal and interest under the Note which will be incurred with respect to the Property as a result of the occurrence of any such fire or other casualty or taking, whichever the case may be, will be covered out of (1) the Net Proceeds, or (2) other funds of Borrower; and (vii) Lender shall be satisfied that making the Net Proceeds available for Restoration shall be permitted pursuant to REMIC Requirements (as defined below), then the Net Proceeds will be disbursed directly to Borrower.

(c)     If the Net Proceeds are greater than the Net Proceeds Availability Threshold or Borrower is not otherwise entitled to have the Net Proceeds disbursed directly to Borrower pursuant to Subsection 3.7(b), such Net Proceeds shall be forthwith paid to Lender to be held by Lender in a segregated account to be made available to Borrower for the Restoration in accordance with the provisions of this Subsection 3.7(c).

The Net Proceeds held by Lender pursuant to this Subsection 3.7(c) shall be made available to Borrower for payment or reimbursement of Borrower's expenses in connection with the Restoration, subject to the following conditions:

12

(i)      no Event of Default shall have occurred and be continuing under the Note, this Security Instrument or any of the other Loan Documents;

(ii)      Lender shall, within a reasonable period of time prior to request for initial disbursement, be furnished with an estimate of the cost of the Restoration accompanied by an independent architect's certification as to such costs and appropriate plans and specifications for the Restoration, such plans and specifications and cost estimates to be subject to Lender's approval, not to be unreasonably withheld or delayed;

(iii)      the Net Proceeds, together with any cash or cash equivalent deposited by Borrower with Lender, are sufficient to cover the cost of the Restoration as such costs are certified by the independent architect;

(iv)      Net Proceeds are less than the then outstanding principal balance of the Note;

(v)      (A) in the event that the Net Proceeds are insurance proceeds, less than thirty percent (30%) of the total floor area of the Improvements has been damaged or destroyed, or rendered unusable as a result of such fire or other casualty; or (B) in the event that the Net Proceeds are condemnation awards, less than thirty percent (30%) of the Land constituting the Property is taken, such Land that is taken is located along the perimeter or periphery of the Property, no portion of the Improvements is located in such Lands and such taking does not materially impair access to the Property;

(vi)      Lender shall be satisfied that any operating deficits, including all scheduled payments of principal and interest under the Note which will be incurred with respect to the Property as a result of the occurrence of any such fire or other casualty or taking, whichever the case may be, will be covered out of (1) the Net Proceeds, or (2) other funds of Borrower;

(vii)      Lender shall be satisfied that, upon the completion of the Restoration, the net cash flow of the Property will be restored to a level sufficient to cover all carrying costs and operating expenses of the Property, including, without limitation, debt service on the Note and all required replacement reserves, reserves for tenant improvements and leasing commissions;

(viii)      the Restoration can reasonably be completed on or before the earliest to occur of (A) six (6) months prior to the Maturity Date (as defined in the Note), (B) the earliest date required for such completion under the terms of any Major Leases (defined in Section 3.8) and (C) such time as may be required under applicable zoning law, ordinance, rule or regulation in order to repair and restore the Property to as nearly as possible the condition it was in immediately prior to such fire or other casualty or to such taking, as applicable;

(ix)      the Property and the use thereof after the Restoration will be in compliance with, and permitted under, all applicable zoning laws, ordinances, rules and regulations (including, without limitation, all applicable Environmental Laws (defined in Section 12.1));

(x)     Lender shall be satisfied that making the Net Proceeds available for Restoration shall be permitted pursuant to REMIC Requirements (as defined below);

(xi)     the Franchise Agreement in effect as of the date of the occurrence of such fire or other casualty shall remain in full force and effect during and after the completion of the Restoration; and     .

(xii)     the Ground Lease shall remain in full force and effect during and after the completion of the Restoration.

(d)     The Net Proceeds held by Lender until disbursed in accordance with the provisions of this Section 3.7 shall constitute additional security for the Obligations.  The Net Proceeds (other than the Net Proceeds paid under the Policy described in Subsection 3.3(a)(iv) which shall be applied by Lender pursuant to and in accordance with the provisions of Subsection 3.3(a)(iv)) shall be disbursed by Lender to, or as directed by, Borrower, in an amount equal to the costs actually incurred from time to time for work in place as part of the Restoration less customary retainage from time to time during the course of the Restoration, not more frequently than once per month, upon receipt of evidence satisfactory to Lender that (A) all materials installed and work and labor performed (except to the extent that they are to be paid for out of the requested disbursement) in connection with the Restoration have been paid for in full, and (B) there exist no notices of pendency, stop orders, mechanic's or materialman's liens or notices of intention to file same, or any other liens or encumbrances of any nature whatsoever on the Property arising out of the Restoration which have not either been fully bonded and discharged of record or in the alternative fully insured to the satisfaction of Lender by the title company insuring the lien of this Security Instrument.  Final payment shall be made after submission to Lender of all licenses, permits, certificates of occupancy and other required approvals of governmental authorization having jurisdiction and Casualty Consultant's (as defined below) certification that the Restoration has been fully completed.

(e)     Lender shall have the use of the plans and specifications and all permits, licenses and approvals required or obtained in connection with the Restoration.  The identity of the contractors, subcontractors and materialmen engaged in the Restoration, as well as the contracts under which they have been engaged, shall be subject to prior review and acceptance by Lender and an independent consulting engineer selected by Lender (the "Casualty Consultant"), such acceptance not to be unreasonably withheld or delayed.  All costs and expenses incurred by Lender in connection with making the Net Proceeds available for the Restoration including, without limitation, reasonable counsel fees and disbursements and the Casualty Consultant's fees, shall be paid by Borrower.

(f)     If at any time the Net Proceeds or the undisbursed balance thereof shall not, in the reasonable opinion of Lender, be sufficient to pay in full the balance of the costs which are estimated by the Casualty Consultant to be incurred in connection with the completion of the Restoration, Borrower shall deposit the deficiency (the "Net Proceeds Deficiency") with Lender before any further disbursement of the Net Proceeds shall be made.  The Net Proceeds Deficiency deposited with Lender shall be held by Lender and shall be disbursed for costs actually incurred in connection with the Restoration on the same conditions applicable to the

disbursement of the Net Proceeds, and until so disbursed pursuant to this Section 3.7 shall constitute additional security for the Obligations.

(g)     Except upon the occurrence and continuance of an Event of Default, Borrower shall settle any insurance claims with respect to the Net Proceeds which in the aggregate are less than the Net Proceeds Availability Threshold.  Lender shall have the right to participate in and reasonably approve any settlement for insurance claims with respect to the Net Proceeds which in the aggregate are greater than the Net Proceeds Availability Threshold.  If an Event of Default shall have occurred and be continuing, Borrower hereby irrevocably empowers Lender, in the name of Borrower as its true and lawful attorney-in-fact, to file and prosecute such claim and to collect and to make receipt for any such payment.  If the Net Proceeds are received by Borrower, such Net Proceeds shall, until the completion of the related work, be held in trust for Lender and shall be segregated from other funds of Borrower to be used to pay for the cost of the Restoration in accordance with the terms hereof.

(h)     The excess, if any, of the Net Proceeds and the remaining balance, if any, of the Net Proceeds Deficiency deposited with Lender after (i) the Casualty Consultant certifies to Lender that the Restoration has been completed in accordance with the provisions of this Section 3.7, and (ii) the receipt by Lender of evidence satisfactory to Lender that all costs incurred in connection with the Restoration have been paid in full and all required permits, licenses, certificates of occupancy and other required approvals of governmental authorities having jurisdiction have been issued, shall be remitted by Lender to Borrower, provided no Event of Default shall have occurred and shall be continuing under the Note, this Security Instrument or any of the other Loan Documents.

(i)     All Net Proceeds not required (i) to be made available for the Restoration or (ii) to be returned to Borrower as excess Net Proceeds pursuant to Subsection 3.7(h) shall be retained and applied by Lender toward the payment of the Debt whether or not then due and payable in such order, priority and proportions as Lender in its discretion shall deem proper or, at the discretion of Lender, the same shall be paid, either in whole or in part, to Borrower.  If Lender shall receive and retain Net Proceeds, the lien of this Security Instrument shall be reduced only by the amount received and retained by Lender and actually applied by Lender in reduction of the Debt.

(j)     Notwithstanding the foregoing or anything to the contrary contained in this Security Instrument, in the event that, in accordance with the applicable terms and conditions hereof, the Condemnation Net Proceeds are required to be applied to the principal amount of the Debt and the amount of the Condemnation Net Proceeds applied to the principal amount of the Debt in connection therewith are insufficient under REMIC Requirements because such Condemnation Net Proceeds (or a portion thereof) are paid to or held by a person or entity other than Lender, Borrower shall, within five (5) days of demand by Lender, prepay the principal amount of the Debt in an amount equal to such insufficiency plus the amount of any interest that would have accrued on such amounts through the next Payment Date (as defined in the Note) (such payment, the "Condemnation Payment").  As used in this Security Instrument, (i) the term "REMIC Requirements" shall mean any applicable legal requirements relating to any REMIC Trust (including, without limitation, any constraints, rules and/or other regulations and/or requirements relating to the servicing, modification and/or other similar matters with respect to

the loan evidenced by the Note (or any portion thereof and/or interest therein)), (ii) the term "REMIC Trust" shall mean a "real estate mortgage investment conduit" within the meaning of Section 860D of the Code that holds the Note and (iii) the term "Code" shall mean the Internal Revenue Code of 1986, as amended, and as it may be further amended from time to time, any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

Section 3.8    Leases and Rents.

(a)    Borrower may enter into a proposed Lease (including the renewal or extension of an existing Lease (a "Renewal Lease")) without the prior written consent of Lender, provided such proposed Lease or Renewal Lease (i) provides for rental rates and terms comparable to existing local market rates and terms (taking into account the type and quality of the tenant) as of the date such Lease is executed by Borrower (unless, in the case of a Renewal Lease, the rent payable during such renewal, or a formula or other method to compute such rent, is provided for in the original Lease), (ii) is an arms-length transaction with a bona fide, independent third party tenant, (iii) does not have a materially adverse effect on the value of the Property taken as a whole, (iv) is subject and subordinate to the Security Instrument and the lessee thereunder agrees to attorn to Lender, and (v) is written on the standard form of Borrower's lease previously approved by Lender.  All proposed Leases which do not satisfy the requirements set forth in this Subsection 3.8(a) shall be subject to the prior approval of Lender and its counsel, at Borrower's expense.  Borrower shall promptly deliver to Lender copies of all Leases which are entered into pursuant to this Subsection together with Borrower's certification that it has satisfied all of the conditions of this Subsection.

(b)    Borrower (i) shall observe and perform all the obligations imposed upon the lessor under the Leases and shall not do or permit to be done anything to impair the value of any of the Leases as security for the Debt; (ii) shall promptly send copies to Lender of all notices of default which Borrower shall send or receive thereunder; (iii) shall enforce all of the material terms, covenants and conditions contained in the Leases upon the part of the tenant thereunder to be observed or performed, (iv) shall not collect any of the Rents more than one (1) month in advance (except security deposits shall not be deemed Rents collected in advance); (v) shall not execute any other assignment of the lessor's interest in any of the Leases or the Rents; and (vi) shall not consent to any assignment of or subletting under any Leases not in accordance with their terms, without the prior written consent of Lender.

(c)    Borrower may, without the consent of Lender, amend, modify or waive the provisions of any Lease or terminate, reduce rents under, accept a surrender of space under, or shorten the term of, any Lease (including any guaranty, letter of credit or other credit support with respect thereto) provided that such action (taking into account, in the case of a termination, reduction in rent, surrender of space or shortening of term, the planned alternative use of the affected space) does not have a materially adverse effect on the value of the Property taken as a whole, and provided that such Lease, as amended, modified or waived, is otherwise in compliance with the requirements of this Security Instrument and any subordination agreement binding upon Lender with respect to such Lease.  A termination of a Lease with a tenant who is in default beyond applicable notice and grace periods shall not be considered an action which has a materially adverse effect on the value of the Property taken as a whole.  Any amendment,

modification, waiver, termination, rent reduction, space surrender or term shortening which does not satisfy the requirements set forth in this Subsection shall be subject to the prior approval of Lender and its counsel, at Borrower's expense.   Borrower shall promptly deliver to Lender copies of amendments, modifications and waivers which are entered into pursuant to this Subsection together with Borrower's certification that it has satisfied all of the conditions of this Subsection.

(d)     Notwithstanding anything contained herein to the contrary, Borrower shall not, without the prior written consent of Lender, enter into, renew, extend, amend, modify, waive any provisions of, terminate, reduce rents under, accept a surrender of space under, or shorten the term of, any Major Lease.   The term "Major Lease" shall mean the Ground Lease and any Lease of commercial space at the Property.

Section 3.9     Maintenance and Use of Property.   (a)  Borrower shall cause the Property to be maintained in a good and safe condition and repair.   The Improvements and the Personal Property shall not be removed, demolished or materially altered (except for normal replacement of the Personal Property) without the consent of Lender.   Borrower shall promptly repair, replace or rebuild any part of the Property which may be destroyed by any casualty, or become damaged, worn or dilapidated or which may be affected by any proceeding of the character referred to in Section 3.6 hereof as provided for in Sections 3.6 and 3.7 herein, and shall complete and pay for any structure at any time in the process of construction or repair on the Land in accordance with Sections 3.6 and 3.7 herein.   Borrower shall not initiate, join in, acquiesce in, or consent to any change in any private restrictive covenant, zoning law or other public or private restriction, limiting or defining the uses which may be made of the Property or any part thereof without the prior written consent of Mortgagee.   If under applicable zoning provisions the use of all or any portion of the Property is or shall become a nonconforming use, Borrower will not cause or permit the nonconforming use to be discontinued or the nonconforming Improvement to be abandoned without the express written consent of Lender.

(b)     Borrower shall not use, maintain or operate the Property in any manner that constitutes a public or private nuisance or that makes void, voidable, or cancelable, or increases the premium of, any insurance then in force with respect thereto.   Borrower shall from time to time make, or cause to be made, all reasonably necessary and desirable repairs, renewals, replacements, betterments and improvements to the Property.   Borrower shall not make nor permit any change in the use of the Property that would materially increase the risk of fire or other hazard arising out of the operation of the Property, or do or permit to be done thereon anything that may in any way impair the value of the Property in any material respect or the lien of this Security Instrument.

Section 3.10   Waste.   Borrower shall not intentionally commit or suffer any physical waste of the Property or make any change in the use of the Property which will in any way materially increase the risk of fire or other hazard arising out of the operation of the Property, or take any action that might invalidate or give cause for cancellation of any Policy, or do or permit to be done thereon anything that may in any way impair the value of the Property or the security of this Security Instrument.   Borrower will not, without the prior written consent of Lender, permit any drilling or exploration for or extraction, removal, or production of any

minerals from the surface or the subsurface of the Land, regardless of the depth thereof or the method of mining or extraction thereof.

Section 3.11   Compliance With Laws.

(a)   Borrower shall promptly comply with all existing and future federal, state and local laws, orders, ordinances, governmental rules and regulations or court orders affecting Borrower, the Property, or the use thereof, including, without limitation, the laws more particularly described in Sections 5.26 and 5.27 (collectively, "Applicable Laws").

(b)   Borrower shall from time to time, upon Lender's request, provide Lender with evidence reasonably satisfactory to Lender that each of Borrower and the Property complies with all Applicable Laws or is exempt from compliance with Applicable Laws.

(c)   Notwithstanding any provisions set forth herein or in any document regarding Lender's approval of alterations of the Property, Borrower shall not alter the Property in any manner which would materially increase Borrower's responsibilities for compliance with Applicable Laws without the prior written approval of Lender.  Lender's approval of the plans, specifications, or working drawings for alterations of the Property shall create no responsibility or liability on behalf of Lender for their completeness, design, sufficiency or their compliance with Applicable Laws.  The foregoing shall apply to tenant improvements constructed by Borrower or by any of its tenants.  Lender may condition any such approval upon receipt of a certificate of compliance with Applicable Laws from an independent architect, engineer, or other Person acceptable to Lender.

(d)   Borrower shall give prompt notice to Lender of the receipt by Borrower of any notice related to a violation of any Applicable Laws and of the commencement of any proceedings or investigations which relate to compliance with Applicable Laws.

(e)   After prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the Applicable Laws affecting the Property, provided that (i) no Event of Default has occurred and is continuing under the Note, this Security Instrument or any of the other Loan Documents; (ii) Borrower is permitted to do so under the provisions of any other mortgage, deed of trust or deed to secure debt affecting the Property; (iii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower or the Property is subject and shall not constitute a default thereunder; (iv) neither the Property, any part thereof or interest therein, any of the tenants or occupants thereof, nor Borrower shall be affected in any material adverse way as a result of such proceeding; (v) non-compliance with the Applicable Laws shall not impose civil or criminal liability on Borrower or Lender; and (vi) Borrower shall have furnished to Lender all other items reasonably requested by Lender.

Section 3.12   Books and Records.

(a)   Borrower and any Guarantors (defined in Subsection 10.1(e)) and Indemnitor(s) (defined in Section 13.4), if any, shall keep adequate books and records of account in accordance with generally accepted accounting principles ("GAAP"), or in accordance with

other methods acceptable to Lender in its sole discretion, consistently applied and furnish to Lender:

(i)    monthly, or if the Loan (defined in Section 5.10) has been securitized or sold as a whole loan by Lender, quarterly and annual certified rent rolls signed and dated by Borrower, detailing the names of all tenants of the Improvements, the portion of Improvements occupied by each tenant, the base rent and any other charges payable under each Lease and the term of each Lease, including the expiration date, the extent to which any tenant is in default under any Lease, and any other information as is reasonably required by Lender, within thirty (30) days after the end of each calendar month, forty-five (45) days after the end of each fiscal quarter or sixty (60) days after the close of each fiscal year of Borrower, as applicable;

(ii)    on a monthly basis, operating statements of the Property for the immediately preceding month (and for previous periods if required by Lender), or if the Loan has been securitized or sold as a whole loan by Lender, quarterly and annual operating statements of the Property, all of which shall be prepared and certified by Borrower in the form required by Lender, detailing the revenues received, the expenses incurred and the net operating income before and after debt service (principal and interest) and major capital improvements for each month and containing appropriate year to date information, within thirty (30) days after the end of each calendar month, forty-five (45) days after the end of each fiscal quarter or sixty (60) days after the close of each fiscal year of Borrower, as applicable;

(iii)    an annual operating statement of the Property detailing the total revenues received, total expenses incurred, total cost of all capital improvements, total debt service and total cash flow, to be prepared and certified by Borrower in the form required by Lender within sixty (60) days after the close of each fiscal year of Borrower;

(iv)    quarterly and annual balance sheet and profit and loss statements of Borrower, any Guarantors and any Indemnitor(s) in the form required by Lender, prepared and certified by the respective Borrower, Guarantors and/or Indemnitor(s) within thirty (30) days after the end of each fiscal quarter or sixty (60) days after the close of each fiscal year of Borrower, Guarantors and Indemnitor(s), as the case may be; and

(v)    an annual operating budget presented on a monthly basis consistent with the annual operating statement described above for the Property, including cash flow projections for the upcoming year, and all proposed capital replacements and improvements at least forty-five (45) days prior to the start of each fiscal year.  Lender shall have the right to approve each such annual operating budget.

(b)    Intentionally omitted.

(c)    Borrower, any Guarantor and any Indemnitor shall furnish Lender with such other additional financial or management information (including state, commonwealth and

federal tax returns, if any) as may, from time to time, be reasonably required by Lender in form and substance satisfactory to Lender.

(d)     Borrower, any Guarantor and any Indemnitor shall furnish to Lender and its agents convenient facilities for the examination of any such books and records.

(e)     Borrower covenants and agrees that, upon Lender's written request therefor in connection with the issuance of Securities, Borrower shall, at Borrower's sole cost and expense, promptly deliver (i) audited financial statements and related documentation prepared by an independent certified public accountant that satisfy securities laws and requirements for use in a public registration statement (which may include up to three (3) years of historical audited financial statements) and (ii) if, at the time one or more disclosure documents are being prepared in connection with the issuance of Securities, Lender expects that Borrower alone or Borrower and one or more of its affiliates collectively, or the Property alone or the Property and any other parcel(s) of real property, together with improvements thereon and personal property related thereto, that is "related", within the meaning of the definition of Significant Obligor, to the Property (a "Related Property") collectively, will be a Significant Obligor, (i) the selected financial data or, if applicable, net operating income, required under Item 1112(b)(1) of Regulation AB ("Regulation AB") under the Securities Act of 1933 (the "Securities Act") and the Securities and Exchange Act of 1934 (the "Exchange Act") and meeting the requirements thereof, if Lender expects that the principal amount of the Loan, together with any loans made to an affiliate of Borrower or secured by a Related Property that is included in a securitization with the Loan (a "Related Loan"), as of the cut-off date for such securitization may, or if the principal amount of the Loan together with any Related Loans as of the cut-off date for such securitization and at any time during which the Loan and any Related Loans are included in a securitization does, equal or exceed ten percent (10%) (but less than twenty percent (20%)) of the aggregate principal amount of all mortgage loans included or expected to be included, as applicable, in the securitization or (ii) the financial statements required under Item 1112(b)(2) of Regulation AB and meeting the requirements thereof, if Lender expects that the principal amount of the Loan together with any Related Loans as of the cut-off date for such securitization may, or if the principal amount of the Loan together with any Related Loans as of the cut-off date for such securitization and at any time during which the Loan and any Related Loans are included in a securitization does, equal or exceed twenty percent (20%) of the aggregate principal amount of all mortgage loans included or expected to be included, as applicable, in the securitization. Additionally, if requested by Lender, Borrower shall furnish, or shall cause the applicable lessee to furnish, to Lender financial data and/or financial statements in accordance with Regulation AB for any lessee of the Property if, in connection with the issuance of Securities, Lender expects there to be, with respect to such lessee or any group of affiliated lessees, a concentration within all of the mortgage loans included or expected to be included, as applicable, in the applicable securitization such that such lessee or group of affiliated lessees would constitute a Significant Obligor (as defined in Item 1101(k) of Regulation AB); provided, however, that in the event the related Lease does not require the related lessee to provide the foregoing information, Borrower shall use commercially reasonable efforts to cause the applicable lessee to furnish such information. Such financial data or financial statements shall be furnished to Lender within ten (10) Business Days (as defined in the Note) after notice from Lender in connection with the preparation of a prospectus, prospectus supplement, private placement memorandum, or similar offering memorandum or offering

circular, in each case in preliminary or final form, used to offer Securities ("Disclosure Documents") and, with respect to the data or financial statements required pursuant to clause (i) hereof, (A) not later than thirty (30) days after the end of each fiscal quarter of Borrower and (B) not later than seventy-five (75) days after the end of each fiscal year of Borrower; provided, however, that Borrower shall not be obligated to furnish financial data or financial statements pursuant to clauses (A) or (B) of this sentence with respect to any period for which a filing pursuant to the Exchange Act in connection with or relating to the securitization is not required.

(f)     Borrower acknowledges the importance to Lender of the timely delivery of each of the items required by this Section 3.12 (each, a "Required Financial Item" and collectively, the "Required Financial Items"). In the event Borrower fails to deliver to Lender any of the Required Financial Items within the time frame specified herein (each such event, a "Reporting Failure") (subject to five (5) days notice and cure not more than one (1) time during any rolling twelve (12) month period during the term of the Loan), in addition to constituting an Event of Default hereunder and without limiting Lender's other rights and remedies with respect to the occurrence of such an Event of Default, Borrower shall pay to Lender the sum of $500.00 per occurrence for each Reporting Failure. It shall constitute a further Event of Default hereunder if any such payment is not received by Lender within thirty (30) days of the date on which such payment is due, and Lender shall be entitled to the exercise of all of its rights and remedies provided hereunder.

Section 3.13   Payment For Labor and Materials.  Borrower will promptly pay when due all bills and costs for labor, materials, and specifically fabricated materials incurred in connection with the Property and never permit to exist in respect of the Property or any part thereof any lien or security interest, even though inferior to the liens and the security interests hereof, and in any event never permit to be created or exist in respect of the Property or any part thereof any other or additional lien or security interest other than the liens or security interests hereof, except for the Permitted Exceptions (defined in Section 5.1).

Section 3.14   Performance of Other Agreements.  Borrower shall observe and perform each and every term to be observed or performed by Borrower pursuant to the terms of any agreement or recorded instrument affecting or pertaining to the Property, or given by Borrower to Lender for the purpose of further securing an Obligation secured hereby and any amendments, modifications or changes thereto.

Section 3.15   Change of Name, Identity or Structure.  Except as may be permitted under Article VIII hereof, Borrower will not change Borrower's name, identity (including its trade name or names) or, if not an individual, Borrower's corporate, partnership or other structure or principal place of business without first (a) notifying the Lender of such change in writing at least thirty (30) days prior to the effective date of such change, (b) taking all action required by Lender for the purpose of perfecting or protecting the lien and security interest of Lender and (c) in the case of a change in Borrower's structure, without first obtaining the prior written consent of the Lender. Borrower shall promptly notify Lender in writing of any change in its organizational identification number. If Borrower does not now have an organizational identification number and later obtains one, Borrower shall promptly notify Lender in writing of such organizational identification number.

Section 3.16   Existence.  Borrower will continuously maintain (a) its existence and shall not dissolve or permit its dissolution, (b) its rights to do business in the state or commonwealth where the Property is located and (c) its franchises and trade names, if any.

Section 3.17   Management.  The management of the Property shall be by either: (a) Borrower or an entity affiliated with Borrower approved by Lender for so long as Borrower or said affiliated entity is managing the Property in a manner consistent with similar hotels for the same class and size in midtown Manhattan; or (b) a professional property management company approved by Lender.  Such management by an affiliated entity or a professional property management company shall be pursuant to a written agreement approved by Lender.  In no event shall any manager be appointed, removed or replaced or the terms of any management agreement modified or amended without the prior written consent of Lender.  Lender shall have the right to terminate, or to direct Borrower to terminate, such management contract and to retain, or to direct Borrower to retain, a new management agent approved by Lender, all in accordance with the terms and provisions of that certain Conditional Assignment of Management Agreement of even date herewith made by and among Borrower, Lender and Leasehold Owner. All Rents generated by or derived from the Property shall first be utilized solely for current expenses directly attributable to the ownership and operation of the Property, including, without limitation, current expenses relating to Borrower's liabilities and obligations with respect to the Note, this Security Instrument and the other Loan Documents, and none of the Rents generated by or derived from the Property shall be diverted by Borrower and utilized for any other purpose unless all such current expenses attributable to the ownership and operation of the Property have been fully paid and satisfied.  If at any time Lender consents to the appointment of a new manager, such new manager and Borrower shall, as a condition of Lender's consent, execute a subordination of management agreement in the form then used by Lender.

Section 3.18   ERISA.  Borrower shall not engage in any transaction which would cause any obligation, or action taken or to be taken, hereunder (or the exercise by Lender of any of its rights under the Note, this Security Instrument or the other Loan Documents) to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under the Employee Retirement Income Security Act of 1974, as amended ("ERISA").  Borrower shall deliver to Lender such certifications or other evidence from time to time throughout the term of the Loan, as requested by Lender in its sole discretion, that (a) Borrower is not an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA, or a "governmental plan" within the meaning of Section 3(32) of ERISA; (b) Borrower is not subject to any state or commonwealth statute regulating investments of, or fiduciary obligations with respect to, governmental plans; and (c) one or more of the following circumstances is true:

(i)   Equity interests in Borrower are publicly offered securities, within the meaning of 29 C.F.R. §2510.3-101(b)(2);

(ii)   Less than twenty-five percent (25%) of each outstanding class of equity interests in Borrower is held by "benefit plan investors" within the meaning of 29 C.F.R. §2510.3-101(f)(2); or

(iii)   Borrower qualifies as an "operating company" or a "real estate operating company" within the meaning of 29 C.F.R. §2510.3-101(c) or (e).

Section 3.19  Debt Cancellation.  Borrower shall not cancel or otherwise forgive or release any claim or debt (other than termination of Leases in accordance herewith) owed to Borrower by any Person, except for adequate consideration and in the ordinary course of Borrower's business.

Section 3.20  Distributions.  Borrower agrees that there shall be no distributions to any of its direct or indirect owners (legal or beneficial) until Borrower satisfies all of its then current due and payable obligations hereunder and under the other Loan Documents, including without limitation, Borrower's obligation to pay debt service due in connection with the Loan, deposits into reserve and escrow funds required pursuant to the Loan Documents, maintenance costs, and operating expenses of the Property set forth in the budget previously submitted to and, if required pursuant to the terms hereof, approved by Lender.

Section 3.21  Material Agreements.  Borrower shall (a) promptly perform and/or observe, in all material respects, all of the covenants and agreements required to be performed and observed by it under the Material Agreements (defined below) and do all things necessary to preserve and to keep unimpaired its material rights thereunder; (b) promptly notify Lender of any material default under the Material Agreements of which it is aware; (c) promptly deliver to Lender a copy of each financial statement, business plan, capital expenditures plan, notice, report and estimate received by it under the Material Agreements; (d) enforce the performance and observance of all of the covenants and agreements required to be performed and/or observed under the Material Agreements in a commercially reasonable manner; (e) cause the Property to be operated, in all material respects, in accordance with the Material Agreements; and (f) not, without the prior written consent of Lender (i) enter into any new Material Agreement or execute modifications to any existing Material Agreements, (ii) surrender, terminate or cancel the Material Agreements, (iii) reduce or consent to the reduction of the term of the Material Agreements, (iv) increase or consent to the increase of the amount of any charges under the Material Agreements, (v) otherwise modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under, the Material Agreements in any material respect or (vi) following the occurrence and during the continuance of an Event of Default, exercise any rights, make any decisions, grant any approvals or otherwise take any action under the Material Agreements.  For the purposes of this Security Instrument, "Material Agreements" shall mean each contract and agreement relating to the ownership, management, development, use, operation, leasing, maintenance, repair or improvement of the Property, other than the property management agreement relating to the Property, if any, and the Leases, as to which either (i) there is an obligation of Borrower to pay more than $100,000.00 per annum; or (ii) the term thereof extends beyond one year (unless cancelable on thirty (30) days or less notice without requiring the payment of termination fees or payments of any kind).

Section 3.22  Franchise Agreement.  Borrower shall not modify or amend any of the terms or provisions of the Franchise Agreement without the prior written consent of Lender.

Section 3.23  Ground Lease.

(a)  Leasehold Owner shall (a) pay all rents, additional rents and other sums required to be paid by Leasehold Owner, as tenant under and pursuant to the provisions of the Ground Lease as and when such rent or other charge is payable, (b) diligently perform and

observe all of the terms, covenants and conditions of the Ground Lease on the part of Leasehold Owner, as tenant thereunder, to be performed and observed prior to the expiration of any applicable grace period therein provided, and (c) promptly notify Lender of the giving of any notice by Fee Owner to Leasehold Owner of any default by Leasehold Owner in the performance or observance of any of the terms, covenants or conditions of the Ground Lease on the part of Leasehold Owner, as tenant thereunder, to be performed or observed and deliver to Lender a true copy of each such notice.  Leasehold Owner shall not, without the prior written consent of Lender, surrender the leasehold estate created by the Ground Lease or terminate or cancel the Ground Lease or modify, change, supplement, alter or amend the Ground Lease, in any respect, either orally or in writing, and Leasehold Owner hereby collaterally assigns to Lender, as further security for the payment of the Debt and for the performance and observance of the terms, covenants and conditions of this Security Instrument, the Note and the other Loan Documents, all of the rights, privileges and prerogatives of Leasehold Owner, which rights, privileges and prerogatives may be exercised by Lender upon an Event of Default, as tenant under the Ground Lease, to surrender the leasehold estate created by the Ground Lease or to terminate, cancel, modify, change, supplement, alter or amend the Ground Lease, and any such surrender of the leasehold estate created by the Ground Lease or termination, cancellation, modification, change, supplement, alteration or amendment of the Ground Lease without the prior consent of Lender shall be void and of no force and effect.  If Leasehold Owner shall default in the performance or observance of any term, covenant or condition of the Ground Lease on the part of Leasehold Owner, as tenant thereunder, to be performed or observed, and such default shall remain uncured after the expiration of any applicable cure or grace period, then, without limiting the generality of the other provisions of this Security Instrument, the Note and the other Loan Documents, and without waiving or releasing Leasehold Owner from any of its obligations hereunder or thereunder, Lender shall have the right, but shall be under no obligation, to pay any sums and to perform any act or take any action as may be appropriate to cause all of the terms, covenants and conditions of the Ground Lease on the part of Leasehold Owner, as tenant thereunder, to be performed or observed or to be promptly performed or observed on behalf of Leasehold Owner, to the end that the rights of Leasehold Owner in, to and under the Ground Lease shall be kept unimpaired and free from default.  If Lender shall make any payment or perform any act or take action in accordance with the preceding sentence, Lender will notify Leasehold Owner of the making of any such payment, the performance of any such act, or the taking of any such action.  In any such event, Lender and any person designated by Lender shall have, and are hereby granted, the right to enter upon the Property at any time and from time to time after such default by Leasehold Owner, which remains uncured after the expiration of any applicable cure or grace period, for the purpose of taking any such action.  Lender may pay and expend such sums of money as Lender deems reasonably necessary for any such purpose and upon so doing shall be subrogated to any and all rights of Fee Owner.  Leasehold Owner hereby agrees to pay to Lender immediately upon demand therefor, all such sums so paid and expended by Lender, together with interest thereon from the day of such demand at the Default Rate.  All sums so paid and expended by Lender and the interest thereon shall be secured by the legal operation and effect of the Security Instrument.

(b)     Notwithstanding anything contained in the Ground Lease to the contrary, Leasehold Owner shall not sublease any portion of the Property except in compliance with the terms and provisions of Section 3.8 hereof.  In the event that any portion of the Property shall be

sublet pursuant to the terms of this subsection, such sublease shall be deemed to be included in the Property.

(c)     To the extent permitted by applicable law, so long as any portion of the Debt shall remain unpaid, unless Lender shall otherwise consent thereto in writing, the fee title to the Property and the leasehold estate therein created pursuant to the provisions of the Ground Lease shall not merge but shall always be kept separate and distinct, notwithstanding the union of such estates in Fee Owner, Lender, or in any other person by purchase, operation of law or otherwise.  Lender reserves the right, at any time, to release portions of the Property, including, but not limited to, the leasehold estate created by the Ground Lease, with or without consideration, at Lender's election, without waiving or affecting any of its rights under this Security Instrument or the other Loan Documents and any such release shall not affect Lender's rights in connection with the portion of the Property not so released.

(d)     (i)     If the Ground Lease is terminated for any reason in the event of the rejection or disaffirmance of the Ground Lease pursuant to the Bankruptcy Code, or any other law affecting creditor's rights, (i) the Leasehold Owner, immediately after obtaining notice thereof, shall give notice thereto to Lender, (ii) Leasehold Owner, without the prior written consent of Lender, shall not elect to treat the Ground Lease as terminated pursuant to Section 365(h) of the Bankruptcy Code or any comparable federal or state statute or law, and any election by Leasehold Owner made without such consent shall be void and (iii) this Security Instrument, the Note and the other Loan Documents and all the liens, terms, covenants and conditions of this Security Instrument, the Note and the other Loan Documents hereby extends to and covers Leasehold Owner's possessory rights under Section 365(h) of the Bankruptcy Code and to any claim for damages due to the rejection of the Ground Lease or other termination of the Ground Lease.  In addition, Leasehold Owner hereby assigns irrevocably to Lender Leasehold Owner's rights to treat the Ground Lease as terminated pursuant to Section 365(h) of the Bankruptcy Code and to offset rents under such Ground Lease in the event any case, proceeding or other action is commenced by or against Fee Owner under the Bankruptcy Code or any comparable federal or state statute or law.

(ii)     Leasehold Owner hereby assigns to Lender during the term of the Loan (i) Leasehold Owner's right to reject the Ground Lease under Section 365 of the Bankruptcy Code or any comparable federal or state statute or law with respect to any case, proceeding or other action commenced by or against Leasehold Owner under the Bankruptcy Code or comparable federal or state statute or law and (ii) Leasehold Owner's right to seek an extension of the sixty (60) day period within which Leasehold Owner must accept or reject the Ground Lease under Section 365 of the Bankruptcy Code or any comparable federal or state statute or law with respect to any case, proceeding or other action commenced by or against Leasehold Owner under the Bankruptcy Code or comparable federal or state statute or law. Further, if the foregoing assignment is not effective under applicable law and Leasehold Owner shall desire to so reject the Ground Lease, at Lender's request, Leasehold Owner shall assign its interest in the Ground Lease to Lender in lieu of rejecting the Ground Lease, upon receipt by Leasehold Owner of notice from Lender of such request together with Lender's agreement to cure any existing defaults of Leasehold Owner under the Ground Lease.

(e)     Leasehold Owner hereby agrees that if the Ground Lease is terminated for any reason in the event of the rejection or disaffirmance of the Ground Lease pursuant to the Bankruptcy Code or any other law affecting creditor's rights, any property not removed by the Leasehold Owner as permitted or required by the Ground Lease, shall at the option of Lender be deemed abandoned by Leasehold Owner, provided that Lender may remove any such property required to be removed by Leasehold Owner pursuant to the Ground Lease and all costs and expenses associated with such removal shall be paid by Leasehold Owner within five (5) days of receipt by Leasehold Owner of an invoice for such removal costs and expenses.

(f)     Notwithstanding anything to the contrary contained in the Ground Lease, Fee Owner and Leasehold Owner hereby acknowledge and agree that all operating income with respect to the Property shall be deposited and applied pursuant to the terms and conditions of the Restricted Account Agreement and the Cash Management Agreement.

## ARTICLE IV
## SPECIAL COVENANTS

Borrower represents, covenants and agrees that:

Section 4.1     Property Use.  The Property shall be used only for a hotel with ground floor retail, and for no other use, without the prior written consent of Lender.

Section 4.2     Single Purpose Entity.  It has not since the date of its formation and shall not:

(a)     fail to be organized solely for the purpose of (i) acquiring, developing, owning, managing or operating the Property, (ii) entering into this Security Instrument and the documents related hereto, and (iii) engaging in any activity that is incidental, necessary or appropriate to accomplish the foregoing;

(b)     engage in any business or activity other than the ownership, operation and/or maintenance of the Property, and activities incidental thereto;

(c)     acquire or own any material assets other than (i) in the case of Fee Owner, the Property and such incidental Personal Property as may be necessary for the operation of the Property and (ii) in the case of Leasehold Owner, a leasehold estate in the Property and such incidental Personal Property as may be necessary for the operation of the Property;

(d)     merge into or consolidate with any Person or dissolve, terminate or liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure;

(e)     fail to preserve its existence as an entity duly organized, validly existing and in good standing (if applicable) under the laws of the jurisdiction of its organization or formation, and qualification to do business in the state where the Property is located, if applicable, or without the prior written consent of Lender, amend, modify, terminate or fail to comply with the provisions of Borrower's Partnership Agreement, Articles or Certificate of

Incorporation, Articles of Organization, Certificate of Formation, Operating Agreement or similar organizational documents, as the case may be;

       (f)    own, form or acquire any subsidiary or make any investment in, any Person;

       (g)    commingle its assets with the assets of any of its members, general partners, affiliates, principals or of any other Person nor fail to hold all of its assets in its own name;

       (h)    incur any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than the Debt, except for trade payables in the ordinary course of its business of owning and operating the Property, provided that such debt (i) is unsecured, (ii) is not evidenced by a note, (iii) is paid when due and (iv) does not at any time exceed three percent (3%) of the outstanding principal amount of the Note (in the aggregate with respect to both Fee Owner and Leasehold Owner);

       (i)    become insolvent or fail to pay its debts and liabilities from its assets as the same shall become due;

       (j)    fail to maintain its records, books of account and bank accounts separate and apart from those of the members, partners, principals and affiliates of Borrower, the affiliates of a member, partner or principal of Borrower, and any other Person or fail to maintain such books and records in the ordinary course of its business;

       (k)    enter into any contract or agreement with any member, general partner, principal or affiliate of Borrower, Guarantor or Indemnitor, or any member, general partner, principal or affiliate thereof, except upon terms and conditions that are intrinsically fair, commercially reasonable and substantially similar to those that would be available on an arms-length basis with third parties other than any member, general partner, principal or affiliate of Borrower, Guarantor or Indemnitor, or any member, general partner, principal or affiliate thereof;

       (l)    seek the dissolution or winding up in whole, or in part, of Borrower;

       (m)    fail to correct any known misunderstandings regarding the separate identity of Borrower from any member, general partner, principal or affiliate thereof or any other person;

       (n)    guaranty or become obligated for the debts of any other Person or hold out its credit as being able to satisfy the debts of another Person;

       (o)    make any loans or advances to any third party, including any member, general partner, principal or affiliate of Borrower, or any member, general partner, principal or affiliate thereof, nor buy or hold evidence of indebtedness issued by any other Person (other than cash or investment grade securities);

(p)     fail to file its own tax returns nor file a consolidated federal income tax return with any other entity, unless required by law;

(q)     fail to hold itself out to the public as a legal entity separate and distinct from any other entity or person, fail to conduct its business solely in its own name, mislead others as to the identity with which such other party is transacting business, or suggest that Borrower is responsible for the debts of any third party (including any member, general partner, principal or affiliate of Borrower, or any member, general partner, principal or affiliate thereof);

(r)     fail to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

(s)     share any common logo with or hold itself out as or be considered as a department or division of (i) any general partner, principal, member or affiliate of Borrower, (ii) any affiliate of a general partner, principal or member of Borrower, or (iii) any other Person;

(t)     fail to maintain separate financial statements and accounting records, showing its assets and liabilities separate and apart from those of any other Person;

(u)     have its assets listed on the financial statement of any other entity;

(v)     fail to observe all applicable organizational formalities;

(w)     fail to pay the salaries of its own employees (if any) from its own funds;

(x)     fail to maintain a sufficient number of employees in light of its contemplated business operations;

(y)     fail to allocate fairly and reasonably any overhead expenses that are shared with an affiliate, including paying for office space and services performed by any employee of an affiliate;

(z)     fail to use separate stationery, invoices, and checks bearing its own name;

(aa)    pledge its assets for the benefit of any other Person, other than in connection with the loan secured hereby;

(bb)    acquire the obligations or securities of any member, general partner, principal or affiliate of Borrower, Guarantor or Indemnitor, or any member, general partner, principal or affiliate thereof;

(cc)    fail to maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other entity;

(dd)    have any obligation to indemnify its partners, officers, directors or members, as the case may be, or have such an obligation only if it is fully subordinated to the

Debt and will not constitute a claim against it in the event that cash flow in excess of the amount required to pay the Debt is insufficient to pay such obligation;

(ee)     fail, to the fullest extent permitted by law, to consider the interests of its creditors in connection with all actions if such entity is a corporation;

(ff)     have any of its obligations guaranteed by any member, general partner, principal or affiliate except Guarantor or Indemnitor;

(gg)     if Borrower is a single member limited liability company, fail to be organized in the State of Delaware; or

(hh)     if Borrower is a single member limited liability company, fail to have a springing member which, upon the dissolution of the sole member of Borrower or the withdrawal or the disassociation of such sole member from Borrower, shall immediately become the sole member of Borrower.

Section 4.3     Backward Representations.     From the date of Borrower's formation to the date of this Security Instrument, Borrower:

(a)     is and always has been duly formed, validly existing, and in good standing in the State of its incorporation and, from and after the date of its initial qualification in the State of New York, in all other jurisdictions where it is qualified to do business;

(b)     has no judgments or liens of any nature against it except for tax liens not yet due;

(c)     is in compliance with all laws, regulations and orders applicable to it and has received all permits necessary for it to operate its business at the Property;

(d)     is not involved in any dispute with any taxing authority;

(e)     has paid all taxes which it owes;

(f)     (i) in the case of Fee Owner, has never owned any real property other than the Property and personal property necessary or incidental to its ownership or operation of the Property and has never engaged in any business other than the ownership and operation of the Property and (ii) in the case of Leasehold Owner, has never owned any real property other than its leasehold interest in the Property and personal property necessary or incidental to its leasehold interest in the Property or operation of the Property and has never engaged in any business other than the management and operation of the Property;

(g)     except as previously disclosed to Lender in writing in connection with the closing of the Loan, is not now, nor has ever been, party to any lawsuit, arbitration, summons or legal proceeding that is still pending or that resulted in a judgment against it that has not been paid in full; and

(h)     has no material contingent or actual obligations not related to the Property.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants to Lender that:

Section 5.1     Warranty of Title.  Borrower has good title to the Property and has the right to mortgage, grant, bargain, sell, pledge, assign, warrant, transfer and convey the same and that Borrower possesses an unencumbered fee simple absolute and leasehold estate in the Land and the Improvements and that it owns both the fee and leasehold interest in the Property free and clear of all liens, encumbrances and charges whatsoever except for those exceptions shown in the title insurance policy insuring the lien of this Security Instrument (the "Permitted Exceptions").  Borrower shall forever warrant, defend and preserve the title and the validity and priority of the lien of this Security Instrument and shall forever warrant and defend the same to Lender against the claims of all Persons whomsoever.

Section 5.2     Legal Status and Authority.  (a)  Borrower (i) is duly organized, validly existing and in good standing under the laws of its state of organization or incorporation; (ii) is duly qualified to transact business and is in good standing in the state where the Property is located; and (iii) has all necessary approvals, governmental and otherwise, and full power and authority to own, operate and lease the Property.  Borrower (and the undersigned representative of Borrower, if any) has full power, authority and legal right to execute this Security Instrument, and to mortgage, grant, bargain, sell, pledge, assign, warrant, transfer and convey the Property pursuant to the terms hereof and to keep and observe all of the terms of this Security Instrument on Borrower's part to be performed.

(b)     Borrower's exact legal name is correctly set forth in the first paragraph of this Security Instrument.  Borrower is an organization of the type specified in the first paragraph of this Security Instrument.  Borrower is incorporated in or organized under the laws of the state specified in the first paragraph of this Security Instrument.  Borrower's principal place of business and chief executive office, and the place where Borrower keeps its books and records, including recorded data of any kind or nature, regardless of the medium or recording, including software, writings, plans, specifications and schematics, has been for the preceding four (4) months (or, if less than four (4) months, the entire period of the existence of Borrower) and will continue to be the address of Borrower set forth in the first paragraph of this Security Instrument (unless Borrower notifies Lender in writing at least thirty (30) days prior to the date of such change).  Fee Owner's organizational identification number, if any, assigned by the state of incorporation or organization is 4521851 and Leasehold Owner's organizational identification number, if any, assigned by the state of incorporation or organization is 4521848.

Section 5.3     Validity of Documents.     (a) The execution, delivery and performance of the Note, this Security Instrument and the other Loan Documents and the borrowing evidenced by the Note (i) are within the power and authority of Borrower; (ii) have been authorized by all requisite organizational action; (iii) have received all necessary approvals and consents, corporate, governmental or otherwise; (iv) will not violate, conflict with, result in a breach of or constitute (with notice or lapse of time, or both) a material default under any provision of law, any order or judgment of any court or governmental authority, the articles of incorporation, by-laws, partnership or trust agreement, articles of organization, operating

agreement, or other governing instrument of Borrower, or any indenture, agreement or other instrument to which Borrower is a party or by which it or any of its assets or the Property is or may be bound or affected; (v) will not result in the creation or imposition of any lien, charge or encumbrance whatsoever upon any of its assets, except the lien and security interest created hereby; and (vi) will not require any authorization or license from, or any filing with, any governmental or other body (except for the recordation of this Security Instrument in appropriate land records in the state or commonwealth where the Property is located and except for Uniform Commercial Code filings relating to the security interest created hereby); and (b) to the best knowledge of Borrower, the Note, this Security Instrument and the other Loan Documents constitute the legal, valid and binding obligations of Borrower.

Section 5.4    Litigation. Except as previously disclosed to Lender in writing in connection with the closing of the Loan, there is no action, suit or proceeding, judicial, administrative or otherwise (including any condemnation or similar proceeding), pending or, to the best of Borrower's knowledge, threatened or contemplated against Borrower, a Guarantor, if any, an Indemnitor, if any, or against or affecting the Property that (a) has not been disclosed to Lender by Borrower in writing, and has a material adverse affect on the Property or Borrower's, any Guarantor's or any Indemnitor's ability to perform its obligations under the Note, this Security Instrument or the other Loan Documents, or (b) is not adequately covered by insurance, each as determined by Lender in its sole discretion.

Section 5.5    Status of Property.

(a)    Borrower has obtained all necessary certificates, licenses and other approvals, governmental and otherwise, necessary for the operation of the Property and the conduct of its business and all required zoning, building code, land use, environmental and other similar permits or approvals, all of which are in full force and effect as of the date hereof and not subject to revocation, suspension, forfeiture or modification.

(b)    The Property and the present and contemplated use and occupancy thereof are in full compliance with all applicable zoning ordinances, building codes, land use laws, Environmental Laws, Applicable Laws and other similar laws.

(c)    The Property is served by all utilities required for the current or contemplated use thereof. All utility service is provided by public utilities and the Property has accepted or is equipped to accept such utility service.

(d)    All public roads and streets necessary for service of and access to the Property for the current or contemplated use thereof have been completed, are serviceable and all-weather and are physically and legally open for use by the public.

(e)    The Property is served by public water and sewer systems.

(f)    The Property is free from damage caused by fire or other casualty.

(g)    All costs and expenses of any and all labor, materials, supplies and equipment used in the construction of the Improvements have been paid in full.

(h)     Borrower has paid in full for, and is the owner of, all furnishings, fixtures and equipment (other than tenants' property) used in connection with the operation of the Property, free and clear of any and all security interests, liens or encumbrances, except the lien and security interest created hereby.

(i)     All liquid and solid waste disposal, septic and sewer systems located on the Property are in a good and safe condition and repair and in compliance with all Applicable Laws.

(j)     No portion of the Improvements is located in an area identified by the Secretary of Housing and Urban Development or any successor thereto as an area having special flood hazards pursuant to the Flood Insurance Acts or, if any portion of the Improvements is located within such area, Borrower has obtained and will maintain the insurance prescribed in Section 3.3 hereof.

(k)     All the Improvements lie within the boundaries of the Land.

Section 5.6     No Foreign Person.  Borrower is not a "foreign person" within the meaning of Section 1445(f)(3) of the Internal Revenue Code of 1986, as amended and the related Treasury Department regulations.

Section 5.7     Separate Tax Lot.  The Property is assessed for real estate tax purposes as one or more wholly independent tax lot or lots, separate from any adjoining land or improvements not constituting a part of such lot or lots, and no other land or improvements is assessed and taxed together with the Property or any portion thereof.

Section 5.8     Leases.  (a) Except as disclosed in the rent roll for the Property delivered to and approved by Lender in writing prior to the date hereof, (i) Borrower is the sole owner of the entire lessor's interest in the Leases; (ii) the Leases are valid and enforceable and in full force and effect; (iii) except for the Ground Lease, all of the Leases are arms-length agreements with bona fide, independent third parties; (iv) no party under any Lease is in default; (v) all Rents due have been paid in full; (vi) the terms of all alterations, modifications and amendments to the Leases are reflected in the certified occupancy statement delivered to and approved by Lender; (vii) none of the Rents reserved in the Leases have been assigned or otherwise pledged or hypothecated (except to Lender); (viii) none of the Rents have been collected for more than one (1) month in advance (except a security deposit shall not be deemed rent collected in advance); (ix) the premises demised under the Leases have been completed and the tenants under the Leases have accepted the same and have taken possession of the same on a rent-paying basis; (x) there exist no offsets or defenses to the payment of any portion of the Rents and Borrower has no monetary obligation to any tenant under any Lease; (xi) Borrower has received no notice from any tenant challenging the validity or enforceability of any Lease; (xii) there are no agreements with the tenants under the Leases other than expressly set forth in each Lease; (xiii) the Leases are valid and enforceable against Borrower and the tenants set forth therein; (xiv) no Lease contains an option to purchase, right of first refusal to purchase, or any other similar provision; (xv) no Person has any possessory interest in, or right to occupy, the Property except under and pursuant to a Lease; (xvi) each Lease is subordinate to this Security Instrument, either pursuant to its terms or a recordable subordination agreement; (xvii) no Lease

has the benefit of a non-disturbance agreement that would be considered unacceptable to prudent institutional lenders, (xviii) all security deposits relating to the Leases reflected on the certified rent roll delivered to Lender have been collected by Borrower; and (xix) no brokerage commissions or finders fees are due and payable regarding any Lease.

(b)     Notwithstanding anything contained herein to the contrary, Borrower shall not willfully withhold from Lender any information regarding renewal, extension, amendment, modification, waiver of provisions of, termination, rental reduction of, surrender of space of, or shortening of the term of, any Lease during the term of the Loan.  Borrower further covenants and agrees that all tenants at the Property as of the date hereof are in physical occupancy of the premises demised under their Leases, are paying full rent under their Leases, and have not exercised any right to "go dark" that they may have under the provisions of their Leases. Borrower further agrees to provide Lender with written notice of a tenant "going dark" under such tenant's lease within five (5) Business Days after such tenant "goes dark" and Borrower's failure to provide such notice shall constitute an Event of Default under this Security Instrument.

Section 5.9   <u>Financial Condition</u>.    (a)    (i) Borrower is solvent, and no bankruptcy, reorganization, insolvency or similar proceeding under any state or federal law with respect to Borrower has been initiated, and (ii) Borrower has received reasonably equivalent value for the granting of this Security Instrument.

(b)     No petition in bankruptcy has ever been filed by or against Borrower, any Guarantor, any Indemnitor or any related entity, or any principal, general partner or member thereof, in the last seven (7) years, and neither Borrower, any Guarantor, any Indemnitor nor any related entity, or any principal, general partner or member thereof, in the last seven (7) years has ever made any assignment for the benefit of creditors or taken advantage of any insolvency act or any act for the benefit of debtors.

Section 5.10   <u>Business Purposes</u>.  The loan evidenced by the Note secured by the Security Instrument and the other Loan Documents (the "<u>Loan</u>") is solely for the business purpose of Borrower, and is not for personal, family, household, or agricultural purposes.

Section 5.11   <u>Taxes</u>.  Borrower, any Guarantor and any Indemnitor have filed all federal, state, county, municipal, and city income and other tax returns required to have been filed by them and have paid all taxes and related liabilities which have become due pursuant to such returns or pursuant to any assessments received by them.  Neither Borrower, any Guarantor nor any Indemnitor knows of any basis for any additional assessment in respect of any such taxes and related liabilities for prior years.  Fee Owner confirms that its federal tax identification number is:  26-2224379 and Leasehold Owner confirms that its federal tax identification number is:  26-2225016.

Section 5.12   <u>Mailing Address</u>.  Borrower's mailing address, as set forth in the opening paragraph hereof or as changed in accordance with the provisions hereof, is true and correct.

Section 5.13   <u>No Change in Facts or Circumstances</u>.  All information in the application for the Loan submitted to Lender (the "<u>Loan Application</u>") and in all financing

statements, rent rolls, reports, certificates and other documents submitted in connection with the Loan Application or in satisfaction of the terms thereof, are accurate, complete and correct in all respects.  There has been no adverse change in any condition, fact, circumstance or event that would make any such information inaccurate, incomplete or otherwise misleading.

Section 5.14   Disclosure.  Borrower has disclosed to Lender all material facts and has not failed to disclose any material fact that could cause any representation or warranty made herein to be materially misleading.

Section 5.15   Third Party Representations.  Each of the representations and the warranties made by each Guarantor and Indemnitor herein or in any other Loan Document(s) is true and correct in all material respects.

Section 5.16   Illegal Activity.  No portion of the Property has been or will be purchased, improved, equipped or furnished with proceeds of any illegal activity and to the best of Borrower's knowledge, there are no illegal activities or activities relating to controlled substance at the Property.

Section 5.17   Regulations T, U and X.  Borrower does not own any "margin stock" as such term is defined in Regulation U of the Board of Governors of the Federal Reserve System (12 CFR Part 221), as amended.  Borrower will not use any part of the proceeds from the loan to be made under this Security Instrument (a) directly or indirectly, to purchase or carry any such stock or to reduce or retire any Obligations originally incurred to purchase any such stock within the meaning of such Regulation, (b) so as to involve Borrower in a violation of Regulation T, U or X of such Board (12 CFR Parts 220, 221 and 224), as amended, or (c) for any other purpose not permitted by Section 7 of the Securities Exchange Act of 1934, as amended, or any of the rules and regulations respecting the extension of credit promulgated thereunder.

Section 5.18   No Plan Assets.  As of the date hereof and throughout the term of the Loan (a) Borrower is not and will not be an "employee benefit plan," as defined in Section 3(3) of ERISA, subject to Title I of ERISA, (b) none of the assets of Borrower constitutes or will constitute "plan assets" of one or more such plans within the meaning of 29 C.F.R. Section 2510.3-101, (c) Borrower is not and will not be a "governmental plan" within the meaning of Section 3(32) of ERISA, and (d) transactions by or with Borrower are not and will not be subject to any state statute regulating investments of, or fiduciary obligations with respect to, governmental plans.

Section 5.19   No Change in Facts or Circumstances; Disclosure.  There has been no material adverse change in any condition, fact, circumstance or event that would make the financial statements, rent rolls, reports, certificates or other documents submitted in connection with the Loan inaccurate, incomplete or otherwise misleading in any material respect or that otherwise materially and adversely affects the business operations or the financial condition of Borrower or the Property.

Section 5.20   Management Agreement.  The property management agreement pursuant to which Leasehold Owner manages the Property ("Management Agreement") is in full force and effect and there is no default thereunder by any party thereto and no event has occurred

that, with the passage of time and/or the giving of notice would constitute a default thereunder. The Management Agreement was entered into on commercially reasonable terms.

Section 5.21   Perfection of Accounts.  Borrower hereby represents and warrants to Lender that:

(a)      This Security Instrument, together with the other Loan Documents, create a valid and continuing security interest (as defined in the Uniform Commercial Code) in the Accounts (as defined in the Cash Management Agreement) in favor of Lender, which security interest is prior to all other liens and is enforceable as such against creditors of and purchasers from Borrower.  Other than in connection with this Security Instrument and the other Loan Documents;

(b)      The Accounts constitute "deposit accounts" or "securities accounts" within the meaning of the Uniform Commercial Code as set forth in the Cash Management Agreement.

Section 5.22   Intentionally Omitted.

Section 5.23   Material Agreements.  With respect to each Material Agreement, Borrower hereby represents that (a) each Material Agreement is in full force and effect and has not been amended, restated, replaced or otherwise modified (except, in each case, as expressly set forth herein, (b) there are no defaults under any Material Agreement by any party thereto and, to borrower's knowledge, no event has occurred which, but for the passage of time, the giving of notice, or both, would constitute a default under any Material Agreement, (c) all payments and other sums due and payable under the Material Agreements have been paid in full, (d) no party to any Material Agreement has commenced any action or given or received any notice for the purpose of terminating any Material Agreement, and (e) the representations made in any estoppel or similar document delivered with respect to any Material Agreement in connection with the Loan are true, complete and correct and are hereby incorporated by reference as if fully set forth herein.

Section 5.24   Illegal Activity/Forfeiture.

(a)      No portion of the Property has been or will be purchased, improved, equipped or furnished with proceeds of any illegal activity and to the best of Borrower's knowledge, there are no illegal activities or activities relating to controlled substances at the Property.

(b)      There has not been and shall never be committed by Borrower or any other Person in occupancy of or involved with the operation or use of the Property any act or omission affording the federal government or any state or local government the right of forfeiture as against the Property or any part thereof or any monies paid in performance of Borrower's obligations under this Security Instrument, the Note, or the other Loan Documents.  Borrower hereby covenants and agrees not to commit, permit or suffer to exist any act or omission affording such right of forfeiture.

Section 5.25   Guarantor Representations.   Borrower hereby represents and warrants that, as of the date hereof and continuing thereafter for the term of the Loan, the representations and warranties set forth in Sections 5.13, 5.14, 5.15 and 5.19 are true and correct with respect to Guarantor, as the same are applicable to such party.   Wherever the term "Borrower" is used in each of the foregoing Sections it shall be deemed to be "Guarantor" with respect to each such party.

Section 5.26   Embargoed Person.   As of the date hereof and at all times throughout the term of the Loan, including after giving effect to any transfers of interests permitted pursuant to the Loan Documents, (a) none of the funds or other assets of Borrower, Sponsor or Guarantor constitute property of, or are beneficially owned, directly or indirectly, by any Person subject to trade restrictions under U.S. law, including but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated thereunder with the result that the investment in Borrower and/or Guarantor, as applicable (whether directly or indirectly), is prohibited by Applicable Laws or the Loan made by Lender is in violation of Applicable Laws ("Embargoed Person"); (b) no Embargoed Person has any interest of any nature whatsoever in Borrower or Guarantor, as applicable, with the result that the investment in Borrower and/or Guarantor, as applicable (whether directly or indirectly), is prohibited by Applicable Laws or the Loan is in violation of Applicable Laws; and (c) none of the funds of Borrower or Guarantor, as applicable, have been derived from any unlawful activity with the result that the investment in Borrower and/or Guarantor, as applicable (whether directly or indirectly), is prohibited by Applicable Laws or the Loan is in violation of Applicable Laws.

Section 5.27   Patriot Act.

(a)      All capitalized words and phrases and all defined terms used in the USA Patriot Act of 2001, 107 Public Law 56 (October 26, 2001) and in other statutes and all orders, rules and regulations of the United States government and its various executive departments, agencies and offices related to the subject matter of the Patriot Act, including Executive Order 13224 effective September 24, 2001 (collectively referred to in this Section only as the "Patriot Act") are incorporated into this Section.  Borrower hereby represents and warrants that Borrower and Guarantor and each and every Person affiliated with Borrower and/or Guarantor or that to Borrower's knowledge has an economic interest in Borrower, or, to Borrower's knowledge, that has or will have an interest in the transaction contemplated by this Security Instrument or in the Property or will participate, in any manner whatsoever, in the Loan, is:  (i) not a "blocked" Person listed in the Annex to Executive Order Nos. 12947, 13099 and 13224 and all modifications thereto or thereof (as used in this Section only, the "Annex"); (ii) in full compliance with the requirements of the Patriot Act and all other requirements contained in the rules and regulations of the Office of Foreign Assets Control, Department of the Treasury (as used in this Section only, "OFAC"); (iii) operated under policies, procedures and practices, if any, that are in compliance with the Patriot Act and available to Lender for their review and inspection during normal business hours and upon reasonable prior notice; (iv) not in receipt of any notice from the Secretary of State or the Attorney General of the United States or any other department, agency or office of the United States claiming a violation or possible violation of the Patriot Act; (v) not listed as a Specially Designated Terrorist or as a "blocked" Person on any lists maintained by the OFAC pursuant to the Patriot Act or any other list of terrorists or terrorist

organizations maintained pursuant to any of the rules and regulations of the OFAC issued pursuant to the Patriot Act or on any other list of terrorists or terrorist organizations maintained pursuant to the Patriot Act; (vi) not a Person who has been determined by competent authority to be subject to any of the prohibitions contained in the Patriot Act; and (vii) not owned or controlled by or now acting and or will in the future act for or on behalf of any Person named in the Annex or any other list promulgated under the Patriot Act or any other Person who has been determined to be subject to the prohibitions contained in the Patriot Act.  Borrower covenants and agrees that in the event Borrower receives any notice that Borrower or Guarantor (or any of their respective beneficial owners, affiliates or participants) or any Person that has an interest in the Property become listed on the Annex or any other list promulgated under the Patriot Act or is indicted, arraigned, or custodially detained on charges involving money laundering or predicate crimes to money laundering, Borrower shall immediately notify Lender.  At Lenders' option, it shall be an Event of Default hereunder if Borrower, Guarantor or any other party to any Loan Document becomes listed on any list promulgated under the Patriot Act or is indicted, arraigned or custodially detained on charges involving money laundering or predicate crimes to money laundering.

(b)     The Patriot Act requires all financial institutions to obtain, verify and record certain information that identifies individuals or business entities which open an "account" with such financial institution.  Consequently, Lender may from time-to-time request, and Borrower shall provide to Lender, Borrower's name, address, tax identification number and/or such other identification information as shall be necessary for Lender to comply with federal law.  An "account" for this purpose may include, without limitation, a deposit account, cash management service, a transaction or asset account, a credit account, a loan or other extension of credit, and/or other financial services product.

Section 5.28   Survival of Representations.  The representations and warranties set forth in Article V shall survive for so long as any amount remains payable to Lender under this Security Instrument or any of the other Loan Documents.

Section 5.29   No Breach of Fiduciary Duty.  No Person currently owning a direct or indirect membership or partnership interest in Borrower (nor any past or current affiliate of such Person), has breached any fiduciary duty owed by such Person to any other Person now or previously owning a direct or indirect membership or partnership interest in Borrower or any prior owner of the Property.

Section 5.30   Ground Lease.   The Ground Lease is in full force and effect and neither Fee Owner nor Leasehold Owner is in default thereunder, and there are no conditions which, with the passage of time or the giving of notice, or both, would constitute a default thereunder.

Section 5.31   Franchise Agreement.  The Franchise Agreement is in full force and effect and neither Leasehold Owner nor, to Borrower's knowledge, any other party to the Franchise Agreement, is in default thereunder, and to the best of Borrower's knowledge, there are no conditions which, with the passage of time or the giving of notice, or both, would constitute a default thereunder

Section 5.32   <u>Financial Statements</u>.   Borrower has provided Lender with complete financial statements that reflect a fair and accurate view of Borrower's financial condition.

Section 5.33   <u>Phase One</u>.   Borrower has delivered to Lender a Phase One environmental audit for the Property.

## ARTICLE VI
## OBLIGATIONS AND RELIANCE

Section 6.1   <u>Relationship of Borrower and Lender</u>.   The relationship between Borrower and Lender is solely that of debtor and creditor, and Lender has no fiduciary or other special relationship with Borrower, and no term or condition of any of the Note, this Security Instrument and the other Loan Documents shall be construed so as to deem the relationship between Borrower and Lender to be other than that of debtor and creditor.

Section 6.2   <u>No Reliance on Lender</u>.   The members, general partners, principals and (if Borrower is a trust) beneficial owners of Borrower are experienced in the ownership and operation of properties similar to the Property, and Borrower and Lender are relying solely upon such expertise and business plan in connection with the ownership and operation of the Property. Borrower is not relying on Lender's expertise, business acumen or advice in connection with the Property.

Section 6.3   <u>No Lender Obligations</u>.   Notwithstanding the provisions of Subsections 1.1(f) and (l) or Section 1.2, Lender is not undertaking the performance of (i) any obligations under the Leases; or (ii) any obligations with respect to such agreements, contracts, certificates, instruments, franchises, permits, trademarks, licenses and other documents.   By accepting or approving anything required to be observed, performed or fulfilled or to be given to Lender pursuant to this Security Instrument, the Note or the other Loan Documents, including without limitation, any officer's certificate, balance sheet, statement of profit and loss or other financial statement, survey, appraisal, or insurance policy, Lender shall not be deemed to have warranted, consented to, or affirmed the sufficiency, the legality or effectiveness of same, and such acceptance or approval thereof shall not constitute any warranty or affirmation with respect thereto by Lender.

Section 6.4   <u>Reliance</u>.   Borrower recognizes and acknowledges that in accepting the Note, this Security Instrument and the other Loan Documents, Lender is expressly and primarily relying on the truth and accuracy of the warranties and representations set forth in Article V and Article XII without any obligation to investigate the Property and notwithstanding any investigation of the Property by Lender; that such reliance existed on the part of Lender prior to the date hereof; that the warranties and representations are a material inducement to Lender in accepting the Note, this Security Instrument and the other Loan Documents; and that Lender would not be willing to make the Loan and accept this Security Instrument in the absence of the warranties and representations as set forth in Article V and Article XII.

## ARTICLE VII
## FURTHER ASSURANCES

Section 7.1    Recording of Security Instrument, etc.   Borrower forthwith upon the execution and delivery of this Security Instrument and thereafter, from time to time, will cause this Security Instrument and any of the other Loan Documents creating a lien or security interest or evidencing the lien hereof upon the Property and each instrument of further assurance to be filed, registered or recorded in such manner and in such places as may be required by any present or future law in order to publish notice of and fully to protect and perfect the lien or security interest hereof upon, and the interest of Lender in, the Property. Borrower will pay all taxes, filing, registration or recording fees, and all expenses incident to the preparation, execution, acknowledgment and/or recording of the Note, this Security Instrument, the other Loan Documents, any note or mortgage supplemental hereto, any security instrument with respect to the Property and any instrument of further assurance, and any modification or amendment of the foregoing documents, and all federal, state, commonwealth, county and municipal taxes, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of this Security Instrument, any mortgage supplemental hereto, any security instrument with respect to the Property or any instrument of further assurance, and any modification or amendment of the foregoing documents, except where prohibited by law so to do.

Section 7.2    Further Acts, etc.   Borrower will, at the cost of Borrower, and without expense to Lender, do, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, mortgages, assignments, notices of assignments, transfers and assurances as Lender shall, from time to time, require, for the better assuring, conveying, assigning, transferring, and confirming unto Lender the Property and rights hereby mortgaged, granted, bargained, sold, conveyed, confirmed, pledged, assigned, warranted and transferred or intended now or hereafter so to be, or which Borrower may be or may hereafter become bound to convey or assign to Lender, or for carrying out the intention or facilitating the performance of the terms of this Security Instrument or for filing, registering or recording this Security Instrument, or for complying with all Applicable Laws. Borrower, on demand, will execute and deliver and hereby authorizes Lender, following 10 days' notice to Borrower, to execute in the name of Borrower or without the signature of Borrower to the extent Lender may lawfully do so, (i) one or more financing statements (including, without limitation, initial financing statements, amendments thereto and continuation statements) with or without the signature of Borrower as authorized by applicable law, chattel mortgages or other instruments, to evidence more effectively the security interest of Lender in the Property, and (ii) any amendments or modifications to the Note, this Security Instrument and/or the other Loan Documents in order to correct any scrivener's errors contained herein or therein, including, without limitation, any errors with respect to the spelling of Borrower's name, the address of the Property, the legal description of the Property and/or the date of execution of the Note, this Security Instrument and/or the other Loan Documents. Borrower also ratifies its authorization for Lender to have filed any like initial financing statements, amendments thereto and continuation statements, if filed prior to the date of this Security Instrument. Borrower grants to Lender an irrevocable power of attorney coupled with an interest for the purpose of exercising and perfecting any and all rights and remedies available to Lender pursuant to this Section 7.2. To the extent not prohibited by applicable law, Borrower

hereby ratifies all acts Lender has lawfully done in the past or shall lawfully do or cause to be done in the future by virtue of such power of attorney.

Section 7.3    Changes in Tax, Debt Credit and Documentary Stamp Laws.

(a)    If any law is enacted or adopted or amended after the date of this Security Instrument which deducts the Debt from the value of the Property for the purpose of taxation or which imposes a tax, either directly or indirectly, on the Debt or Lender's interest in the Property, Borrower will pay the tax, with interest and penalties thereon, if any.  If Lender is advised by counsel chosen by it that the payment of tax by Borrower would be unlawful or taxable to Lender or unenforceable or provide the basis for a defense of usury, then Lender shall have the option, exercisable by written notice of not less than ninety (90) days, to declare the Debt immediately due and payable.

(b)    Borrower will not claim or demand or be entitled to any credit or credits on account of the Debt for any part of the Taxes or Other Charges assessed against the Property, or any part thereof, and no deduction shall otherwise be made or claimed from the assessed value of the Property, or any part thereof, for real estate tax purposes by reason of this Security Instrument or the Debt.  If such claim, credit or deduction shall be required by law, Lender shall have the option, exercisable by written notice of not less than ninety (90) days, to declare the Debt immediately due and payable.

(c)    If at any time the United States of America, any state thereof or any subdivision of any such state shall require revenue or other stamps to be affixed to the Note, this Security Instrument, or any of the other Loan Documents or impose any other tax or charge on the same, Borrower will pay for the same, with interest and penalties thereon, if any.

Section 7.4    Estoppel Certificates.

(a)    After written request by Lender, Borrower, within ten (10) days, shall furnish Lender or any proposed assignee with a statement, duly acknowledged and certified, setting forth (i) the original principal amount of the Note, (ii) the unpaid principal amount of the Note, (iii) the rate of interest of the Note, (iv) the terms of payment and maturity date of the Note, (v) the date installments of interest and/or principal were last paid, (vi) that, except as provided in such statement, there are no defaults or events which with the passage of time or the giving of notice or both, would constitute an event of default under the Note or the Security Instrument, (vii) that the Note and this Security Instrument are valid, legal and binding obligations and have not been modified or if modified, giving particulars of such modification, (viii) whether any offsets or defenses exist against the obligations secured hereby and, if any are alleged to exist, a detailed description thereof, (ix) that all Leases are in full force and effect and (provided the Property is not a residential multifamily property) have not been modified (or if modified, setting forth all modifications), (x) the date to which the Rents thereunder have been paid pursuant to the Leases, (xi) whether or not, to the best knowledge of Borrower, any of the lessees under the Leases are in default under the Leases, and, if any of the lessees are in default, setting forth the specific nature of all such defaults, (xii) the amount of security deposits held by Borrower under each Lease and that such amounts are consistent with the amounts required under each Lease, and (xiii) as to any other matters reasonably requested by Lender and

reasonably related to the Leases, the obligations secured hereby, the Property or this Security Instrument.

(b)     Borrower shall use its best efforts to deliver to Lender, promptly upon request, duly executed estoppel certificates from any one or more lessees as required by Lender attesting to such facts regarding the Lease as Lender may require, including but not limited to attestations that each Lease covered thereby is in full force and effect with no defaults thereunder on the part of any party, that none of the Rents have been paid more than one month in advance, and that the lessee claims no defense or offset against the full and timely performance of its obligations under the Lease.

(c)     Upon any transfer or proposed transfer contemplated by Section 18.1 hereof, at Lender's request, Borrower, any Guarantors and any Indemnitor(s) shall provide an estoppel certificate to the Investor (defined in Section 18.1) or any prospective Investor in such form, substance and detail as Lender, such Investor or prospective Investor may require.

Section 7.5     Flood Insurance.  After Lender's request, Borrower shall deliver evidence satisfactory to Lender that no portion of the Improvements is situated in a federally designated "special flood hazard area" or if it is, that Borrower has obtained insurance meeting the requirements of Section 3.3(a)(vi).

Section 7.6     Replacement Documents.  Upon receipt of an affidavit of an officer of Lender as to the loss, theft, destruction or mutilation of the Note or any other Loan Document which is not of public record, and, in the case of any such mutilation, upon surrender and cancellation of such Note or other Loan Document, Borrower will issue, in lieu thereof, a replacement Note or other Loan Document, dated the date of such lost, stolen, destroyed or mutilated Note or other Loan Document in the same principal amount thereof and otherwise of like tenor.

**ARTICLE VIII**
**DUE ON SALE/ENCUMBRANCE**

Section 8.1     No Sale/Encumbrance.  Borrower agrees that Borrower shall not, without the prior written consent of Lender in its sole and absolute discretion, sell, convey, mortgage, grant, bargain, encumber, pledge, assign, or otherwise transfer the Property or any part thereof or any interest therein or any direct or indirect interest in Borrower or permit the Property or any part thereof or any interest therein or any direct or indirect interest in Borrower to be sold, conveyed, mortgaged, granted, bargained, encumbered, pledged, assigned, or otherwise transferred, other than pursuant to Leases of space in the Improvements to tenants in accordance with the provisions of Section 3.8.

Section 8.2     Sale/Encumbrance Defined.  A sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment, or transfer within the meaning of this Article VIII shall be deemed to include, but not be limited to, (a) an installment sales agreement wherein Borrower agrees to sell the Property or any part thereof for a price to be paid in installments; (b) specifically excluding the Ground Lease, an agreement by Borrower leasing all or a substantial part of the Property for other than actual occupancy by a space tenant thereunder or a

sale, assignment or other transfer of, or the grant of a security interest in, Borrower's right, title and interest in and to any Leases or any Rents; (c) if Borrower, any Guarantor, any Indemnitor, or any general or limited partner or member of Borrower, any Guarantor or any Indemnitor is a corporation, any merger, consolidation or voluntary or involuntary sale, conveyance, transfer or pledge of such corporation's stock (or the stock of any corporation directly or indirectly controlling such corporation by operation of law or otherwise) or the creation or issuance of new stock in one or a series of transactions by which an aggregate of more than 10% of such corporation's stock shall be vested in a party or parties who are not now stockholders; (d) if Borrower, any Guarantor or any Indemnitor or any general or limited partner or member of Borrower, any Guarantor or any Indemnitor is a limited or general partnership or joint venture, the change, removal or resignation of a general partner or the transfer or pledge of the partnership interest of any general partner or any profits or proceeds relating to such partnership interest or the voluntary or involuntary sale, conveyance, transfer or pledge of limited partnership interests (or the limited partnership interests of any limited partnership directly or indirectly controlling such limited partnership by operation of law or otherwise); and (e) if Borrower, any Guarantor, any Indemnitor or any general or limited partner or member of Borrower, any Guarantor or any Indemnitor is a limited liability company, the change, removal or resignation of a managing member (or if no managing member, any member or non-member manager) or the transfer of the membership interest of a managing member (or if no managing member, any member) or any profits or proceeds relating to such membership interest or the voluntary or involuntary sale, conveyance, transfer or pledge of membership interests (or the membership interests of any limited liability company directly or indirectly controlling such limited liability company by operation of law or otherwise).

Section 8.3    Lender's Rights.  Lender reserves the right to condition the consent required hereunder upon a modification of the terms hereof and on assumption of the Note, this Security Instrument and the other Loan Documents as so modified by the proposed transferee, payment of a transfer fee equal to one percent (1%) of the then outstanding principal balance of the Note, and all of Lender's expenses incurred in connection with such transfer, the approval by a Rating Agency of the proposed transferee, the proposed transferee's continued compliance with the covenants set forth in this Security Instrument, including, without limitation, the covenants in Section 4.2 hereof, or such other conditions as Lender shall determine in its sole discretion to be in the interest of Lender.  All of Lender's expenses incurred shall be payable by Borrower whether or not Lender consents to the transfer.  Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of default hereunder in order to declare the Debt immediately due and payable upon Borrower's sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment, or transfer of the Property without Lender's consent.  This provision shall apply to every sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment, or transfer of the Property regardless of whether voluntary or not, or whether or not Lender has consented to any previous sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment, or transfer of the Property.

Section 8.4    Permitted One Time Transfer.  Notwithstanding the foregoing provisions of this Article VIII, until the date which is thirty (30) days following the issuance of Securities involving the Loan or any portion thereof (the "Permitted Transfer Date"), a one-time sale, conveyance or transfer of the Property in its entirety (hereinafter, "Sale") shall be permitted only with the prior written consent of Lender, which consent may be withheld by Lender in its

sole and absolute discretion.  From and after the Permitted Transfer Date, Lender shall not unreasonably withhold consent to a one-time Sale (provided no Sale has previously occurred), to any Person provided that each of the following terms and conditions are satisfied:

(a)     no Event of Default is then continuing hereunder, under the Note or under any of the other Loan Documents;

(b)     Borrower gives Lender written notice of the terms of such prospective Sale not less than thirty (30) days before the date on which such Sale is scheduled to close and, concurrently therewith, gives Lender all such information concerning the proposed transferee of the Property (hereinafter, "Buyer") as Lender would reasonably require in evaluating an initial extension of credit to a borrower and pays to Lender a non-refundable application fee in the amount of $2,500.00.  Lender shall have the right to approve or disapprove the proposed Buyer, such approval not to be unreasonably withheld.  In determining whether to give or withhold its approval of the proposed Buyer, Lender shall consider the Buyer's experience and track record in owning and operating facilities similar to the Property, the Buyer's financial strength, the Buyer's general business standing and the Buyer's relationships and experience with contractors, vendors, tenants, lenders and other business entities; provided, however, that, notwithstanding Lender's agreement to consider the foregoing factors in determining whether to give or withhold such approval, such approval shall be given or withheld based on what Lender determines to be commercially reasonable and, if given, may be given subject to such conditions as Lender may deem reasonably appropriate;

(c)     Borrower pays Lender, concurrently with the closing of such Sale, a non-refundable assumption fee in an amount equal to all out-of-pocket costs and expenses, including, without limitation, reasonable attorneys' fees, incurred by Lender in connection with the Sale plus an amount equal to one-half of one percent (0.5%) of the then outstanding principal balance of the Note.  Borrower also pays, concurrently with the closing of such Sale, all costs and expenses of all third parties and Rating Agencies in connection with the Sale;

(d)     Buyer assumes and agrees to pay the indebtedness secured hereby as and when due subject to the provisions of Article XI of the Note and, prior to or concurrently with the closing of such Sale, the Buyer executes, without any cost or expense to Lender, such documents and agreements as Lender shall reasonably require to evidence and effectuate said assumption;

(e)     Borrower and the Buyer execute, without any cost or expense to Lender, new financing statements or financing statement amendments and any additional documents reasonably requested by Lender;

(f)     Borrower delivers to Lender, without any cost or expense to Lender, such endorsements to Lender's title insurance policy, hazard insurance endorsements or certificates and other similar materials as Lender may deem necessary at the time of the Sale, all in form and substance satisfactory to Lender, including, without limitation, an endorsement or endorsements to Lender's title insurance policy insuring the lien of this Security Instrument insuring that both fee simple and leasehold title to the Property is vested in the Buyer;

(g)     Buyer shall furnish, if the Buyer is a corporation, partnership or other entity, all appropriate papers evidencing the Buyer's capacity and good standing, and the qualification of the signers to execute the assumption of the indebtedness secured hereby, which papers shall include certified copies of all documents relating to the organization and formation of the Buyer and of the entities, if any, which are partners or members of the Buyer.  The Buyer and such constituent partners, members or shareholders of Buyer (as the case may be), as Lender shall require, shall be single purpose, "bankruptcy remote" entities which satisfy the requirements of Article IV hereof and the requirements of the Rating Agencies, and whose formation documents shall be approved by counsel to Lender.

(h)     Buyer shall assume the obligations of Borrower under any management agreements pertaining to the Property or assign to Lender as additional security any new management agreement entered into in connection with such Sale;

(i)     Buyer shall furnish an opinion of counsel satisfactory to Lender and its counsel (A) that the Buyer's formation documents provide for the matters described in subparagraph (g) above, (B) that the assumption of the indebtedness evidenced hereby has been duly authorized, executed and delivered, and that the Note, this Security Instrument, the assumption agreement and the other Loan Documents are valid, binding and enforceable against the Buyer in accordance with their terms, (C) that the Buyer and any entity which is a controlling stockholder, member or general partner of Buyer, have been duly organized, and are in existence and good standing, (D) if required by Lender, that the assets of the Buyer will not be consolidated with the assets of any other entity having an interest in, or affiliation with, the Buyer, in the event of bankruptcy or insolvency of any such entity, and (E) with respect to such other matters as Lender may reasonably request;

(j)     Lender shall have received confirmation in writing from the Rating Agencies that rate the Securities or Participations (as defined in Section 18.1) to the effect that the Sale will not result in a qualification, downgrade or withdrawal of any rating initially assigned or then currently assigned or to be assigned to the Securities or Participations, as applicable (a "Rating Agency Confirmation").  If any Rating Agency shall waive, decline or refuse to review or otherwise engage any request for a Rating Agency Confirmation hereunder (hereinafter, a "RA Consent"), such RA Consent shall be deemed to eliminate, for such request only, the condition that a Rating Agency Confirmation by such Rating Agency (only) be obtained.  For purposes of clarity, any such waiver, declination or refusal to review or otherwise engage in any request for a Rating Agency Confirmation hereunder shall not be deemed a waiver, declination or refusal to review or otherwise engage in any subsequent request for a Rating Agency Confirmation hereunder, and the condition for Rating Agency Confirmation pursuant to this Security Instrument for any subsequent request shall apply regardless of any previous waiver, declination or refusal to review or otherwise engage in such prior request;

(k)     Borrower's obligations under the contract of sale pursuant to which the Sale is proposed to occur shall expressly be subject to the satisfaction of the terms and conditions of this Section 8.4; and

(l)      if required by Lender, Borrower shall make a corresponding increase in its deposits into the Escrow Fund with respect to Taxes in the event such Sale results in an increase in the real property tax assessment by the applicable taxing authority.

Section 8.5     Permitted Transfers of Ownership Interests.  Notwithstanding the foregoing provisions of this Article VIII, so long as no Event of Default has occurred and is continuing, the following transfers shall be permitted upon written notice to, but without the consent of (except as otherwise provided below), Lender:  (i) a transfer by devise or descent or by operation of law upon the death of any natural person owning a direct or indirect ownership interest in Borrower so long as the transferee of such interest is a family member, (ii) transfers of direct or indirect ownership interests in Borrower among the existing members of Borrower or the constituent owners of such members of Borrower as of the date hereof, and (iii) transfers of direct or indirect ownership interests in Borrower to persons who are not owners of direct or indirect ownership interests in Borrower as of the date hereof, so long as with respect to each such transfer in clauses (i), (ii) and (iii) above (a) Joginder Y. Sharma, directly or indirectly, continues to own not less than a fifty-one percent (51%) ownership interest in Borrower and continues at all times to control the day-to-day operation and management of Borrower, (b) following each such transfer, Borrower continues to satisfy the single purpose requirements of Section 4.2 hereof, (c) if, after giving effect to such transfer and all prior transfers, more than forty-nine percent (49%), in the aggregate, of direct or indirect interests in Borrower are owned by any person or entity and its affiliates or family members, as applicable, that owned less than a forty-nine percent (49%) direct or indirect interest in Borrower as of the date hereof, Lender receives written confirmation from the Rating Agencies that rate the Securities or Participations to the effect that such transfer will not result in a qualification, downgrade or withdrawal of any rating initially assigned or then currently assigned or to be assigned to the Securities or Participations, as applicable, (d) if the proposed transferee is a person or entity who did not previously have an ownership interest in Borrower, Lender confirms that such proposed transferee is not an Embargoed Person; and (e) Borrower pays all of the actual out-of-pocket costs and expenses of Lender and the Rating Agencies in connection with such transfer.  As used in this Section 8.5, (i) the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management, policies or activities of a person, whether through ownership of voting securities, by contract or otherwise, (ii) the term "family member" means the spouse, parents, siblings, children and grandchildren (natural or adopted) of the transferor and any trust established solely for the benefit of such transferor and/or his spouse, parents, siblings, children and grandchildren and (iii) the term "Embargoed Person" means any person, entity or government subject to trade restrictions under United States law, including, but not limited to, The USA PATRIOT Act (including the anti-terrorism provisions thereof), the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701, et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated thereunder including those related to Specially Designated Nationals and Specially Designated Global Terrorists or any person, entity or government appearing on the list of specially designated nationals and blocked persons subject to financial sanctions that is maintained by the U.S. Treasury Department, Office of Foreign Assets Control and any other similar list maintained by the U.S. Treasury Department, Office of Foreign Assets Control pursuant to any requirements of law, including, without limitation, trade embargo, economic sanctions, or other prohibitions imposed by Executive Order of the President of the United States.

## ARTICLE IX
## PREPAYMENT

Section 9.1    Prepayment.  The Debt may not be prepaid in whole or in part except in strict accordance with the express terms and conditions of the Note.

## ARTICLE X
## DEFAULT

Section 10.1    Events of Default.  The occurrence of any one or more of the following events shall constitute an "Event of Default":

(a)    if any portion of the Debt (other than the payment due on the Maturity Date (as defined in the Note)) is not paid when due or if the entire Debt is not paid on or before the Maturity Date;

(b)    if any of the Taxes or Other Charges is not paid when the same is due and payable except to the extent sums sufficient to pay such Taxes and Other Charges have been deposited with Lender in accordance with the terms of this Security Instrument;

(c)    if the Policies are not kept in full force and effect (except to the extent sums sufficient to pay the Insurance Premiums have been deposited in the Insurance Funds with Lender in accordance with the terms of this Security Instrument, no Event of Default has occurred and is then continuing, and Lender has failed to apply such funds to such payment), or if the Policies are not delivered to Lender upon request;

(d)    if Borrower violates or does not comply with any of the provisions of Section 3.12, Section 4.2 or Article VIII;

(e)    if any representation or warranty of Borrower, any Indemnitor or any Person guaranteeing payment of the Debt or any portion thereof or performance by Borrower of any of the terms of this Security Instrument (a "Guarantor"), or any member, general partner, principal or beneficial owner of any of the foregoing, made herein or in the Environmental Indemnity (defined in Section 13.4) or in any guaranty, or in any certificate, report, financial statement or other instrument or document furnished to Lender shall have been false or misleading in any material respect when made;

(f)    if (i) Borrower or any managing member or general partner of Borrower, or any Guarantor or Indemnitor shall commence any case, proceeding or other action (A) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or the Borrower or any managing member or general partner of Borrower, or any Guarantor or Indemnitor shall make a general assignment for the benefit of its creditors; or (ii) there shall be commenced against Borrower or any managing member or general partner of Borrower, or any

Guarantor or Indemnitor any case, proceeding or other action of a nature referred to in clause (i) above (specifically excluding any such proceeding commenced by Lender) which (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed, undischarged or unbonded for a period of sixty (60) days; or (iii) there shall be commenced against the Borrower or any managing member or general partner of Borrower, or any Guarantor or Indemnitor any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets which results in the entry of any order for any such relief which shall not have been vacated, discharged, or stayed or bonded pending appeal within sixty (60) days from the entry thereof (specifically excluding any such proceeding commenced by Lender); or (iv) the Borrower or any managing member or general partner of Borrower, or any Guarantor or Indemnitor shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (i), (ii), or (iii) above; or (v) the Borrower or any managing member or general partner of Borrower, or any Guarantor or Indemnitor shall be unable to, or shall admit in writing its inability to, pay its debts as they become due;

     (g)    if Borrower shall be in default beyond applicable notice and grace periods under any other mortgage, deed of trust, deed to secure debt or other security agreement covering any part of the Property whether it be superior or junior in lien to this Security Instrument;

     (h)    if the Property becomes subject to any mechanic's, materialman's or other lien other than a lien for local real estate taxes and assessments not then due and payable and the lien shall remain undischarged of record (by payment, bonding or otherwise) for a period of forty-five (45) days;

     (i)    if any federal tax lien is filed against Borrower, any member or general partner of Borrower, any Guarantor, any Indemnitor or the Property and same is not discharged of record within forty-five (45) days after same is filed;

     (j)    if any default occurs under any guaranty or indemnity executed in connection herewith (including the Environmental Indemnity) and such default continues after the expiration of applicable grace periods, if any;

     (k)    if Borrower shall fail to comply with the covenants set forth in Sections 5.26 and/or 5.27 hereof;

     (l)    if Borrower shall fail to deliver to Lender, within ten (10) days after written request by Lender, the estoppel certificates required pursuant to Section 7.4;

     (m)    if any default occurs under any other term, covenant or condition of the Note, this Security Instrument or the other Loan Documents and such default continues (i) in the case of any default which can be cured by the payment of a sum of money, for more than fifteen (15) days after notice from Lender or (ii) in the case of any other such default, for forty-five (45) days after notice from Lender, provided that if such default cannot reasonably be cured within such forty-five (45) day period and Borrower shall have commenced to cure such default within such forty-five (45) day period and thereafter diligently and expeditiously proceeds to cure the same, such forty-five (45) day period shall be extended for so long as it shall require Borrower in

the exercise of due diligence to cure such default, it being agreed that no such extension shall be for a period in excess of ninety (90) days;

(n)     if a default by Borrower occurs beyond any applicable notice or cure periods (if any) under the Franchise Agreement;

(o)     if the Franchise Agreement is terminated, cancelled, modified or expires without the prior written consent of Lender;

(p)     if a default by Borrower occurs beyond any applicable notice or cure periods (if any) under the Ground Lease; or

(q)     if the Ground Lease is terminated, cancelled, modified or expires without the prior written consent of Lender.

## ARTICLE XI
## RIGHTS AND REMEDIES

Section 11.1   <u>Remedies</u>.   Upon the occurrence of any Event of Default, Borrower agrees that Lender may take such action, without notice or demand, as it deems advisable to protect and enforce its rights against Borrower and in and to the Property, including, but not limited to, the following actions, each of which may be pursued concurrently or otherwise, at such time and in such order as Lender may determine, in its sole discretion, without impairing or otherwise affecting the other rights and remedies of Lender:

(a)     declare the entire unpaid Debt to be immediately due and payable;

(b)     institute proceedings, judicial or otherwise, for the complete foreclosure of this Security Instrument under any applicable provision of law in which case the Property or any interest therein may be sold for cash or upon credit in one or more parcels or in several interests or portions and in any order or manner;

(c)     with or without entry, to the extent permitted and pursuant to the procedures provided by applicable law, institute proceedings for the partial foreclosure of this Security Instrument for the portion of the Debt then due and payable, subject to the continuing lien and security interest of this Security Instrument for the balance of the Debt not then due, unimpaired and without loss of priority;

(d)     sell for cash or upon credit the Property or any part thereof and all estate, claim, demand, right, title and interest of Borrower therein and rights of redemption thereof, pursuant to power of sale or otherwise, at one or more sales, in one or more parcels, at such time and place, upon such terms and after such notice thereof as may be required or permitted by law;

(e)     subject to the provisions of Article XI of the Note, institute an action, suit or proceeding in equity for the specific performance of any covenant, condition or agreement contained herein, in the Note or in the other Loan Documents;

(f)    subject to the provisions of Article XI of the Note, recover judgment on the Note either before, during or after any proceedings for the enforcement of this Security Instrument or the other Loan Documents;

(g)    apply for the appointment of a receiver, trustee, liquidator or conservator of the Property, without notice and without regard for the adequacy of the security for the Debt and without regard for the solvency of Borrower, any Guarantor, Indemnitor or of any Person liable for the payment of the Debt;

(h)    subject to any applicable law, the license granted to Borrower under Section 1.2 shall automatically be revoked and Lender may enter into or upon the Property, either personally or by its agents, nominees or attorneys and dispossess Borrower and its agents and servants therefrom, without liability for trespass, damages or otherwise and exclude Borrower and its agents or servants wholly therefrom, and take possession of all books, records and accounts relating thereto and Borrower agrees to surrender possession of the Property and of such books, records and accounts to Lender upon demand, and thereupon Lender may (i) use, operate, manage, control, insure, maintain, repair, restore and otherwise deal with all and every part of the Property and conduct the business thereat; (ii) complete any construction on the Property in such manner and form as Lender deems advisable; (iii) make alterations, additions, renewals, replacements and improvements to or on the Property; (iv) exercise all rights and powers of Borrower with respect to the Property, whether in the name of Borrower or otherwise, including, without limitation, the right to make, cancel, enforce or modify Leases, obtain and evict tenants, and demand, sue for, collect and receive all Rents of the Property and every part thereof; (v) require Borrower to pay monthly in advance to Lender, or any receiver appointed to collect the Rents, the fair and reasonable rental value for the use and occupation of such part of the Property as may be occupied by Borrower; (vi) require Borrower to vacate and surrender possession of the Property to Lender or to such receiver and, in default thereof, Borrower may be evicted by summary proceedings or otherwise; and (vii) apply the receipts from the Property to the payment of the Debt, in such order, priority and proportions as Lender shall deem appropriate in its sole discretion after deducting therefrom all expenses (including reasonable attorneys' fees) incurred in connection with the aforesaid operations and all amounts necessary to pay the Taxes, Other Charges, insurance and other expenses in connection with the Property, as well as just and reasonable compensation for the services of Lender, its counsel, agents and employees;

(i)    exercise any and all rights and remedies granted to a secured party upon default under the Uniform Commercial Code, including, without limiting the generality of the foregoing:  (i) the right to take possession of the Personal Property or any part thereof, and to take such other measures as Lender may deem necessary for the care, protection and preservation of the Personal Property, and (ii) request Borrower at its expense to assemble the Personal Property and make it available to Lender at a convenient place acceptable to Lender.  Any notice of sale, disposition or other intended action by Lender with respect to the Personal Property sent to Borrower in accordance with the provisions hereof at least five (5) days prior to such action, shall constitute commercially reasonable notice to Borrower;

(j)    apply any sums then deposited in the Escrow Fund and any other sums held in escrow or otherwise by Lender in accordance with the terms of this Security Instrument or any other Loan Document to the payment of the following items in any order in its sole

discretion: (i) Taxes and Other Charges; (ii) Insurance Premiums; (iii) interest on the unpaid principal balance of the Note; (iv) amortization of the unpaid principal balance of the Note; (v) all other sums payable pursuant to the Note, this Security Instrument and the other Loan Documents, including without limitation advances made by Lender pursuant to the terms of this Security Instrument;

(k)       surrender the Policies maintained pursuant to Article III hereof, collect the unearned Insurance Premiums and apply such sums as a credit on the Debt in such priority and proportion as Lender in its discretion shall deem proper, and in connection therewith, Borrower hereby appoints Lender as agent and attorney-in-fact (which is coupled with an interest and is therefore irrevocable) for Borrower to collect such Insurance Premiums;

(l)       apply the undisbursed balance of any Net Proceeds Deficiency deposit, together with interest thereon, to the payment of the Debt in such order, priority and proportions as Lender shall deem to be appropriate in its discretion;

(m)       pursue such other remedies as Lender may have under applicable law; or

(n)       in Lender's sole discretion and at Lender's sole election, terminate the Ground Lease.

In the event of a sale, by foreclosure, power of sale, or otherwise, of less than all of the Property, this Security Instrument shall continue as a lien and security interest on the remaining portion of the Property unimpaired and without loss of priority.  Notwithstanding the provisions of this Section 11.1 to the contrary, if any Event of Default as described in clause (i) or (ii) of Subsection 10.1(f) shall occur, the entire unpaid Debt shall be automatically due and payable, without any further notice, demand or other action by Lender.

Section 11.2   <u>Application of Proceeds</u>.   The purchase money, proceeds and avails of any disposition of the Property, or any part thereof, or any other sums collected by Lender pursuant to the Note, this Security Instrument or the other Loan Documents, may be applied by Lender to the payment of the Debt in such priority and proportions as Lender in its discretion shall deem proper.

Section 11.3   <u>Right to Cure Defaults</u>.   Upon the occurrence of any Event of Default or if Borrower fails to make any payment or to do any act as herein provided, Lender may, but without any obligation to do so and without notice to or demand on Borrower and without releasing Borrower from any obligation hereunder, make or do the same in such manner and to such extent as Lender may deem necessary to protect the security hereof.  Lender is authorized to enter upon the Property for such purposes, or appear in, defend, or bring any action or proceeding to protect its interest in the Property or to foreclose this Security Instrument or collect the Debt.  The cost and expense of any cure hereunder (including reasonable attorneys' fees to the extent permitted by law), with interest as provided in this Section 11.3, shall constitute a portion of the Debt and shall be due and payable to Lender upon demand.  All such costs and expenses incurred by Lender in remedying such Event of Default or such failed payment or act or in appearing in, defending, or bringing any such action or proceeding shall bear interest at the Default Rate (as defined in the Note), for the period after notice from Lender

that such cost or expense was incurred to the date of payment to Lender.  All such costs and expenses incurred by Lender together with interest thereon calculated at the Default Rate shall be deemed to constitute a portion of the Debt and be secured by this Security Instrument and the other Loan Documents and shall be immediately due and payable upon demand by Lender therefor.

Section 11.4   <u>Actions and Proceedings</u>.  Lender has the right to appear in and defend any action or proceeding brought with respect to the Property and, after the occurrence and during the continuance of an Event of Default, to bring any action or proceeding, in the name and on behalf of Borrower, which Lender, in its discretion, decides should be brought to protect its interest in the Property.

Section 11.5   <u>Recovery of Sums Required To Be Paid</u>.  Lender shall have the right from time to time to take action to recover any sum or sums which constitute a part of the Debt as the same become due, without regard to whether or not the balance of the Debt shall be due, and without prejudice to the right of Lender thereafter to bring an action of foreclosure, or any other action, for a default or defaults by Borrower existing at the time such earlier action was commenced.

Section 11.6   <u>Examination of Books and Records</u>.   Lender, its agents, accountants and attorneys shall have the right, upon prior written notice to Borrower if no Event of Default exists, to examine and audit, during reasonable business hours, the records, books, management and other papers of Borrower and its affiliates or of any Guarantor or Indemnitor which pertain to their financial condition or the income, expenses and operation of the Property, at the Property or at any office regularly maintained by Borrower, its affiliates or any Guarantor or Indemnitor where the books and records are located.  Lender and its agents shall have the right to make copies and extracts from the foregoing records and other papers.

Section 11.7   <u>Other Rights, etc</u>.  (a)  The failure of Lender to insist upon strict performance of any term hereof shall not be deemed to be a waiver of any term of this Security Instrument.  Borrower shall not be relieved of Borrower's obligations hereunder by reason of (i) the failure of Lender to comply with any request of Borrower, any Guarantor or any Indemnitor to take any action to foreclose this Security Instrument or otherwise enforce any of the provisions hereof or of the Note or the other Loan Documents, (ii) the release, regardless of consideration, of the whole or any part of the Property, or of any Person liable for the Debt or any portion thereof, or (iii) any agreement or stipulation by Lender extending the time of payment or otherwise modifying or supplementing the terms of the Note, this Security Instrument or the other Loan Documents.

(b)     It is agreed that the risk of loss or damage to the Property is on Borrower, and Lender shall have no liability whatsoever for decline in value of the Property, for failure to maintain the Policies, or for failure to determine whether insurance in force is adequate as to the amount of risks insured.  Possession by Lender shall not be deemed an election of judicial relief, if any such possession is requested or obtained, with respect to any Property or collateral not in Lender's possession.

(c)     Lender may resort for the payment of the Debt to any other security held by Lender in such order and manner as Lender, in its discretion, may elect.  Lender may take action to recover the Debt, or any portion thereof, or to enforce any covenant hereof without prejudice to the right of Lender thereafter to foreclose this Security Instrument.  The rights of Lender under this Security Instrument shall be separate, distinct and cumulative and none shall be given effect to the exclusion of the others.  No act of Lender shall be construed as an election to proceed under any one provision herein to the exclusion of any other provision.  Lender shall not be limited exclusively to the rights and remedies herein stated but shall be entitled to every right and remedy now or hereafter afforded at law or in equity.

Section 11.8   Right to Release Any Portion of the Property.  Lender may release any portion of the Property for such consideration as Lender may require without, as to the remainder of the Property, in any way impairing or affecting the lien or priority of this Security Instrument, or improving the position of any subordinate lienholder with respect thereto, except to the extent that the obligations hereunder shall have been reduced by the actual monetary consideration, if any, received by Lender for such release, and may accept by assignment, pledge or otherwise any other property in place thereof as Lender may require without being accountable for so doing to any other lienholder.  This Security Instrument shall continue as a lien and security interest in the remaining portion of the Property.

Section 11.9   Violation of Laws.  If the Property is not in compliance with Applicable Laws, Lender may impose additional requirements upon Borrower in connection herewith including, without limitation, monetary reserves or financial equivalents.

Section 11.10   Right of Entry.  Lender and its agents shall have the right to enter and inspect the Property at all reasonable times.

Section 11.11   Subrogation.  If any or all of the proceeds of the Note have been used to extinguish, extend or renew any indebtedness heretofore existing against the Property, then, to the extent of the funds so used, Lender shall be subrogated to all of the rights, claims, liens, titles, and interests existing against the Property heretofore held by, or in favor of, the holder of such indebtedness and such former rights, claims, liens, titles, and interests, if any, are not waived but rather are continued in full force and effect in favor of Lender and are merged with the lien and security interest created herein as cumulative security for the repayment of the Debt, the performance and discharge of Borrower's obligations hereunder, under the Note and the other Loan Documents and the performance and discharge of the Other Obligations.

### ARTICLE XII
### ENVIRONMENTAL MATTERS

Section 12.1   Environmental Representations and Warranties.   Borrower represents and warrants that, to the best of Borrower's knowledge and except as otherwise specifically disclosed in the Environmental Report (as hereinafter defined):  (a) there are no Hazardous Materials (defined below) or underground storage tanks in, on, or under the Property, except those that are both (i) in compliance with Environmental Laws (defined below) and with permits issued pursuant thereto (if such permits are required), if any, and (ii) either (A) in amounts not in excess of that necessary to operate the Property or (B) fully disclosed to and

approved by Lender in writing pursuant to the written reports resulting from the environmental site assessments of the Property delivered to Lender (the "Environmental Report"); (b) there are no past, present or threatened Releases (defined below) of Hazardous Materials in violation of any Environmental Law and which would require remediation by a governmental authority in, on, under or from the Property except as described in the Environmental Report; (c) there is no threat of any Release of Hazardous Materials migrating to the Property except as described in the Environmental Report; (d) there is no past or present non-compliance with Environmental Laws, or with permits issued pursuant thereto, in connection with the Property except as described in the Environmental Report; (e) Borrower does not know of, and has not received, any written or oral notice or other communication from any Person (including but not limited to a governmental entity) relating to Hazardous Materials in, on, under or from the Property; (f) Borrower has truthfully and fully provided to Lender, in writing, any and all information relating to environmental conditions in, on, under or from the Property known to Borrower or contained in Borrower's files and records, including but not limited to any reports relating to Hazardous Materials in, on, under or migrating to or from the Property and/or to the environmental condition of the Property; (g) the Property currently displays no evidence of water infiltration or water damage; (h) there are no prior or current complaints by tenants at the Property regarding water infiltration or water damage or leaks or odors related thereto, and (i) the Property currently displays no conspicuous evidence of the growth of Microbial Matter. "Environmental Law" means any present and future federal, state and local laws, statutes, ordinances, rules, regulations, standards, policies and other government directives or requirements, as well as common law, including but not limited to the Comprehensive Environmental Response, Compensation and Liability Act and the Resource Conservation and Recovery Act, that apply to Borrower or the Property and relate to Hazardous Materials and/or Microbial Matter. "Hazardous Materials" shall mean petroleum and petroleum products and compounds containing them, including gasoline, diesel fuel and oil; explosives, flammable materials; radioactive materials; polychlorinated biphenyls ("PCBs") and compounds containing them; lead and lead-based paint; asbestos or asbestos-containing materials in any form that is or could become friable; underground or above-ground storage tanks, whether empty or containing any substance; any substance the presence of which on the Property is prohibited by any federal, state or local authority; any substance that requires special handling; and any other material or substance now or in the future defined as a "hazardous substance," "hazardous material", "hazardous waste", "toxic substance", "toxic pollutant", "contaminant", or "pollutant" within the meaning of any Environmental Law. "Release" of any Hazardous Materials includes but is not limited to any release, deposit, discharge, emission, leaking, spilling, seeping, migrating, injecting, pumping, pouring, emptying, escaping, dumping, disposing or other movement of Hazardous Materials. "Microbial Matter" shall mean fungi or bacterial matter which reproduces through the release of spores or the splitting of cells, including, but not limited to, mold, mildew and viruses, whether or not such Microbial Matter is living.

Section 12.2    Environmental Covenants.  Borrower covenants and agrees that so long as Borrower owns, manages, is in possession of, or otherwise controls the operation of the Property:  (a) all uses and operations on or of the Property, whether by Borrower or any other Person, shall be in compliance with all Environmental Laws and permits issued pursuant thereto (and Borrower shall use commercially reasonable efforts to cause hotel guests to comply with all Environmental Laws and permits issued pursuant thereto); (b) there shall be no Release of Hazardous Materials in, on, under or from the Property; (c) there shall be no Hazardous

Materials in, on, or under the Property, except those that are both (i) in compliance with all Environmental Laws and with permits issued pursuant thereto, if and to the extent required, and (ii) (A) in amounts not in excess of that necessary to operate the Property or (B) fully disclosed to and approved by Lender in writing; (d) Borrower shall keep the Property free and clear of all liens and other encumbrances imposed pursuant to any Environmental Law, whether due to any act or omission of Borrower or any other Person (the "Environmental Liens"); (e) Borrower shall, at its sole cost and expense, fully and expeditiously cooperate in all activities pursuant to Section 12.3 below, including but not limited to providing all relevant information and making knowledgeable Persons available for interviews; (f) Borrower shall, at its sole cost and expense, perform any environmental site assessment or other investigation of environmental conditions in connection with the Property (not more frequently than once per calendar year unless an Event of Default has occurred and/or the results of such assessment or investigation recommend additional assessments or investigations), pursuant to any reasonable written request of Lender detailing Lender's reasonable belief that the Property is not in full compliance with all Environmental Laws, and share with Lender the reports and other results thereof, and Lender and other Indemnified Parties shall be entitled to rely on such reports and other results thereof; (g) Borrower shall, at its sole cost and expense, comply with all reasonable written requests of Lender to (i) reasonably effectuate remediation of any Hazardous Materials in, on, under or from the Property; and (ii) comply with any Environmental Law; (h) Borrower shall not allow any tenant or other user of the Property to violate any Environmental Law (and Borrower shall use commercially reasonable efforts to cause hotel guests not to violate any Environmental Law); (i) Borrower shall immediately notify Lender in writing after it has become aware of (A) any presence or Release of Hazardous Materials in, on, under, from or migrating towards the Property; (B) any non-compliance with any Environmental Laws related in any way to the Property; (C) any actual or potential Environmental Lien; (D) any required or proposed remediation of environmental conditions relating to the Property; and (E) any written or oral notice or other communication of which Borrower becomes aware from any source whatsoever (including but not limited to a governmental entity) relating in any way to Hazardous Materials; (j) Borrower shall undertake any course of action recommended by the Environmental Protection Agency to prevent the growth of Microbial Matter; (k) Borrower shall comply with any and all local, state or federal laws, legislation, guidelines or statutes at any time in effect with respect to Microbial Matter; (l) upon Lender's request (not more frequently than once per calendar year), Borrower shall engage an engineering consultant reasonably acceptable to Lender to conduct (and such consultant shall conduct) an inspection for water damage at the Property; (m) upon Lender's request (not more frequently than once per calendar year), Borrower shall engage an environmental consultant reasonably acceptable to Lender to conduct (and such consultant shall conduct) an inspection for evidence of the growth of Microbial Matter at the Property; and (n) Borrower shall immediately adopt a remediation plan reasonably acceptable to Lender with respect to any water damage or Microbial Matter identified as a result of such environmental and/or engineering inspections.

Section 12.3   Lender's Rights.   Lender and any other Person designated by Lender, including but not limited to any representative of a governmental entity, and any environmental consultant, and any receiver appointed by any court of competent jurisdiction, shall have the right, but not the obligation, to enter upon the Property at all reasonable times upon reasonable notice to assess any and all aspects of the environmental condition of the Property and its use, including but not limited to conducting any environmental assessment or

audit (the scope of which shall be determined in Lender's sole discretion) and taking samples of soil, groundwater or other water, air, or building materials, and conducting other invasive testing. Borrower shall cooperate with and provide access to Lender and any such Person designated by Lender.

Section 12.4    Operations and Maintenance Programs.    Where recommended by the Environmental Report or as a result of any other environmental assessment or audit of the Property,  Borrower shall establish and comply with an operations and maintenance program with respect to the Property, in form and substance reasonably acceptable to Lender, prepared by an environmental consultant reasonably acceptable to Lender, which program shall address any asbestos containing material or lead based paint that may now or in the future be detected at or on the Property.  Without limiting the generality of the preceding sentence, Lender may require (a) periodic notices or reports to Lender in form, substance and at such intervals as Lender may specify, (b) an amendment to such operations and maintenance program to address changing circumstances, laws or other matters, (c) at Borrower's sole expense, supplemental examination of the Property by consultants specified by Lender, (d) access to the Property by Lender, its agents or servicer, to review and assess the environmental condition of the Property and Borrower's compliance with any operations and maintenance program, and (e) variation of the operations and maintenance program in response to the reports provided by any such consultants.

## ARTICLE XIII
## INDEMNIFICATIONS

Section 13.1    General Indemnification.

(a)      Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties (defined below) from and against any and all Losses (defined below) imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any one or more of the following:  (a) any accident, injury to or death of persons or loss of or damage to property occurring in, on or about the Property or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (b) any use, nonuse or condition in, on or about the Property or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (c) performance of any labor or services or the furnishing of any materials or other property in respect of the Property or any part thereof; (d) any failure of the Property to be in compliance with any Applicable Laws; (e) any and all claims and demands whatsoever which may be asserted against Lender by reason of any alleged obligations or undertakings on its part to perform or discharge any of the terms, covenants, or agreements contained in any Lease; or (f) the payment of any commission, charge or brokerage fee to anyone which may be payable in connection with the funding of the Loan evidenced by the Note and secured by this Security Instrument.  Any amounts payable to Lender by reason of the application of this Section 13.1 shall become immediately due and payable and shall bear interest at the Default Rate from the date loss or damage is sustained by Lender until paid.

(b)      Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless each Indemnified Party from and against any and all Losses imposed upon or incurred by or asserted against any Indemnified Party and directly or indirectly arising

out of or in any way relating to any transfer tax incurred by any Indemnified Party in connection with the exercise of remedies hereunder or under the Note or any other Loan Documents.

(c)     Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless each Indemnified Party from and against any and all Losses (including, without limitation, reasonable attorneys' fees and costs incurred in the investigation, defense, and settlement of Losses incurred in correcting any prohibited transaction or in the sale of a prohibited loan, and in obtaining any individual prohibited transaction exemption under ERISA that may be required, in Lender's sole discretion) that Lender may incur, directly or indirectly, as a result of a default under Sections 3.18 or 5.18 of this Security Instrument.

The term "Losses" shall mean any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, costs, expenses, fines, penalties, charges, fees, expenses, judgments, awards, amounts paid in settlement of whatever kind or nature actually incurred (including but not limited to reasonable attorneys' fees and other costs of defense).   The term "Indemnified Parties" shall mean (a) Lender, (b) any prior owner or holder of the Note, (c) any servicer or prior servicer of the Loan, (d) the officers, directors, shareholders, partners, members, employees and trustees of any of the foregoing, and (e) the heirs, legal representatives, successors and assigns of each of the foregoing.

Section 13.2   Mortgage and/or Intangible Tax.   Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any tax on the making and/or recording of this Security Instrument, the Note or any of the other Loan Documents.

Section 13.3   Duty to Defend; Attorneys' Fees and Other Fees and Expenses. Upon written request by any Indemnified Party, Borrower shall defend such Indemnified Party (if requested by any Indemnified Party, in the name of the Indemnified Party) by attorneys and other professionals approved by the Indemnified Parties.   Notwithstanding the foregoing, any Indemnified Parties may, in their sole discretion, engage their own attorneys and other professionals to defend or assist them, and, at the option of Indemnified Parties, their attorneys shall control the resolution of any claim or proceeding.   Upon demand, Borrower shall pay or, in the sole discretion of the Indemnified Parties, reimburse, the Indemnified Parties for the payment of reasonable fees and disbursements of attorneys, engineers, environmental consultants, laboratories and other professionals in connection therewith.

Section 13.4   Environmental Indemnity.   Simultaneously with this Security Instrument, Borrower and any other Person(s) identified therein (collectively, the "Indemnitors") have executed and delivered that certain environmental indemnity agreement dated the date hereof to Lender (the "Environmental Indemnity").

## ARTICLE XIV
## WAIVERS

Section 14.1  <u>Waiver of Counterclaim</u>.  Borrower hereby waives the right to assert a counterclaim, other than a mandatory or compulsory counterclaim, in any action or proceeding brought against it by Lender arising out of or in any way connected with this Security Instrument, the Note, any of the other Loan Documents, or the Obligations.

Section 14.2  <u>Marshalling and Other Matters</u>.  Borrower hereby waives, to the extent permitted by law, the benefit of all appraisement, valuation, stay, extension, reinstatement and redemption laws now or hereafter in force and all rights of marshalling in the event of any sale hereunder of the Property or any part thereof or any interest therein.  Further, Borrower hereby expressly waives any and all rights of redemption from sale under any order or decree of foreclosure of this Security Instrument on behalf of Borrower, and on behalf of each and every Person acquiring any interest in or title to the Property subsequent to the date of this Security Instrument and on behalf of all Persons to the extent permitted by Applicable Laws.

Section 14.3  <u>Waiver of Notice</u>.  Borrower shall not be entitled to any notices of any nature whatsoever from Lender except (a) with respect to matters for which this Security Instrument specifically and expressly provides for the giving of notice by Lender to Borrower and (b) with respect to matters for which Lender is required by Applicable Laws to give notice, and Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which this Security Instrument does not specifically and expressly provide for the giving of notice by Lender to Borrower.

Section 14.4  <u>Waiver of Statute of Limitations</u>.  Borrower hereby expressly waives and releases to the fullest extent permitted by law, the pleading of any statute of limitations as a defense to payment of the Debt or performance of its Other Obligations.

Section 14.5  <u>Sole Discretion of Lender</u>.  Wherever pursuant to this Security Instrument (a) Lender exercises any right given to it to approve or disapprove, (b) any arrangement or term is to be satisfactory to Lender, or (c) any other decision or determination is to be made by Lender, the decision of Lender to approve or disapprove, all decisions that arrangements or terms are satisfactory or not satisfactory and all other decisions and determinations made by Lender, shall be in the sole discretion of Lender, except as may be otherwise expressly and specifically provided herein.

Section 14.6  **WAIVER OF TRIAL BY JURY.  BORROWER HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER IN CONTRACT, TORT OR OTHERWISE, RELATING DIRECTLY OR INDIRECTLY TO THE LOAN EVIDENCED BY THE NOTE, THE APPLICATION FOR THE LOAN EVIDENCED BY THE NOTE, THE NOTE, THIS SECURITY INSTRUMENT OR THE OTHER LOAN DOCUMENTS OR ANY ACTS OR OMISSIONS OF LENDER, ITS OFFICERS, EMPLOYEES, DIRECTORS OR AGENTS IN CONNECTION THEREWITH.**

## ARTICLE XV
## EXCULPATION

Section 15.1    Exculpation.  The provisions of Article XI of the Note are hereby incorporated by reference to the fullest extent as if the text of such Article were set forth in its entirety herein.

## ARTICLE XVI
## NOTICES

Section 16.1    Notices.  All notices or other written communications hereunder shall be deemed to have been properly given (i) upon delivery, if delivered in person or by facsimile transmission with receipt acknowledged by the recipient thereof and confirmed by telephone by sender, (ii) one (1) Business Day (defined below) after having been deposited for overnight delivery with any reputable overnight courier service, or (iii) three (3) Business Days after having been deposited in any post office or mail depository regularly maintained by the U.S. Postal Service and sent by registered or certified mail, postage prepaid, return receipt requested, addressed to Borrower or Lender, as the case may be, at the addresses set forth on the first page of this Security Instrument or addressed as such party may from time to time designate by written notice to the other parties.

Notices to Borrower shall be addressed to the attention of Ronica Sharma at 302 West 47th Street, New York, New York 10036.  Borrower's telephone number is (212) 246-1991 and facsimile number is (212) 246-0263.  Copy to the attention of Hugh Finnegan, Esq. of Sullivan & Worcester LLP, 1290 Avenue of the Americas, New York, New York 10104.  Mr. Finnegan's telephone number is (212) 660-3027 and facsimile number is (212) 660-3001.

Either party by notice to the other may designate additional or different addresses for subsequent notices or communications.

For purposes of this Subsection, "Business Day" shall mean a day on which commercial banks are not authorized or required by law to close in New York, New York.

## ARTICLE XVII
## APPLICABLE LAW

Section 17.1    Choice of Law.  This Security Instrument shall be governed, construed, applied and enforced in accordance with the laws of the state in which the Property is located.

Section 17.2    Provisions Subject to Applicable Law.  All rights, powers and remedies provided in this Security Instrument may be exercised only to the extent that the exercise thereof does not violate any applicable provisions of law and are intended to be limited to the extent necessary so that they will not render this Security Instrument invalid, unenforceable or not entitled to be recorded, registered or filed under the provisions of any Applicable Laws.

## ARTICLE XVIII
## SECONDARY MARKET

Section 18.1   <u>Transfer of Loan</u>.  Lender may, at any time, sell, transfer or assign the Note, this Security Instrument and the other Loan Documents, and any or all servicing rights with respect thereto, or grant participations therein (the "<u>Participations</u>") or issue mortgage pass-through certificates or other securities evidencing a beneficial interest in a rated or unrated public offering or private placement (the "<u>Securities</u>").  Lender may forward to each purchaser, transferee, assignee, servicer, participant, or investor in such Participations or Securities (collectively, the "<u>Investor</u>") or any Rating Agency rating such Securities, each prospective Investor, and any organization maintaining databases on the underwriting and performance of commercial mortgage loans, all documents and information which Lender now has or may hereafter acquire relating to the Debt and to Borrower, any Guarantor, any Indemnitor(s) and the Property, whether furnished by Borrower, any Guarantor, any Indemnitor(s) or otherwise, as Lender determines necessary or desirable.  Borrower irrevocably waives any and all rights it may have under Applicable Laws to prohibit such disclosure, including but not limited to any right of privacy.

Section 18.2   <u>Cooperation</u>.  Borrower, Guarantor and Indemnitor agree to cooperate with Lender in connection with any transfer made or any Securities created pursuant to this Article XVIII, including, without limitation, the taking, or refraining from taking, of such action as may be necessary to satisfy all of the conditions of any Investor, the delivery of an estoppel certificate required in accordance with Subsection 7.4(c) hereof and such other documents as may be reasonably requested by Lender, and the execution of amendments to the Note, this Security Instrument and other Loan Documents and Borrower's organizational documents as reasonably requested by Lender; provided that the costs incurred for such cooperation shall be paid by Lender, up to an amount not exceeding $10,000.00 in the aggregate, and no changes to the Loan Documents shall be required which will have a material adverse economic impact on Borrower, Guarantor or Indemnitor. Borrower shall also furnish and Borrower, Guarantor and Indemnitor consent to Lender furnishing to such Investors or prospective Investors or any Rating Agency any and all information concerning the Property, the Leases, the financial condition of Borrower, Guarantor and Indemnitor as may be requested by Lender, any Investor, any prospective Investor or any Rating Agency in connection with any sale, transfer or Participations or Securities and shall indemnify and hold Lender harmless (and for purposes of this Section 18.2, Lender hereunder shall include its officers and directors), the affiliate of Lender (together with Lender, "<u>Morgan Stanley</u>") that has filed the registration statement relating to the Securities (the "<u>Registration Statement</u>"), each of its directors, each of its officers who have signed the Registration Statement and each Person that controls the affiliate within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act (collectively, the "<u>Morgan Stanley Group</u>"), and Lender, and any other placement agent or underwriter with respect to the Securities, each of their respective directors and each Person who controls Morgan Stanley or any other placement agent or underwriter within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act (collectively, the "<u>Underwriter Group</u>") for any losses, claims, damages or liabilities (collectively, the "<u>Liabilities</u>") to which Lender, the Morgan Stanley Group or the Underwriter Group may become subject insofar as the Liabilities arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in Disclosure Document or arise out of or

are based upon the omission or alleged omission to state therein a material fact required to be stated in the Disclosure Document or necessary in order to make the statements in the Disclosure Document, in light of the circumstances under which they were made, not misleading and agreeing to reimburse Lender, the Morgan Stanley Group and/or the Underwriter Group for any legal or other expenses reasonably incurred by Lender, the Morgan Stanley Group and the Underwriter Group in connection with investigating or defending the Liabilities; provided, however, that Borrower will be liable in any such case under this Section 18.2 only to the extent that any such loss claim, damage or liability arises out of or is based upon any such untrue statement or omission made therein in reliance upon and in conformity with information furnished to Lender by or on behalf of Borrower in connection with the preparation of the Disclosure Document or in connection with the underwriting or closing of the Loan, including, without limitation, financial statements of Borrower, operating statements and rent rolls with respect to the Properties.  This indemnity agreement will be in addition to any liability which Borrower may otherwise have and shall survive the termination of this Security Instrument and the satisfaction and discharge of the Debt.

## ARTICLE XIX
## COSTS

Section 19.1  Performance at Borrower's Expense.  Borrower acknowledges and confirms that Lender shall impose certain administrative processing and/or commitment fees (including, without limitation, loan servicing or special servicing fees) in connection with (a) the extension, renewal, modification, amendment and termination of the Loan, (b) the release or substitution of collateral therefor, (c) obtaining certain consents, waivers and approvals with respect to the Property, or (d) the review of any Lease or proposed Lease or the preparation or review of any subordination, non-disturbance agreement (the occurrence of any of the above shall be called an "Event").  Borrower further acknowledges and confirms that it shall be responsible for the payment of all costs of reappraisal of the Property or any part thereof, whether required by law, regulation, Lender or any governmental or quasi-governmental authority.  Borrower hereby acknowledges and agrees to pay, immediately, with or without demand, all such fees (as the same may be increased or decreased from time to time), and any additional fees of a similar type or nature which may be imposed by Lender from time to time, upon the occurrence of any Event or otherwise.  Wherever it is provided for herein that Borrower pay any costs and expenses, such costs and expenses shall include, but not be limited to, all reasonable legal fees and disbursements of Lender, whether with respect to retained firms, the reimbursement for the expenses of in-house staff or otherwise.

Section 19.2  Legal Fees for Enforcement.  (a) Borrower shall pay all reasonable legal fees incurred by Lender in connection with (i) the preparation of the Note, this Security Instrument and the other Loan Documents and (ii) the items set forth in Section 19.1 above, and (b) Borrower shall pay to Lender on demand any and all expenses, including legal expenses and attorneys' fees, incurred or paid by Lender in protecting its interest in the Property or in collecting any amount payable hereunder or in enforcing its rights hereunder with respect to the Property, whether or not any legal proceeding is commenced hereunder or thereunder, together with interest thereon at the Default Rate from the date paid or incurred by Lender until such expenses are paid by Borrower, and all "special servicing" fees following an Event of Default, "workout" and/or "liquidation" fees (or their equivalent).

## ARTICLE XX
## DEFINITIONS

Section 20.1   <u>General Definitions</u>.   Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, words used in this Security Instrument may be used interchangeably in singular or plural form and the word "Borrower" shall mean "each Borrower and any subsequent owner or owners of the Property or any part thereof or any interest therein," the word "Lender" shall mean "Lender and any subsequent holder of the Note," the word "Note" shall mean "the Note and any other evidence of indebtedness secured by this Security Instrument," the word "Property" shall include any portion of the Property and any interest therein, and the phrases "attorneys' fees" and "counsel fees" shall include any and all attorneys', paralegal and law clerk fees and disbursements, including, but not limited to, fees and disbursements at the pre-trial, trial and appellate levels incurred or paid by Lender in protecting its interest in the Property, the Leases and the Rents and enforcing its rights hereunder.

Section 20.2   <u>Headings, etc</u>.   The headings and captions of various Articles and Sections of this Security Instrument are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

## ARTICLE XXI
## MISCELLANEOUS PROVISIONS

Section 21.1   <u>No Oral Change</u>.   This Security Instrument, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

Section 21.2   <u>Liability</u>.   If Borrower consists of more than one Person, the obligations and liabilities of each such Person hereunder shall be joint and several. This Security Instrument shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and assigns forever.

Section 21.3   <u>Inapplicable Provisions</u>.   If any term, covenant or condition of the Note or this Security Instrument is held to be invalid, illegal or unenforceable in any respect, the Note and this Security Instrument shall be construed without such provision. ·

Section 21.4   <u>Duplicate Originals; Counterparts</u>.   This Security Instrument may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original. This Security Instrument may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute a single Security Instrument. The failure of any party hereto to execute this Security Instrument, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

Section 21.5   <u>Number and Gender</u>.   Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

Section 21.6    Brokers and Financial Advisors.   Borrower hereby represents that it has dealt with no financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the transactions contemplated by this Security Instrument other than Estreich & Company ("Broker").   Borrower shall be responsible for paying any fees or commissions payable to Broker pursuant to a separate written agreement between Borrower and Broker. Borrower shall indemnify, defend and hold Lender harmless from and against any and all claims, liabilities, costs and expenses of any kind (including Lender's attorneys' fees and expenses) in any way relating to or arising from a claim by any person or entity (including, without limitation, Broker) that such person or entity acted on behalf of Borrower or Lender in connection with the transactions contemplated herein.   The provisions of this Section 21.6 shall survive the expiration and termination of this Security Instrument and the payment of the Debt.

**ARTICLE XXII**
**SPECIAL NEW YORK PROVISIONS**

Section 22.1    Principles of Construction.   In the event of any inconsistencies between the terms and provisions of this Security Instrument and Article XXII of this Security Instrument, the terms and provisions of this Article XXII shall govern and control.

Section 22.2    Trust Fund.   Pursuant to Section 13 of the New York Lien Law, Borrower shall receive the advances secured hereby and shall hold the right to receive the advances as a trust fund to be applied first for the purpose of paying the cost of any improvement and shall apply the advances first to the payment of the cost of any such improvement on the Property before using any part of the total of the same for any other purpose.

Section 22.3    Commercial Property.   Borrower represents that this Security Instrument does not encumber real property principally improved or to be improved by one or more structures containing in the aggregate not more than six residential dwelling units, each having its own separate cooking facilities.

Section 22.4    Insurance.   The provisions of subsection 4 of Section 254 of the New York Real Property Law covering the insurance of buildings against loss by fire shall not apply to this Security Instrument.   In the event of any conflict, inconsistency or ambiguity between the provisions of this Security Instrument or of any other Loan Document and the provisions of subsection 4 of Section 254 of the New York Real Property Law covering the insurance of buildings against loss by fire, the Loan Documents shall control.

Section 22.5    Section 291-f Agreement.   This Security Instrument is intended to be, and shall operate as, the agreement described in Section 291-f of the Real Property Law of the State of New York and shall be entitled to the benefits afforded thereby.   Borrower hereby covenants and agrees that Borrower shall not, without the consent of Lender, (i) amend, modify or waive the provisions of any Lease or terminate, reduce rents under or shorten the term of any Lease, except pursuant to and in accordance with the provisions of this Security Instrument, or (ii) collect any Rents (exclusive of security deposits) more than thirty (30) days in advance of the time when the same shall become due.   Borrower shall deliver notice of this Security Instrument in form and substance reasonably acceptable to Lender, to all present and future holders of any interest in any Lease, by assignment or otherwise, and shall take such other action as may now or

hereafter be reasonably required to afford Lender the full protections and benefits of Section 291-f of the Real Property Law. Borrower shall request the recipient of any such notice to acknowledge the receipt thereof.

Section 22.6   Statutory Construction.   The clauses and covenants contained in this Security Instrument that are construed by Section 254 of the New York Real Property Law shall be construed as provided in those sections (except as provided in Section 8.4 above). The additional clauses and covenants contained in this Security Instrument shall afford rights supplemental to and not exclusive of the rights conferred by the clauses and covenants construed by Section 254 and shall not impair, modify, alter or defeat such rights (except as provided in Section 8.4 above), notwithstanding that such additional clauses and covenants may relate to the same subject matter or provide for different or additional rights in the same or similar contingencies as the clauses and covenants construed by Section 254. The rights of Lender arising under the clauses and covenants contained in this Security Instrument shall be separate, distinct and cumulative and none of them shall be in exclusion of the others. No act of Lender shall be construed as an election to proceed under any one provision herein to the exclusion of any other provision, anything herein or otherwise to the contrary notwithstanding. In the event of any inconsistencies between the provisions of Section 254 and the provisions of this Security Instrument or any other Loan Document, the Loan Documents shall prevail.

Section 22.7   Maximum Principal Amount Secured. Notwithstanding anything to the contrary contained in this Security Instrument, the maximum amount of principal indebtedness secured by this Security Instrument or which under any contingency may be secured by this Security Instrument is $11,500,000.00, plus all amounts expended by Lender after an Event of Default to enforce, defend and/or maintain the lien of this Security Instrument or to protect the Property, or the value thereof, including, without limitation, all amounts in respect of insurance premiums and all real estates taxes, charges or assessments imposed by law upon said premises, or any other amount, cost or charge to which Lender may become subrogated upon payment as a result of Borrower's failure to pay as required by the terms of this Security Instrument, plus all accrued but unpaid interest, late charges and prepayment premiums payable in connection with the Indebtedness secured hereby.

Section 22.8   Power of Sale.   In addition to any other remedies provided to Lender hereunder or the other Loan Documents, upon the occurrence and during the continuance of an Event of Default and upon Lender's exercise of its remedies hereunder, to the extent permitted by applicable law, Lender or the agent or successor of Lender may sell or offer for sale the Property in such portions, order and parcels as Lender may determine, with or without having first taken possession of same, in accordance with the terms and provisions of Article 14 of the New York Real Property Actions and Proceedings Law.

Section 22.9   Cooperation with Future Assignment.   Notwithstanding anything to the contrary contained herein, upon prepayment or maturity of the Loan (pursuant to and in accordance with the terms of the Note) and simultaneous repayment in full of the Note, if Borrower desires an assignment of the Note and this Security Instrument to a new lender in order to save mortgage recording tax, Lender shall assign the Note and this Security Instrument, each without recourse, covenant or warranty of any nature, express or implied, to such new lender designated by Borrower (other than Borrower or a nominee of Borrower) provided that (i)

Borrower pays Lender's reasonable attorney's fees for the preparation, delivery and performance of such an assignment; (ii) such new lender shall materially modify or amend and restate the Note and this Security Instrument such that it shall be treated as a new loan for federal tax purposes; (iii) such an assignment is not then prohibited by any federal, state or local law, rule, regulation, order or by any other governmental authority; (iv) to the extent applicable, such assignment and the actions described above do not constitute a prohibited transaction for any REMIC Trust and will not disqualify such REMIC Trust as a "real estate mortgage investment conduit" within the meaning of Section 860D of the IRS Code as a result of such assignment; and (v) Borrower provides such items, information and documents which a prudent lender would require to effectuate such assignment.

**[NO FURTHER TEXT ON THIS PAGE]**

IN WITNESS WHEREOF, THIS SECURITY INSTRUMENT has been executed by Borrower and Lender the day and year first above written.

**BORROWER**:

767 8TH AVENUE LLC,
a Delaware limited liability company

By:    767 Holding Corp.,
       a New York corporation,
       its sole member and manager

       By: _____
       Name: Joginder Y. Sharma
       Title: President


SHERMAN MANAGEMENT LLC,
a Delaware limited liability company

By:    Sherman Equities Inc.,
       a New York corporation,
       its sole member and manager

       By: _____
       Name: Joginder Y. Sharma
       Title: President


**LENDER**:

MORGAN STANLEY MORTGAGE CAPITAL
HOLDINGS LLC, a New York limited liability
company


By: _____
Name:
Title:


[Signature page to Consolidated, Amended and Restated Mortgage and Security Agreement]

IN WITNESS WHEREOF, THIS SECURITY INSTRUMENT has been executed by Borrower and Lender the day and year first above written.

**BORROWER**:

767 8TH AVENUE LLC,
a Delaware limited liability company

By:    767 Holding Corp.,
a New York corporation,
its sole member and manager

By: _____
Name:  Joginder Y. Sharma
Title:  President

SHERMAN MANAGEMENT LLC,
a Delaware limited liability company

By:    Sherman Equities Inc.,
a New York corporation,
its sole member and manager

By: _____
Name:  Joginder Y. Sharma
Title:  President

**LENDER**:

MORGAN STANLEY MORTGAGE CAPITAL HOLDINGS LLC, a New York limited liability company

By: _____
Name:
Title:

Cynthia Eckes
Authorized Signatory

[Signature page to Consolidated, Amended and Restated Mortgage and Security Agreement]

NJ01/FOLEB/165815

BORROWER'S ACKNOWLEDGMENTS

STATE OF NEW YORK           )
                            )  ss.
COUNTY OF NEW YORK          )

       On the ___ day of ___ in the year 2012 before me, the undersigned, a notary public in and for said state, personally appeared Joginder Y. Sharma, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

                                    CYRIL DERZIE
                              NOTARY PUBLIC, State of New York
                                    No. 02DE6127675
                               Qualified in Nassau County
                              Commission Expires May 31, 2013

[Notary Seal]              My commission expires:_____

STATE OF NEW YORK           )
                            )  ss.
COUNTY OF NEW YORK          )

       On the ___ day of ___ in the year 2012 before me, the undersigned, a notary public in and for said state, personally appeared Joginder Y. Sharma, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

                                    _____
                                          Notary Public

                                          CYRIL DERZIE
                              NOTARY PUBLIC, State of New York
[Notary Seal]              My commission expires:____ No. 02DE6127675
                               Qualified in Nassau County
                              Commission Expires May 31, 2013



LENDER'S ACKNOWLEDGMENT

STATE OF NEW YORK        )
                         )        ss.
COUNTY OF NEW YORK       )

On the _7th_ day of _MAY_ in the year 2012 before me, the undersigned, a notary public in and for said state, personally appeared _CYNTHIA ECKES_ personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

LESLIE RUSSO
Notary Public, State of New York
No. 01RU6232298
Qualified in New York County
Commission Expires Dec. 6, 2014

_____
Notary Public

[Notary Seal]        My commission expires: _12·6·2014_

NJ01/FOLEB/165815

EXHIBIT A

Legal Description of Property

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, County, City and State of New York, bounded and described as follows:

BEGINNING at the corner formed by the intersection of the westerly line of Eighth Avenue with the southerly line of 47th Street;

RUNNING THENCE southerly along the westerly line of Eighth Avenue, 25 feet;

THENCE westerly and parallel with 47th Street, 100 feet;

THENCE northerly and parallel with Eighth Avenue, 25 feet to the southerly line of 47th Street;

THENCE easterly along the southerly line of 47th Street, 100 feet to the point or place of BEGINNING.

**Tax Map Designation:  Section 4 Block 1037 Lot 36**

EXHIBIT B
Original Mortgage and Gap Mortgage

1. Replacement Fee and Leasehold Mortgage (Mortgage A) made by 767 8th Avenue LLC and Sherman Management LLC to North Hill Funding of New York LLC, in the amount of $8,950,000.00, dated 7/20/2009 and recorded on 8/5/2009 under CRFN 2009000242246.

Note: Created pursuant to the Severance Agreement recorded under CRFN 2009000242245.

Which Mortgage was assigned by Assignment of Mortgage from North Hill Funding of New York LLC to Madison National Bank, dated 7/20/2009 and recorded on 8/5/2009 under CRFN 2009000242247.

Which Mortgage was modified and extended by terms of a Mortgage Modification and Extension Agreement made between 767 8th Avenue LLC and Sherman Management LLC and Madison National Bank, dated 7/20/2009 and recorded on 8/5/2009 under CRFN 2009000242248.

Which Mortgage was further assigned in the reduced amount of $8,533,522.12 by Assignment of Mortgage from Madison National Bank to Morgan Stanley Mortgage Capital Holdings LLC, dated May 3, 2012 and being recorded immediately prior hereto.

2. Replacement Fee and Leasehold Mortgage (Mortgage B) made by 767 8th Avenue LLC and Sherman Management LLC to North Hill Funding of New York LLC, in the amount of $2,500,000.00, dated 7/20/2009 and recorded on 8/5/2009 under CRFN 2009000242249.

Note: Created pursuant to the Severance Agreement recorded under CRFN 2009000242245.

Which Mortgage was assigned by Assignment of Mortgage from North Hill Funding of New York LLC to Omni Vertex, Incorporated, dated 7/16/2009 and recorded on 8/5/2009 under CRFN 2009000242250.

Which Mortgage was modified and extended by terms of a Mortgage Modification and Extension Agreement made between 767 8th Avenue LLC and Sherman Management LLC and Omni Vertex, Incorporated, dated 7/20/2009 and recorded on 8/5/2009 under CRFN 2009000242251.

Which Mortgage was further assigned in the reduced amount of $2,366,967.74 by Assignment of Mortgage from Omni Vertex, Incorporated to Morgan Stanley Mortgage Capital Holdings LLC, dated May 8, 2012 and being recorded immediately prior hereto.

3. Gap Mortgage made by 767 8th Avenue LLC and Sherman Management LLC, as mortgagor, to Morgan Stanley Mortgage Capital Holdings LLC, a New York limited liability company, as mortgagee, in the amount of $599,510.14 dated May 9, 2012 and being recorded immediately prior hereto.